IN THE UNITED STATES DSITRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| FEDERAL FIREARMS<br>LICENSEES OF ILLINOIS, *et al.*,<br><br>    **Plaintiffs,**<br><br>vs.<br><br>JAY ROBERT "J.R." PRITZKER, et al.,<br><br>    **Defendants.** | Case No. 3:23-215-SPM |

## **PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

Plaintiffs FEDERAL FIREARMS LICENSEES ("FFL-IL"), GUNS SAVE LIFE ("GSL"), GUN OWNERS OF AMERICA ("GOA"), GUN OWNERS FOUNDATION ("GOF"), PIASA ARMORY ("PIASA"), DEBRA CLARK ("Clark"), JASMINE YOUNG ("Young"), and CHRIS MOORE ("Moore") ("Plaintiffs"), by counsel, pursuant to Fed. R. Civ. Proc. 65, move this Court to enjoin Defendants JAY ROBERT "J.R." PRITZKER, KWAME RAOUL, and BRENDAN F. KELLY ("Defendants") from enforcing 720 ILCS 5/24-1.9, et seq. ("Firearms Ban") for the following reasons:

### **INTRODUCTION**

Illinois' Firearms Ban bans the most popular firearm models in the Nation—firearms that are commonly possessed, lawfully owned, and safely operated by millions of Americans with no special restrictions, in all but a few states. To achieve such a broad ban, Illinois classifies as "assault weapons": (1) dozens of specific, popular firearms by their make and model; and (2) any rifle, shotgun, or pistol having certain common features that are the hallmarks of the most popular firearm models.

By banning these common firearms, the Firearms Ban defies Supreme Court precedent, which establishes that the "arms" protected by the Second Amendment "extend[], prima facie, to all instruments that constitute bearable arms," and, at a minimum, include those "typically possessed by law-abiding citizens for lawful purposes" today. *District of Columbia v. Heller,* 554 U.S. 570, 582, 625 (2008) *("Heller"); see also, e.g., Caetano v. Massachusetts,* 577 U.S. 411, 412 (2016). The Supreme Court has found that semiautomatic rifles, including rifles prohibited by Illinois, "traditionally have been widely accepted as lawful possessions." *Staples v. United*

1

*States,* 511 U.S. 600, 612 (1994). And considering the recent Supreme Court ruling that reaffirmed that modern gun control laws withstand constitutional scrutiny only if the government meets its burden to prove that the law is in line with the Nation's historical tradition of firearm regulation *(N.Y. State Rifle & Pistol Ass'n v. Bruen,* 597 U.S. __, 142 S. Ct. 2111, 2126 (2022) *("Bruen"))*, this Court can and should promptly dispose of the Firearms Ban as there is no historical tradition on which Illinois can rely to support banning possession of these commonly owned firearms. *See, e.g., United States v. Rahimi,* No. 21-11001, 2023 U.S. App. LEXIS 2693, *18-28 (5th Cir. Feb. 2, 2023) (holding that 18 U.S.C. § 922(g)(8) violates the Second Amendment because banning gun ownership in civil domestic violence cases in inconsistent with the Nation's historical tradition of firearm regulation); *United States v. Harrison,* No. 22-00328, 2023 U.S. Dist. LEXIS 18397, at *10-21, 54 (W.D. Okla. Feb. 3, 2023) (holding that 18 U.S.C. § 922(g)(3) violates the Second Amendment because banning gun ownership by marijuana users is inconsistent with the Nation's historical tradition of firearm regulation).

**FACTUAL BACKGROUND**

On January 10, 2023, Illinois adopted the Firearms Ban, a sweeping package of gun control laws that, among other things, bans many of the most commonly owned firearms in America. The new law makes it "unlawful for any person within this State to knowingly manufacture, deliver, sell, import, or purchase or cause to be manufactured, delivered, sold, imported, or purchased by another, an assault weapon, [and] assault weapon attachment[.]" 720 ILCS 5/24-1.9(b). This "emergency" ban on acquiring and transferring "assault weapons" took immediate effect. *Id.* After January 1, 2024, the ban applies to mere possession of such arms for those who do not register them by that date. 720 ILCS 5/24-1.9(d).

The Firearms Ban purports to ban only a subclass of firearms pejoratively labeled "assault weapons." But the term "assault weapon," is a political creation of anti-gun politicians, a non-technical and imprecise legal term with no agreed-upon definition or scope, under which the Firearms Ban sweeps up countless common firearms.

Before 1989, "'the term 'assault weapon' did not exist in the lexicon of firearms. It is a political term, developed by anti-gun publicists to expand the category of 'assault rifles' so as to allow an attack on as many additional firearms as possible on the basis of undefined 'evil' appearance.'" *Stenberg v. Carhart,* 530 U.S. 914, 1001 n.16 (2000) (Thomas, J., dissenting). Because the term has no real static definition, it is defined slightly differently each time a municipality, a state, or the federal government attempts to ban common firearms by arbitrarily labeling them as "assault weapons." Opponents of gun rights have admitted they exploit this political term. In 1988, a Violence Policy Center study discussing the use of the term "assault weapon" strategized that "[t]he weapons' menacing looks, coupled with the public's confusion over fully automatic machine guns versus semi-automatic assault weapons – anything that looks like a machine gun is assumed to be a machine gun – can only increase the chance of public support for restrictions on these weapons."[1]

The Firearms Ban appears to be modeled after California's "assault weapon" law. California has changed its definition of "assault weapon" several times, evolving from a list of specific make and model firearms, to all semiautomatic firearms with detachable magazines that have certain features, to semiautomatic firearms with *non*-fixed magazines having certain features. If "assault weapon" was a real term, its definition would not be so easily manipulated, changing dramatically from year to year and varying from jurisdiction to jurisdiction. Because there is no established definition of "assault weapon," the government can so label *any* firearm it wishes to regulate or outright ban.

Illinois' Firearms Ban exemplifies this dynamic definition phenomenon. The law broadly defines "assault weapon" to include some of America's most popular firearms. It expressly identifies dozens of popular model rifles, pistols, and shotguns by name—including any "copies, duplicates, variants, or altered facsimiles with the capability of any such weapon"—and

---

[1] Violence Policy Center, *Assault Weapons and Accessories in America (1988)*, https://vpc.org/publications/assault-weapons-and-accessories-in-america/ (click link to "Conclusion").

arbitrarily declares them to be "assault weapons." 720 ILCS 5/24-1.9(a)(1)(J). The list includes "all AR-type[]" rifles and pistols, (720 ILCS 5/24-1.9(a)(1)(J)(ii), (a)(1)(K)(ii)), and "all AK-type[]" rifles and pistols, (720 ILCS 5/24-1.9(a)(1)(J)(i), (a)(1)(K)(i)).

The Firearms Ban Act also defines "assault weapon" by a firearm's features, including, among other things, detachable and fixed magazines, "protruding" and "pistol" grips, "thumbhole," "adjustable" ("telescoping"), "detachable," and "folding" stocks, "flash suppressors," "threaded" barrels and barrel "shrouds." 720 ILCS 5/24-1.9(a)(1)(A)-(G). Rather than constituting some nefarious class of dangerous characteristics, these common features of modern firearms merely improve the user's ability to wield the respective firearms safely. For instance, a pistol grip on a rifle or shotgun allows for a more comfortable and stable grip which, in turn, promotes accuracy when shooting. "The defensive application is obvious, as is the public safety advantage in preventing stray shots." *Kolbe v. Hogan,* 849 F.3d 114, 159 (4th Cir. 2017) *(en banc)* (Traxler, J., dissenting). "Thumbhole" stocks serve a similar purpose. Adjustable ("telescoping") stocks allow the user to adjust the stock, making it shorter or longer, according to the user's physical size so that the rifle can be held comfortably, making it safer to shoot. And "flash suppressors" serve multiple purposes. They prevent a rifle user from being blinded in low lighting conditions and they redirect the gases that would otherwise come straight out of the muzzle to reduce recoil and muzzle movement, improving accuracy. In sum, these features facilitate the firearm's safe and effective operation when used for a lawful purpose such as hunting, competition shooting, training, or self-defense. They "tend to make rifles easier to control and more accurate—making them safer to use." *Murphy v. Guerrero,* No. 14-00026, 2016 WL 5508998, at *18 (D. N. Mar. I. Sept. 28, 2016). None of the features increase a firearm's rate of fire.

The Firearms Act Ban also labels as an "assault weapon" "[a]ny firearm that has been modified to be operable as an assault weapon as defined in this Section," (720 ILCS 5/24-1.9(a)(1)(H)), and even "[a]ny part or combination of parts designed or intended to convert a firearm into an assault weapon," (720 ILCS 5/24-1.9(a)(1)(I)). The restriction on "parts or

4

combination of parts" also functions to block repairs, modifications, or improvements of existing "grandfathered" firearms when parts break or accessories are appropriate.

Finally, the Firearms Ban Act also restricts "assault weapon attachments," the definition of which includes "any device capable of being attached to a firearm that is specifically designed for making or converting a firearm into an "assault weapon." 720 ILCS 5/24-1.9(a)(3). So merely possessing a ubiquitous, plastic pistol grip or other harmless part—even without owning an accompanying firearm—is now a serious crime in Illinois.

Failure to understand the nuances of the complicated law and to recognize that a particular firearm, part, or accessory falls under the ban puts the owner at risk of criminal charges and confiscation of the firearms, attachments, or parts. Carrying or possessing an "assault weapon" is a Class A misdemeanor for a first offense, punishable by 364 days in jail. A second offense is a Class 3 felony, punishable by 2-5 years in prison (720 ILCS 5/24-1(b)) and a loss of all Second Amendment rights (18 U.S.C.S. § 922(g)). Manufacturing, selling, delivering, importing, or purchasing any "assault weapon" is a Class 3 felony for a first offense, punishable by 2-5 years prison (720 ILCS 5/24-1(b)) and a loss of all Second Amendment rights (18 U.S.C.S. § 922(g)). A second offense is a Class 2 felony, punishable by 3-7 years in prison, (720 ILCS 5/24-1(b)), and a loss of all Second Amendment rights, (18 U.S.C.S. § 922(g)). Selling, manufacturing, delivering, importing, possessing, or purchasing any "assault weapon attachment" is a Class A misdemeanor for a first offense, punishable by 364 days in jail. A second offense is a Class 4 felony, punishable by 1-3 years in prison, (720 ILCS 5/24-1(b)), and a loss of all Second Amendment rights, (18 U.S.C.S. § 922(g)).[2]

---

[2] The only exemptions from the Firearms Ban are for governmental entities such as law enforcement, retired law enforcement, and security companies. 720 ILCS 5/24-1.9 (e)(1)-(7). Existing owners can be "grandfathered in" only if they provide detailed information about themselves and the firearm, swear under oath that they owned the firearms before the ban, and register the firearms with the government. 720 ILCS 5/24-1.9 (d). *Accuracy Firearms, LLC, v. Pritzker*, 2023 Ill. App. (5th) 230035, at 37-38 (2023) held this violated the Illinois Constitution.

The individual and business plaintiffs—Debra Clark, Jasmine Young, and Chris Moore—are law-abiding Illinoisans who either seek to sell, acquire and possess a firearm that is now banned by the Firearms Ban or lawfully possess such a firearm and do not wish to register it with the state. *See* Declaration of Debra Clark, Declaration of Jasmine Young Declaration of Chris Moore. Organizational plaintiffs GSL, GOA, and GOF represent the interests of law-abiding owners of firearms, parts, and accessories restricted by Illinois' Firearms Ban who would retain possession of, but not register, those items if the Court enjoins the law, as well as individuals who would acquire and possess such items if it were legal to do so. *See* Declaration of John Boch; Declaration of Erich Pratt. Plaintiffs Clark and Piasa Armory and other members of Plaintiff FFL-IL are in the business of selling firearms, parts, and accessories, including items that Illinois now restricts under the Firearms Ban Act. Their businesses will be irreparably harmed by the Firearms Ban Act's restrictions on sales. *See* Declaration of Dan Eldridge; Declaration of Scott Pulaski; Declaration of Debra Clark.

## ARGUMENT

To obtain a preliminary injunction, the movant "[1] must show that they are likely to succeed on the merits of their claims, [2] that they are likely to suffer irreparable harm without an injunction, [3] that the harm they would suffer without the injunction is greater than the harm that preliminary relief would inflict on the defendants, and [4] that the injunction is in the public interest." *Michigan v. United States Army Corps of Eng'rs*, 667 F.3d 765, 769 (7th Cir. 2011) (citing *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008)).

## I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR SECOND AMENDMENT CLAIM

The Second Amendment provides that "the right of the people to keep and bear Arms … shall not be infringed." U.S. Const. Amend. II. That right, as the Supreme Court recently confirmed, necessarily "protects the possession and use of weapons that are 'in common use.'"

*Bruen* at 2118. More specifically, it "extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller,* 554 U.S. at 582. In short, if an arm is "typically possessed by law-abiding citizens for lawful purposes" today, the government cannot ban it – full stop. *Id.* at 625-627. This must be so. For the state has no power to ban law-abiding Americans from possessing arms that the Constitution protects. Indeed, if the Second Amendment means anything, it must mean that the government cannot ban "an entire class of 'arms' that is overwhelmingly chosen by American society for [a] lawful purpose." *Id.* at 628.

But the Second Amendment protects not just the right to possess common firearms. Like other enumerated rights, the right to keep and bear arms necessarily protects those "closely related acts necessary to their exercise." *Luis v. United States,* 578 U.S. 5, 26-27 (2016) (Thomas, J., concurring) (recognizing that "without bullets, the right to bear arms would be meaningless"). "No axiom is more clearly established in law, or in reason, than that wherever the end is required, the means are authorized." *The Federalist No. 44,* at 282 (Charles R. Kesler ed., 2003). For that reason, even pre-*Bruen* precedent confirms that the right to possess firearms implies a corresponding right to obtain them (and the parts, ammunition, magazines, and accessories necessary to use and repair them).

For example, after the U.S. Supreme Court invalidated Chicago's handgun ban in *McDonald v. City of Chicago,* 561 U.S. 742 (2010), the city enacted a new set of firearm restrictions, including a ban on ranges, gun shops and sales within the city. Illinois federal courts readily invalidated these laws, even prior to *Bruen*. In *Ezell v. City of Chicago,* 651 F. 3d 684, 704 (7th Cir. 2011), the Court held that "[t]he right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use...." In *Illinois Firearms Retailers Ass'n v. Chicago,* 961 F. Supp. 2d 928, 938 (N.D. Ill. 2014), the Court recognized that Chicago's ban on gun sales burdened the Second Amendment because it "prevent[ed] Chicagoans from fulfilling, within the limits of Chicago, the most fundamental prerequisite of legal gun ownership – that of simple acquisition."

7

Other courts have likewise held that the Second Amendment protects those predicate activities necessary to use a lawful firearm for a lawful purpose. *See, e.g., Drummond v. Robinson Twp.*, 9 F. 4th 217, 224, 227-28 (3d Cir. 2021) (zoning rules barring for-profit shooting ranges and practice with center-fire ammunition); *Kolbe v. Hogan*, 813 F. 3d 160, 175 (4th Cir. 2016) (possession of "component parts" like detachable magazines), *vacated*, 849 F. 3d 114 (4th Cir. 2017) *(en banc), abrogated by Bruen*, 142 S. Ct. at 2126-27; *Teixeira v. Cty. of Alameda*, 873 F. 3d 670, 677 (9th Cir. 2017) *(*"[T]he core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms."); *Jones v. Bonta*, 34 F. 4th 704, 716 (9th Cir. 2022), *vacated on reh'g*, 2022 WL 4090307; *Renna v. Becerra*, 535 F. Supp. 3d 931, 940 (S.D. Cal. 2021) (holding that the right to keep and bear arms implies a right to keep those arms in good condition, including by making all necessary repairs and improvements); *Duncan v. Becerra*, 742 F. App'x 218, 221 (9th Cir. 2018) (possession and acquisition of magazines over 10 rounds).

These authorities are consistent with *Heller's* favorable citation to *Andrews v. State*, 50 *Tenn. 165* (1871), which recognized that the "[t]he right to keep arms[] *necessarily* involves the right to purchase them, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms, and to keep them in repair." *Id.* at 178 *(emphasis added)*.

Nonetheless, Illinois has taken the extreme step of banning the manufacture, delivery, sale, importation, purchase, and—in less than a year—the possession of any "assault weapon"[3]/ which the state has defined so broadly as to encompass most modern semiautomatic rifles and many other firearms commonly chosen by law-abiding Americans for lawful purposes. It also

---

[3]/ The only way for an owner of a banned firearm to retain possession is to register their firearm pursuant to a set of yet-to-be written rules by the government. 720 ILCS 5/24-1.9. Failure to correctly identify the firearms or to misidentify a so-called "assault weapon" can be perjury. Even if registered, the owner cannot transfer the firearm except to a licensed gun dealer to be sold out of state or to an heir. The continued possession of a registered firearm is also severely limited in where and how it can be transported. 720 ILCS 5/24-1.9(D).

8

bans mere possession of several common parts it calls "assault weapon attachments" (720 ILCS 5/24-1.9(a)(3)), making some repairs of even registered "assault weapons" impossible.

Because the law is a flat ban on these arms, this case is a straightforward one. Indeed, *Heller* teaches us that even historical laws restricted the ownership of weapons *only* if they were "dangerous *and* unusual." *Heller*, 554 U.S. at 627. On the other hand, the state cannot ban arms, like those at issue here, that are "typically possessed by law-abiding citizens for lawful purposes." *Id.* at 625. *Bruen* did not change this test for analyzing bans on bearable arms. *Bruen* reaffirmed this "common use" test in several places. *See, e.g.,* 142 S. Ct. at 399, 408, 426, 488. This case thus boils down to a single issue: Are the arms that Illinois bans "bearable arms"? Are they of the sort "typically possessed" for lawful purposes? As many courts have already held, the answer is "yes." Under *Heller* (as elaborated by *Bruen*), no further inquiry is required and Illinois' Firearms Ban is unconstitutional.

Even if this Court indulges the State's hidden treasure hunt for appropriate historical analogues needed to justify these modern restriction[4]/, no such appropriate analogs exist. No "enduring American tradition" of laws exists banning arms in common use for lawful purposes, like the firearms that Illinois now bans. *Bruen,* 142 S. Ct. at 2135.

**A.    The Firearms Ban Is Unconstitutional Because It Bans Arms That Are "Typically Possessed by Law-Abiding Citizens for Lawful Purposes."**

Firearms equipped with the banned features and firearms banned by name are extremely popular with the American public. Between 1990 and 2014, more than 11 million rifles having at least some of these features were manufactured in or imported into the United States. *See Kolbe v. Hogan,* 813 F.3d 160, 174 (4th Cir. 2016), *vacated* 849 F.3d 114 (2017). "Over the last three decades, 19,797,000 … rifle[s] built on the AR-15 platform have been manufactured or imported into the United States." *Miller v. Bonta,* 542 F. Supp. 3d 1009, 1020 (S.D. Cal. 2021), vacated

---

[4]/ Pre-*Bruen* Seventh Circuit cases that upheld local "assault weapons" bans, including *Friedman v. City of Highland Park,* 487 F. 3d 406, 410 (7th Cir. 2015), and *Wilson v. Cook County,* 937 F. 3d 1028, 1034-35 (7th Cir. 2019), are no longer good law.

9

and remanded, 2022 WL 3095986 (9th Cir. Aug. 1, 2022). In 2014 alone, about 1,228,000 such rifles were manufactured or sold in the U.S.[5] Not surprisingly, these numbers have been steadily increasing. According to two more recent surveys, over 24 million Americans have owned AR-15 or similar modern rifles. William English, Ph.D., *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* at 2, 33 (May 13, 2022), https://bit.ly/3yPfoHw (last visited Jan. 18, 2023); *National Shooting Sports Foundation, Inc., Commonly Owned: NSSF Announces Over 24 Million MSRs in Circulation* (July 20, 2022) ("NSSF"), https://bit.ly/3QBXiyv (last visited Jan. 18, 2023). Twenty percent of all firearms sold in recent years are rifles that the Firearms Ban restricts. English, *supra, at 2, 33.*

It is no wonder then that many lower courts have found that the rifles Illinois now bans are common. For example, in *Heller v. District of Columbia,* 670 F.3d 1244, 1261 (D.C. Cir. 2011) *("Heller II"),* the Court held that:

> We think it clear enough in the record that semi-automatic rifles and magazines holding more than ten rounds are indeed in 'common use,' as the plaintiffs contend. Approximately 1.6 million AR-15s alone have been manufactured between 1986, and in 2007 this one popular model accounted for 5.5 percent of all firearms, and 14.4 percent of all rifles, produced in the U.S. for the domestic market.

Likewise, the Second Circuit observed: "Americans own millions of the firearms that the challenged legislation prohibits ... Even accepting the most conservative estimates cited by the parties and by amici, the assault weapons and large-capacity magazines at issue are 'in common use' as that term was used in *Heller.*" *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo,* 804 F.3d 242, 255 (2d Cir. 2015). See also, *Colo. Outfitters Ass'n v. Hickenlooper,* 24 F. Supp. 3d 1050, 1068 (D. Colo. 2014) (concluding that statute "affects the use of firearms that are both widespread and commonly used for self-defense," given that "lawfully owned semiautomatic firearms using a magazine with the capacity of greater than 15 rounds number in the tens of

---

[5] To put that in perspective, fewer than 570,000 Ford F-150 were sold in 2014. *Warren Clarke, Top 10 Best-Selling Vehicles for 2014, Edmunds* (Jan. 15, 2015), https://www.edmunds.com/car-reviews/top-10/top-10-best-selling-vehicles-for-2014.html.

millions"), *vacated in part on other grounds,* 823 F.3d 537 (10th Cir. 2016); *Rocky Mount. Gun Owners v. Town of Superior, Colo.,* No. 22-cv-01685, at 9-10 (D. Colo. July 22, 2022) (ECF No. 18) (barring enforcement of a ban on certain semiautomatic rifles that are "commonly used by law-abiding citizens for lawful purposes").

While many focus the discussion of "assault weapons" on rifles built on the AR-15 platform, Illinois' definition is so broad that the Firearms Ban covers many other common firearms, including several models of the popular Remington 11-87 shotgun and many models of the Ruger 10/22, one of the most popular target and hunting .22s that exists.[6] As of 2015, there were over 7 million Ruger 10/22s in circulation. Walt Kulek, *The Ruger 10/22 Complete Owner's and Assembly Guide* (2015). The Firearms Ban also condemns any semiautomatic rifle with a fixed magazine that has "the capacity to accept more than 10 rounds, except for an attached tubular device designed to accept, and capable of operating only with, .22 caliber rimfire ammunition (720 ILCS 5/24-1.9(a)(1)(B)), like 15- and 30-round model M-1s. Hundreds of thousands of these firearms were sold to civilians by the U.S. government in the 20th-century. *See Duncan v. Becerra,* 970 F. 3d 1133, 1148 (9th Cir. 2020).

Given that the arms that Illinois bans likely number in the millions, there should be no dispute that such arms are in "common use." To put it in perspective, stun guns "are widely owned and accepted as a legitimate means of self-defense across the country," based on evidence that just "*hundreds of thousands* of Tasers and stun guns have been sold to private citizens." *Caetano v. Massachusetts,* 577 U.S. 411, 420 (2016) (Alito, J., concurring) (emphasis added). Because "stun guns are 'arms' within the protection of the Second Amendment," a Massachusetts law barring "civilians from possessing or carrying stun guns, even in their home,

---

[6] The Firearms Ban does not exempt .22 caliber rimfire rifles that possess the prohibited features, as many Ruger 10-22 models do.

11

is inconsistent with the Second Amendment and is therefore unconstitutional." *Ramirez v. Commonwealth*, 94 N.E.3d 809, 815 (Mass. 2018).[2]/ *See also Maloney v. Singas,* 351 F. Supp. 3d 222, 237 (E.D.N.Y. 2018) (finding "at least 64,890 metal and wood nunchaku" that were "sold on the retail market in the United States between 1995 and 2018" to be in common use). If the 200,000 stun guns in the U.S. are in "common use" and thus protected, certainly the 24 million modern semiautomatic rifles in circulation are too.

What's more, these firearms are "typically possessed by law-abiding citizens for lawful purposes." *Heller,* 554 U.S. at 624-25. "Roughly 5 million Americans own AR-style semiautomatic rifles. The overwhelming majority of citizens who own and use such rifles do so for lawful purposes, including self-defense and target shooting. Under our precedents, that is all that is needed for citizens to have a right under the Second Amendment to keep such weapons." *Friedman v. City of Highland Park*, 577 U.S. 1039, 1042 (2015) (Thomas, J. & Scalia, J., dissenting from denial of certiorari). "The overwhelming majority of citizens who own and keep the popular AR-15 rifle and its many variants do so for lawful purposes, including self-defense at home." *Miller,* 542 F. Supp. 3d 1009 at 1021*, vacated as moot* 2022 U.S. App. LEXIS 21172 (9th Cir. Aug. 1, 2022). Indeed, when asked, a majority of purchasers said they owned these firearms for self-defense. English, *supra*, at 34 (61.9% owned for home defense; 34.6% owned for defense outside the home); *National Shooting Sports Foundation, Inc., Modern Sporting Rifle: Comprehensive Consumer Report: Ownership, Usage and Attitudes Toward AR- and AK-Platform Modern Sporting Rifles* 18 (July 14, 2022), https://bit.ly/3SSrVjM (last visited Feb. 2, 2023).

Other lawful purposes for these firearms include hunting, competitive shooting, and recreational target shooting. In 2020, more than 20 million adults participated in target or sport

---

[2]/ "Any attempt by the state to rebut the prima facie presumption of Second Amendment protection afforded stun guns and tasers on the grounds that the weapons are uncommon or not typically possessed by law-abiding citizens for lawful purposes would be futile." *People v. Webb*, 131 N.E.3d 93, 96 (Ill. 2019).

shooting with semiautomatic rifles like those Illinois now seeks to ban. *National Shooting Sports Foundation, Inc., Sport Shooting Participation in the U.S. in 2020,* at iii (2021), https://bit.ly/3sPuEQl (last visited Jan. 30, 2023). Although self-defense is central to the Second Amendment, "the [Supreme Court] also said the Second Amendment protects the right to keep and bear arms for other 'lawful purposes,' such as hunting." *Heller II,* 670 F.3d 1244 at 1260.

In short, the banned firearms are typically possessed for lawful purposes and are in no way "dangerous and unusual" weapons. Quite the opposite; they are among the most popular firearms in the country, and they are used for various lawful purposes. Under *Heller* and *Bruen*, the inquiry should end there.

**B.    Alternatively, the Firearms Ban Is Presumed Unconstitutional, and Illinois Cannot Meet Its Burden to Prove the Law Is Part of an Enduring American Tradition of Comparable Firearm Regulation.**

At the very least, because the Firearms Ban Act restricts the acquisition and possession of arms in common use for lawful purposes – conduct that "the Constitution presumptively protects"—Illinois must "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. *Bruen,* 142 S. Ct. at 2126, 2130. "Only then may [this] court conclude that" the conduct Plaintiffs wish to engage in "falls outside the Second Amendment's 'unqualified command.'" *Id.* Illinois cannot meet this heavy burden.

*Bruen* cautioned that not all history is created equal: "The Second Amendment was adopted in 1791; the Fourteenth in 1868. Historical evidence that long predates either date may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years." *Id.* at 2136. "[T]o the extent later history contradicts what the text says, the text controls." *Id.* at 2137. The Court also made clear that the kind of historical tradition the government must prove is "an enduring American tradition of state regulation." *Id.* at 2155-56. Courts may not uphold a law just because a few similar laws may be found in the past, because doing so "'risk[s] endorsing outliers that our ancestors would never have accepted.'" *Id.*

13

The Firearms Ban's broad restrictions do not "resemble prohibitions historically exempted from the Second Amendment." *Fyock v. Sunnyvale,* 779 F.3d 991, 997 (9th Cir. 2015). The banned firearms have not been "the subject of longstanding, accepted regulation." *Id.* To the contrary, the U.S. Supreme Court has observed that the rifles Illinois seeks to ban "traditionally have been widely accepted as lawful possessions." *Staples v. United States,* 511 U.S. 600, 612 (1994) (referring to AR-15 platform rifles, which generally meet Illinois' "assault weapon" definition). Today, nearly all states place *no* restrictions on such rifles. The handful of restrictions that *are* in place are of recent vintage, and (as explained above) they vary as to what constitutes an "assault weapon."

Indeed, "[p]rior to the 1990s, there was no national history of banning weapons because they were equipped with features like pistol grips, collapsible stocks, flash hiders, flare launchers, or barrel shrouds." *Miller,* 542 F. Supp. 3d at 1024. Indeed, California's Assault Weapon Control Act, adopted in 1989, was the first law in the country's history targeting semiautomatic rifles with detachable magazines having certain features. Along with Illinois and California, only six other states and the District of Columbia have adopted "assault weapon" laws, all of which were adopted in the 1990s or later.[7] Even the federal government allowed its "assault weapon ban," adopted in 1994, to expire just ten years later because it was not proven to have led to any "discernable reduction" in gun violence. *See* Pub. L. No. 103-322, Title XI, § 110105(2); Christopher S. Koper et al., *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets & Gun Violence, 1994-2003,* Rep. to the Nat'l Inst. of Justice, U.S. Dep't of Justice 96 (2004). Each less than 35 years old, these outlier restrictions are certainly *not* the sort of longstanding, historical regulations that might justify Illinois' law. *See Heller,* 554 U.S. at 635 (overturning a 33-year-old handgun ban); *Heller II,* 670 F. 3d at 1260

---

[7] California Penal Code § 30505; Conn. Gen. Stat. § 53-202b; Hawaii Rev. Stat. Ann. § 134-4; Md. Code Ann. § 4-303; Mass. Gen. Laws Ch. 140 § 131M; N.J. Stat. Ann. § 2C:39-1 and 39-5; N.Y. Penal Law § 265.02; D.C. Code Ann. § 7-2502.02.

("We are not aware of evidence that prohibitions on either semi-automatic rifles or large-capacity rifles are longstanding and thereby deserving of a presumption of validity.")

Admittedly, three states and the District of Columbia did adopt laws purporting to restrict semiautomatic firearms in the 1920s and 1930s, but most of those laws were repealed within decades. *Id.* at 1250.[2] And laws from the same period restricting arms that "are not commonly possessed by law-abiding citizens for lawful purposes, do not stand as proof of long-standing prohibitions" on arms that *are* in common use for lawful purposes, like the arms Illinois bans here. *Id.* at 1252.

What's more, all these 20th-century laws contradict this Nation's long history of *not* banning classes of arms in common use for lawful purposes. They are thus irrelevant outliers that provide no insight into the original meaning of the Second Amendment. As *Heller* makes clear, the most relevant period for the historical analysis is the founding era because the meaning of a constitutional provision is fixed at the time of ratification. *Heller,* 554 U.S. at 634-35. While *Bruen* did examine 19th-century laws, it did so only because "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry." 142 S. Ct. at 2138. Indeed, the Court questioned whether ratification-era history had any role at all to play in interpreting the Second Amendment, leaving the question for another day. *Id.* The Court also cautioned against "giving postenactment [sic] history more weight than it can rightly bear." *Id.* at 2136. Late 19th-century evidence is thus relevant only when it provides confirmation of what had been established before; "'postratification adoption or

---

[2] See 1927 Mich. Pub. Acts 887, § 3 (prohibiting firearms able to be "fired sixteen times without reloading"), repealed via 1959 Mich. Pub. Acts 249, 250; 1927 R.I. Pub. Laws 256 §§ 1, 3 (prohibiting firearms "which shoot[] more than twelve shots semi-automatically"), repealed via 1959 R.I. Acts & Resolves 260, 260, 263 (amended 1975); 1933 Ohio Laws 189, §§ 12819-3, -4 (prohibiting "any firearm which shoots more than eighteen shots semi-automatically"), repealed via 1972 Ohio Laws 1866, 1963 (setting 32-round limit); see also 2013-2014 Leg., H.R. 234 (Ohio) (fully repealing magazine ban); 47 Stat. 650, §§ 1, 14 (1932) (D.C. law prohibiting "any firearm which shoots ... semiautomatically more than twelve shots without reloading"), repealed via 48 Stat. 1236 (1934), currently codified as amended at 26 U.S.C. §§ 5801-72.

15

acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text.'" *Id.* at 2137 (quoting *Heller II,* 670 F.3d at 1274, n.6 (Kavanaugh, J., dissenting)).

Evidence from the 20th century is even less relevant, as the Court explained in a footnote: "We will not address any of the 20th-century historical evidence brought to bear by respondents or their amici. … [It] does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Id.* at 2154 n.28. Considering *Bruen*'s clear guidance, the earliest wave of post-*Bruen* Second Amendment decisions have rebuked calls to rely on evidence of 20th-century regulations. *See, e.g., Antonyuk v. Hochul,* No. 22-cv-0986, 2022 U.S. Dist. LEXIS 201944, at *127 (N.D.N.Y. Nov. 7, 2022); *United States v. Nutter,* No. 21-cr-00142, 2022 U.S. Dist. LEXIS 155038, at *9 (S.D. W. Va. Aug. 29, 2022) (holding that laws originating in the 20th-century alone cannot uphold a law unless similar laws existed in the Founding era); *Firearms Pol'y Coal., Inc. v. McCraw,* No. 21-cv-1245, 2022 U.S. Dist. LEXIS 152834, at *29 (N.D. Tex. Aug. 25, 2022) (holding that 22 state laws adopted in the 20th-century were insufficient historical justification for a ban on firearms purchases for those under the age of 21).

The rarity of historical laws regulating the banned firearms (or their similarly functioning predecessors) cannot be attributed to the lack of such arms in the American marketplace. The AR-15 platform rifle has been available to the American public for over 60 years. Jeff Zimba, *The Evolution of the Black Rifle: 20 Years of Upgrades, Options, and Accessories 10* (Prepper Press 2014). Semiautomatic, centerfire rifles with detachable magazines were mass produced and widely available to the public for another about 60 years before that Chuck Willis & Robert A. Sadowski, *The Illustrated History of Guns* 256 (2017).[10]/

---

[10]/ See also *Model 8 Autoloading Centerfire Rifle*, https://web.archive.org/web/20130520070354/http://remington.com/products/archived/centerfire/autoloading/model-8.aspx (last visited Feb. 5, 2023).

In *Heller II*, Judge (now Justice) Brent Kavanaugh provided the following concise summary of the early development in the United States of semiautomatic rifles:

> The first commercially available semi-automatic rifles, the Winchester Models 1903 and 1905 and the Remington Model 8, entered the market between 1903 and 1906. See JOHN HENWOOD, THE 8 AND THE 81: A HISTORY OF REMINGTON'S PIONEER AUTOLOADING RIFLES 5 (1993); JOHN HENWOOD, THE FORGOTTEN WINCHESTERS: A HISTORY OF THE MODELS 1905, 1907, AND 1910 SELF-LOADING RIFLES 2-6 (1995). (The first semi-automatic shotgun, designed by John Browning and manufactured by Remington, hit the market in 1905 and was a runaway commercial success. See HENWOOD, 8 AND THE 81, at 4.) Other arms manufacturers, including Standard Arms and Browning Arms, quickly brought their own semi-automatic rifles to market. See id. at 64-69. Fiveshot magazines were standard, but as early as 1907, Winchester was offering the general public ten-shot magazines for use with its .351 caliber semi-automatic rifles. See HENWOOD, THE FORGOTTEN WINCHESTERS 22-23. Many of the early semi-automatic rifles were available with pistol grips. See id. at 117-24. These semi-automatic rifles were designed and marketed primarily for use as hunting rifles, with a small ancillary market among law enforcement officers. See HENWOOD, 8 AND THE 81, at 115-21.

*See also,* Halbrook, Stephen P., *America's Rifle, The Case for the AR-15* at 145-148.

While *Bruen* noted that "unprecedented societal concerns or dramatic technological changes may require a more nuanced approach" to determining whether a law is consistent with historical tradition, it cautioned that reasoning by analogy in such cases must be constrained by an inquiry into both "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." 142 S. Ct. at 2133. What's more, *Bruen* teaches that reasoning by analogy is appropriate only when "unprecedented societal concerns or dramatic technological changes" make the search for a dead-ringer futile. *Id.* at 2132.

That concern is irrelevant here. There is nothing novel about the technology of these condemned firearms, since rRepeating firearms have been available for over 150 years. These include popular rifles like the Henry and Winchester lever action rifles that could quickly fire up to 17 rounds before reloading. Henry, *Henry History,* https://www.henryusa.com/about-us/henry-

history/ (last visited Feb. 5, 202). So, even if Illinois considers citizens owning common rifles capable of repeatedly firing a "general societal problem," it is a "problem" that is not "unprecedented" in American history. When a modern regulation addresses a general societal problem that has persisted since before the 18th-century, "the lack of a historical analogue is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. . .." *Antonyuk,* 2022 U.S. Dist. LEXIS 201944, at *19 (citing *Bruen,* 142 S. Ct. at 2131). Thus, the lack of any unprecedented societal concern or dramatic technological change here means that the State must show a history of regulations that are directly comparable, not just analogous. It cannot meet this burden.

Even if analogical evidence were relevant here, Illinois must still present "well-established and representative" analogues that are "relevantly similar" to the challenged modern law. *Bruen,* 142 S. Ct. at 2131-32. "[G]enerally, a historical statute cannot earn the title 'analogue' if it is clearly more distinguishable than it is similar to the thing to which it is compared." *Antonyuk,* No. 22-cv-0986, 2022 U.S. Dist. LEXIS 182965, at *20. Whether a proposed analogue from the past is "relevantly similar" includes an analysis of "how" and "why" the regulations were enacted. *Bruen,* 142 S. Ct. at 2133. It is not enough for a proposed 18th- or 19th-century analogue to be superficially similar if the burden it imposed was different in kind or in justification. Critically, however, "[t]his does not mean that courts may engage in independent means-end scrutiny under the guise of an analogical inquiry…. Analogical reasoning requires judges to apply faithfully the balance struck by the founding generation to modern circumstances…. It is not an invitation to revise that balance through means-end scrutiny." *Id.* at n.7.

In sum, there is no "enduring American tradition" of laws flatly banning arms of the sort Illinois now bans. Even if one or two such laws existed, they would be outliers that do not satisfy *Bruen*'s demand for a broad and enduring historical tradition. Illinois thus cannot meet its burden under *Bruen* to justify Illinois' modern restriction on common arms.

Plaintiffs are likely to succeed on the merits of their claim.

18

## II. THE REMAINING PRELIMINARY INJUNCTION FACTORS WARRANT RELIEF

If Plaintiffs are likely to succeed on their Second Amendment claims, then, "[t]he existence of a continuing constitutional violation constitutes proof of an irreparable harm." *Preston v. Thompson,* 589 F. 2d 300, 303 n.3 (7th Cir. 1978). The Second Amendment should be treated no differently. *See McDonald,* 561 U.S. 742 at 780 (refusing to treat the Second Amendment as a second-class right subject to different rules); see also *Ezell*, 651 F. 3d at 700 (deprivation of the right to arms is "irreparable and having no adequate remedy at law"). There is no question that the infringement on Plaintiffs' rights is real and imminent. Acquisition of many commonly owned firearms is now illegal. Plaintiffs' continued possession and use of those now-banned firearms they already own has become heavily restricted because the Firearms Ban not only requires gun owners to register their firearms with the government or dispossess themselves of them altogether, and it restricts the ability to travel with these firearms. 720 ILCS 5/24-1.9(C) and (D).

The law also has a devastating effect on those engaged in the sale of firearms. Licensed dealers cannot return firearms on consignment or given to them for repairs. They cannot deliver custom-ordered firearms not yet received. And they can no longer sell any firearm the state now classifies as an "assault weapon." 720 ILCS 5/24-1.9(b). So certain Plaintiffs will lose substantial revenue if this Court does not enjoin the law. Indeed, some FFLs have reductions of up to 60% in their business. *See* Declaration of Dan Eldridge. And many Illinois FFLs may even be put out of business. Because economic injuries can typically be compensated by damages, they are not usually considered "irreparable." "But where, as here, the plaintiff in question cannot recover damages from the defendant due to the defendant's sovereign immunity," *(Feinerman v. Bernardi,* 558 F. Supp. 2d 36, 51 (D.D.C. 2008), "any loss of income suffered by a plaintiff is irreparable per se." *Id.*

Finally, both the balance of hardships and equities and the public interest favor Plaintiffs. When the government is a party, these factors merge. *Nken v. Holder,* 556 U.S. 418, 435 (2009). When challenging state action affecting the exercise of constitutional rights, both "[t]he balance

19

of equities and the public interest … tip sharply in favor of enjoining the" law. *Klein v. City of San Clemente,* 584 F. 3d 1196, 1208 (9th Cir. 2009). More specifically, "'[i]t is always in the public interest to prevent the violation of a party's constitutional rights.'" *Mitchell v. Baker,* 2015 WL 278852, at *7 (S.D. Ill. Jan. 21, 2015). On the other hand, "the public interest is not harmed by preliminarily enjoining … a law that is probably unconstitutional." *Am. Civ. Libs. Union v. Alvarez,* 679 F. 3d 583, 590 (7th Cir. 2012).

## CONCLUSION

Accordingly, this Court should grant Plaintiffs' Motion for a Preliminary Injunction.

February 6, 2023

Respectfully submitted,

By: /s/ Mark L. Shaw
Plaintiffs' Attorneys

Mark L. Shaw
Jennifer Craigmile Neubauer
Michael A. Danforth
SHAW LAW LTD.
33 North County Street, Suite 300
Waukegan, Illinois 60085
(T): (847) 244-4696
(E): *mlshaw@shawlawltd.com*

Carl D. Michel (*pro hac vice*)
Sean A. Brady (*pro hac vice*)
Konstadinos T. Moros (*pro hac vice*)
MICHEL & ASSOCIATES, P.C.
180 East Ocean Blvd., Suite 200
Long Beach, California 90802
(T): (562) 216-4444
(E): *cmichel@michellawyers.com*