# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| CALEB BARNETT, et al., | ) | Case No. 3:23-cv-209-SPM |
| Plaintiffs, | ) | **designated Lead Case |
| | ) | |
| v. | ) | |
| | ) | |
| KWAME RAOUL, et al., | ) | |
| Defendants, | ) | |
| | ) | |
| DANE HARREL, et al., | ) | Case No. 3:23-cv-141-SPM |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KWAME RAOUL, et al., | ) | |
| Defendants, | ) | |
| | ) | |
| JEREMY W. LANGLEY, et al., | ) | Case No. 3:23-cv-192-SPM |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BRENDAN KELLY, et al., | ) | |
| Defendants, | ) | |
| | ) | |
| **FEDERAL FIREARMS LICENSEES OF ILLINOIS, et al.,** | ) | **Case No. 3:23-CV-215-SPM** |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **JAY ROBERT "J.B." PRITZKER, et al.,** | ) | |
| **Defendants.** | ) | |

## FEDERAL FIREARMS LICENSEES OF ILLINOIS PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Plaintiffs FEDERAL FIREARMS LICENSEES ("FFL-IL"), GUNS SAVE LIFE ("GSL"), GUN OWNERS OF AMERICA ("GOA"), GUN OWNERS FOUNDATION ("GOF"), PIASA ARMORY ("PIASA"), DEBRA CLARK ("Clark"), JASMINE YOUNG ("Young"), and CHRIS MOORE ("Moore") ("Plaintiffs"), by counsel, under Rule 65 of the Federal Rules of Civil Procedure, move this Court to enjoin Defendants JAY ROBERT "J.R." PRITZKER, KWAME RAOUL, and BRENDAN F. KELLY ("Defendants" or "the State") from enforcing the registration provisions of 720 ILCS 5/24-1.9, et seq., for the reasons below:

## INTRODUCTION

As this Court is aware, Illinois has pejoratively declared as "assault weapons": (1) dozens of specific firearm makes and models; (2) any rifle, shotgun, or pistol having certain features that are the hallmarks of popular firearm models; and (3) certain parts compatible with those firearms. Illinois law wholly bans those items' acquisition and, unless timely registered, their possession. As a result, Illinoisans must register their currently owned firearms and various vaguely defined parts by January 1, 2024. Given the State's insistence on enforcing that deadline, despite this litigation, Plaintiffs bring this motion to protect their rights and those of the public in the meantime.

Illinois's registration scheme is unconstitutional thrice over. First, because there are serious criminal consequences for not registering, the State did not provide sufficient notice under the Due Process Clause by merely posting the requirements online in hopes those affected see them; especially by allowing only a three-month window to comply. Second, many of the statutory terms crucial for identifying which firearms or parts must be registered are hopelessly vague. And third, the scheme violates the Second Amendment because there is no historical tradition of requiring individuals to register with the government every firearm or part of a certain type that they own. In light of the irreparable harm that it will inflict on Plaintiffs and other Illinoisans who own a firearm or part potentially subject to it, the Court should enjoin enforcement of the unconstitutional registration to protect these rights and maintain the status quo pending litigation of Plaintiffs' claims. As explained below, nothing in the Seventh Circuit's recent opinion overruling this Court's

preliminary injunction on different grounds precludes such relief being granted here.

## FACTUAL BACKGROUND

Because this Court is well acquainted with this case, Plaintiffs do not belabor its factual, legal, or procedural backgrounds. To briefly recap, Illinois recently made it "unlawful for any person within this State to knowingly manufacture, deliver, sell, import, or purchase or cause to be manufactured, delivered, sold, imported, or purchased by another, an assault weapon, [and] assault weapon attachment[.]" 720 ILCS 5/24-1.9(b). Relevant to this motion, to be able to continue to lawfully possess their already-owned "assault weapons," "assault weapon attachments," ".50 caliber rifles," or ".50 caliber cartridges" ("Regulated Items"), Illinois residents must register them by January 1, 2024, according to rules produced by the Illinois State Police. 720 ILCS 5/24-1.9(d). On September 15, the State Police released those rules on an emergency basis.[1] ("Rules").  Decl. of C.D. Michel Supp. Mot. Prelim. Inj. ("Michel Decl."), Ex. B.

For any Regulated Item, the owner must submit "an endorsement affidavit, prior to January 1, 2024, under oath or affirmation and in the form and manner prescribed by the Illinois State Police, beginning October 1, 2023," (the "registration"). 720 Ill. Comp. Stat. Ann. 5/24-1.9(d). Endorsements are electronically executed through the online FOID/FCCL System and are limited to items owned before January 10, 2023. Michel Decl., Ex. B at 5. Endorsements must include the affiant's FOID card number; an affirmation that the Regulated Item was acquired before January 10, 2023; the make, model, caliber, and serial number of each firearm; and an affirmation that the affidavit is signed under oath. 720 Ill. Comp. Stat. Ann. 5/24-1.9(d); Michel Decl., Ex. B at 10-11.

The Rules provide virtually no clarification of critical statutory terms for determining what firearms or parts must be registered. Indeed, with one exception ("barrel shroud," which definition causes other issues), the Rules merely restate the statutory language for all terms, rather than define them in a way that ordinary people can understand them. Making matters worse, the only "notice" to the public Illinois has provided about registration is posting announcements about it online. *Id.*

---

[1] As emergency rules, no public comment was considered. 5 ILCS 100/5-45(c).

Organizational plaintiffs GSL, GOA, and GOF represent the interests of their members and supporters who lawfully own Regulated Items and who would retain possession of, but not register, those items but for fear of criminal prosecution. Decl. of Todd Vandermyde Supp. Mot. Prelim. Inj. ("Vandermyde Decl."), ¶¶ 14, 16-22. They also represent the interests of members who may not have received notice of the registration requirement or who are unsure what items must be registered, or how to register them, so that they can retain their lawfully acquired property. *Id.*

## ARGUMENT

To obtain a preliminary injunction, movants "[1] must show that they are likely to succeed on the merits of their claims, [2] that they are likely to suffer irreparable harm without an injunction, [3] that the harm they would suffer without the injunction is greater than the harm that preliminary relief would inflict on the defendants, and [4] that the injunction is in the public interest." *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 769 (7th Cir. 2011) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Plaintiffs satisfy each factor here.

## I.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR DUE PROCESS AND SECOND AMENDMENT CLAIMS

### A.   Plaintiffs Are Likely to Succeed on Their Due Process Claims

Even if the Second Amendment generally tolerated mandatory registration of common firearms (it does not), Illinois's *specific* registration separately violates the Fourteenth Amendment's Due Process Clause for various reasons, some resulting from statute and others from the State's implementation. Illinois has not provided its residents sufficient notice of the new requirements, much less time to learn about and comply with them. But even if proper notice and sufficient time had been provided, most of the critical terms dictating what needs to be registered are too vague to make sense of and thus cannot be enforced.

#### 1.   Illinois Failed to Give Sufficient Notice of Its Registration Requirement

Illinois residents who would be required to comply with the registration have not been provided sufficient notice of its mandates. While the individual Plaintiffs are generally aware of

the registration requirement, associational Plaintiffs' members and other Illinoisans cannot be expected to be. The State did not provide direct notice to firearm owners about what items must be registered. Apparently, the State assumes that people will just learn about the registration requirement via the news or internet. That is unacceptable. As the Supreme Court has explained, "[e]ngrained in our concept of due process is the requirement of notice. Notice is sometimes essential so that the citizen has the chance to defend charges. Notice is required before property interests are disturbed, before assessments are made, before penalties are assessed." *Lambert v. California*, 355 U.S. 225, 228 (1957); *see also Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1 (1978) (Notice provided was not reasonably calculated to inform customers of procedures for protesting termination of utilities to which they were entitled under the due process clause.). "[T]he principle is equally appropriate where a person, wholly passive and unaware of any wrongdoing, is brought to the bar of justice for condemnation in a criminal case." *Lambert*, 355 U.S. at 228. At issue here is not merely individuals deprived of property rights, but potentially of their liberty, as there are criminal consequences, including incarceration, for possessing an unregistered Regulated Item after January 1, 2024. 720 Ill. Comp. Stat. Ann. 5/24-1(b).

The State has no excuse for failing to provide direct notice. To qualify for registration, an applicant must have a FOID card. 720 Ill. Comp. Stat. Ann. 5/24-1.9(d)(1). Illinois maintains a contact list of all FOID holders through its FOID system. 430 ILCS 65/0.01 et seq. Yet the State has not contacted those in the FOID system directly to inform them of the registration requirement, despite the law calling for a public awareness campaign. 720 Ill. Comp. Stat. Ann. 5/24-1.9(h).

Coupled with the lack of direct notice, the short window of time that Illinois has given its

residents to learn about registration and comply with it,[2] is unreasonable and thus violates Due Process. "Notice must not be a mere gesture, but rather an effort reasonably calculated to effect actual notice." *Snider Int'l Corp. v. Town of Forest Heights, Md.*, 739 F.3d 140, 146 (4th Cir. 2014) (citing *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 315 (1950)).  Although registration was enacted in January 2023, the Illinois State Police did not release its Rules until September 15, with a January 1, 2024 deadline to comply. Michel Decl., Ex. B at 1. Three months is insufficient notice for members of the public to learn about, assess whether the requirement applies to them, and effect registration; particularly when failure to do so has criminal penalties.

Lack of notice is especially problematic here because the registration retroactively criminalizes conduct that was lawful at the time it was performed. Illinois does not merely require that Regulated Items be registered moving forward. Rather, it requires that *all* previously acquired Regulated Items be registered or their possession *becomes* illegal. 720 Ill. Comp. Stat. Ann. 5/24-1.9(d). Countless Illinois residents, including Plaintiffs, lawfully acquired Regulated Items long before the State made their *un*-registered possession illegal. First Amended Complaint, at ¶ 174. Our legal system "for centuries . . . has harbored a singular distrust of retroactive statutes, and that distrust is reflected in [the Supreme] Court's due process jurisprudence." *E. Enters. v. Apfel*, 524 U.S. 498, 502 (1998) (maj. op.). "If retroactive laws change the legal consequences of transactions long closed, the change can destroy the reasonable certainty and security which are the very objects of property ownership." *Id.* at 548. It therefore "does not follow . . . that what [a legislature] can legislate prospectively it can legislate retrospectively. The retrospective aspects of legislation, as well as the prospective aspects, must meet the test of due process, and the justifications for the

---

[2] Imagine, for example, one of the organizational Plaintiffs' many members in the Armed Forces stationed overseas who will not return home until after the registration window is closed.

latter may not suffice for the former." *Usery v. Turner Elkhorn, Mining Co.*, 428 U.S. 1, 16-17 (1976). Accordingly, courts have "given careful consideration to due process challenges to legislation with retroactive effects," *E. Enters.*, 524 U.S. at 547-48 (Kennedy, J., concurring in part and dissenting in part) (collecting cases), subjecting such laws to "heightened scrutiny," *Kelo v. City of New London*, 545 U.S. 469, 493 (2005) (Kennedy, J., concurring). Further exacerbating the retroactivity concerns is the complex nature of the parts at issue, because they make Illinois's registration requirement a "highly technical statute[] that threaten[s] to ensnare individuals engaged in apparently innocent conduct." *Bryan v. United States*, 524 U.S. 184, 185 (1998).

At bottom, Illinois residents who lawfully bought a Regulated Item before 2023 will now become criminals for having made that transaction, unless they take the affirmative step of registering their property with the government before the statutory deadline. Such a drastic retroactive effect on transactions that were lawful when they occurred, often years or decades ago, violates the mandates of due process. As the Seventh Circuit has observed, "[m]anifest injustice may occur where a new law changes existing rights or imposes unanticipated obligations on a party without providing appropriate notice." *Jideonwo v. I.N.S.*, 224 F.3d 692, 697 (7th Cir. 2000).

### 2.      Various Aspects of Registration Are Too Vague to Enforce

The registration requirement cannot be enforced as to certain Regulated Items because the law does not sufficiently describe what items must be registered or, in some cases, how to register them. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). A law is unconstitutionally vague if it (1) "fails to provide a person of ordinary intelligence fair notice of what is prohibited," or (2) "is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008); *City of Chicago v. Morales*, 527 U.S. 41, 60 (1999). Numerous aspects of Illinois's law suffer from each of these

deficiencies and are thus each vague, prohibiting enforcement of its registration as to them.

In relevant part, Illinois defines as an "assault weapon" certain semiautomatic rifles having:

- a pistol grip or thumbhole stock;
- any feature that can function as a protruding grip that can be held by the non-trigger hand;
- a folding, telescoping, thumbhole, or detachable stock, or a stock that is otherwise foldable or adjustable in a manner that reduces the length, size, or any other dimension, or otherwise enhances the concealability of, the weapon;
- a flash suppressor;
- a shroud attached to the barrel or that partially or completely encircles the barrel, allowing the bearer to hold the firearm with the non-trigger hand without being burned, but excluding a slide that encloses the barrel.

720 Ill. Comp. Stat. Ann. 5/24-1.9(a)(1). Yet the Rules provide no definition for "pistol grip" or "flash suppressor" nor any details on what any of the remaining vague features mean.

For instance, "pistol grips" have existed since at least 1813 in various iterations. *See* Expert Declaration of Stephen Helsley 3-6, *Rupp v. Becerra*, No. 17-cv-00746 (C.D. Cal. Nov. 14, 2017) (ECF No. 24-4). Other jurisdictions with "assault weapon" laws have defined "pistol grip" in a way that would *not* include all such examples. *See, e.g.*, Cal. Code Regs. tit. 11, § 5471(z). It is unclear which iteration(s), if any, Illinois's law contemplates.[3] Likewise, other jurisdictions have defined "flash suppressor" (or "flash hider") as a device that hides flash from the shooter's field of vision, *see, e.g.*, Cal. Code Regs. tit. 11, § 5471(r), while others define it as a device that reduces flash to conceal the shooter. *See, e.g.*, Wash. Rev. Code Ann. § 9.41.010(iv)(E). Whether either or both perspective-based definitions are contemplated here is unclear, as is whether "compensators" that attach to a firearm's barrel to reduce felt recoil and muzzle rise but also affect flash are.[4] As for the various impermissible "stocks," other than a "detachable" one, it is unclear when a stock

---

[3] "Pistol grip" is also undefined as a feature that makes a semiautomatic shotgun into an "assault weapon." 720 Ill. Comp. Stat. Ann. 5/24-1.9(a)(1)(F)(i). "Flash suppressor" is also undefined as a feature that makes a semiautomatic pistol into an "assault weapon." *Id.* at (C)(iv).

[4] https://www.midwayusa.com/product/102089981?pid=390953

"operates to reduce the length, size, or any other dimension, or otherwise enhances the concealability of" a rifle. To avoid "short-barrel rifle" status, a rifle must be a minimum length, including its stock, in its shortest configuration. 18 U.S.C.A. § 921(a)(8). An adjustable stock thus makes a legal rifle *longer* than its minimum length. The statute's failure to define which stocks would "reduce" a firearm's length is thus vague.

Ironically, the only definition provided for a feature—"barrel shroud"—makes the term *more* vague. Setting aside that rifles do not have "slides," this definition covers virtually *every* semiautomatic rifle in existence. All rifles have a barrier between "the non-trigger hand" and the barrel because holding a naked barrel risks burning the user's hand. Illinois could not have intended such an "absurd result" without expressly saying so. *See Portnoy v. Kawecki Berylco Indus., Inc.*, 607 F.2d 765, 769 (7th Cir. 1979) ("Principles of statutory construction allow courts to construe a statute with greater flexibility if the most obvious construction would lead to an absurd result."). But that leaves this term vague as to what it does include.[5]

What constitutes an "assault weapon attachment" is also vague. It is defined as "any device capable of being attached to a firearm that is specifically designed for making or converting a firearm into any of the firearms listed in paragraph (1) of this subsection (a)." 720 Ill. Comp. Stat. Ann. 5/24-1.9(a)(3). "Any part or combination of parts designed or intended to convert a firearm into an assault weapon" is itself also an "assault weapon." 720 Ill. Comp. Stat. Ann. 5/24-1.9(a)(1)(I). First, whether these two provisions contemplate the same universe of items is vague. If not, what "parts" other than "attachments" must be registered is anyone's guess. Second, what specific items those terms contemplate is hopelessly vague. To the extent they are limited to the

---

[5] It is also unclear how "any feature capable of functioning as a protruding grip that can be held by the non-trigger hand" is distinct from "barrel shroud" and not a subset of that vague term.

feature-based terms of "assault weapon" listed in the statute—such as pistol grip, flash suppressor, etc.—those terms themselves are unconstitutionally vague, as explained above. And if they do not, what other parts are contemplated is a mystery. The third vagueness issue is whether "parts" used for *non*-"assault weapons" that are cross-compatible with "assault weapons"—such as pistol grips or adjustable stocks installed on an otherwise legal pump action shotgun, but which also could be installed on an AR-15—would meet the definition of "assault weapon attachments" because they *could* be used as part of an "assault weapon." If so, then the law would ban or require registration of other firearms that are not themselves "assault weapons."

What's more, even if an individual in possession of parts potentially covered by the law decides to register them out of caution, the statutes and Rules are vague on the process for how to do so. The Rules call for an electronic affidavit that includes an affirmation that the affiant possessed any "assault weapon attachment" before January 10, 2023, (or inherited or moved to Illinois with such items). Michel Decl., Ex. B at 5. While the make, model, caliber, and serial number for each "assault weapon" or .50 caliber rifle being registered is required, there is no such identifying information or process articulated for "assault weapon attachments" to be registered. *Id.*, Ex. B at 11. Must people merely affirm that they own "assault weapon attachments" or must they describe each specific attachment? And, if the latter, how do they describe them? The Rules are silent. Similar concerns apply to those in possession of .50 caliber cartridges.

Finally, Illinois includes as "assault weapons" all "copies, duplicates, variants, and altered facsimiles" of a long list of firearms specifically identified by make and model. 720 Ill. Comp. Stat. Ann. 5/24-1.9(j). None of those terms is defined, creating a chilling effect for those fearful that the State may consider a new firearm to be a "copy" of a banned gun. As the *Langley* Plaintiffs recently pointed out, "if the firearms classified as 'copies, duplicates, variants, or altered facsimiles

with the capability of any such weapon' are banned, how is someone supposed to know it?" (Dkt. No. 41). This concern is magnified for registration of existing arms, as it leaves it up to laypersons to determine whether an existing firearm must be registered as a "copy" of a firearm banned by make and model. *See United States v. Lachman*, 387 F.3d 42, 56-57 (1st Cir. 2004) (citing *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982)).

This is unjustifiable. Indeed, California similarly bans firearms considered a "series" of any "assault weapon" listed by make and model. Cal. Penal Code § 30510, subd., (f). To avoid vagueness and lack-of-notice concerns, however, a court held that California can enforce its "assault weapon" restriction on a "series" firearm *only if* its Attorney General includes that specific firearm by name on its public list of "assault weapons." *Harrott v. Cnty. of Kings*, 25 Cal. 4th 1138, 1154-55 (2001). Because Illinois, by contrast, does not provide for this sort of clarity, its residents must struggle with whether their specific firearm is a "copy, duplicate, variant, or altered facsimile" of an "assault weapon" and face serious criminal consequences if they guess incorrectly.

While as applied vagueness challenges are preferred, facial challenges are appropriate where, as here: (1) the "law impacts [a] constitutional right" or (2) "there is a high risk that a law is unconstitutionally vague under the second prong of the void-for-vagueness test – the law is so indefinite or standardless that it allows or encourages arbitrary or discriminatory enforcement." *United States v. Stupka*, 418 F. Supp. 3d 402, 409 (N.D. Iowa 2019) (citing *United States v. Williams*, 553 U.S. 285, 304 (2008); *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)). "In vagueness challenges alleging infringement of constitutionally protected rights, courts may strike down a statute as vague and facially invalid even if that statute is not impermissibly vague in all of its applications." *Karlin v. Foust*, 188 F.3d 446, 458 (7th Cir. 1999); *see also Copeland v. Vance*, 893 F.3d 101, 111 n.2 (2d Cir. 2018), *cert. denied*, -- U.S. --, 139 S. Ct. 2714 (2019). These factors are

all present here.

Indeed, Plaintiffs' concerns are not about uncertainty "at the margins." *Trs. of Ind. Univ. v. Curry*, 918 F.3d 537, 540 (7th Cir. 2019). Nearly every definition of a critical term of a Regulated Item is vague. A facial challenge is thus appropriate.[6] The registration thus crumbles piecemeal with respect to each of these vague terms. In sum, the very terms for the features that define "assault weapon" discussed above are facially vague and the registration thus cannot be enforced as to those terms. Even proceeding as applied, the vagueness issues with the law are legion, and little of the registration scheme will remain once those problematic parts are excised.

Given this vagueness, individuals may reasonably not understand what needs to be registered or how to register certain Regulated Items, and thus may *unintentionally* violate the law, leaving them at the whim of "relatively unaccountable police, prosecutors, and judges, eroding the people's ability to oversee the creation of the laws they are expected to abide." *United States v. Davis*, 139 S. Ct. 2319, 2325 (2019). Should the Court not preliminarily enjoin the registration requirement for failing to provide sufficient notice or for violating the Second Amendment (discussed below), it should at least enjoin its enforcement as to these vague terms.

### B.   Illinois's Registration Requirement Violates the Second Amendment

#### 1.   The Proper Second Amendment Analysis

Last year, the Supreme Court distilled the proper Second Amendment analysis as follows:

> We reiterate that the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2126 (2022) ("*Bruen*"). The Court left no

---

[6] Though Plaintiffs also challenge the law on an as-applied basis. FAC ¶ 175, 185, 196.

confusion about who bears the burden under this analysis, explaining that "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126; *see also id.* at 2127, 2130, 2149 n.25, 2150, 2156. To satisfy its burden, government must produce evidence of a "well-established and *representative* historical analogue," not just some unrepresentative "outlier that our ancestors would never have accepted." *Id.* at 2133 (emphasis added) (quoting *Drummond v. Robinson Township*, 9 F.4th 217, 226 (3rd Cir. 2021)).

The relevant historical timeframe is limited to the Founding because "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Id.* at 2136. Although declining to definitively resolve the question in *Bruen*, because the Court understood the Ratification-Reconstruction distinction to be inapposite in that case, the Court nonetheless has made it abundantly clear that post-Founding history serves a merely confirmatory role of a Founding-era tradition that already has been established. *See id.* at 2136 ("[W]e must … guard against giving postenactment history more weight than it can rightly bear."); *id.* at 2137 ("[T]o the extent later history contradicts what the text says, the text controls."); *id.* (treating 19th-century evidence "as mere confirmation of what the Court thought had already been established"); *id.* ("the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791."); *id.* at 2154 n.28 ("late-19th-century evidence, the 20th-century evidence … does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence."); *see also Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2258-59 (2020) (rejecting examples of 19th-century laws from "more than 30 States" as failing to "establish an early American tradition").

When "a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a *distinctly similar* historical regulation addressing that problem is

relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* at 2131 (emphasis added). In that case, the historical inquiry would be "fairly straightforward." *Id.* When a modern law addresses "unprecedented societal concerns or dramatic technological changes," on the other hand, *Bruen* allows "a more nuanced approach" to the historical inquiry. *Id.* at 2132. In that situation, government need not establish a tradition that is "a historical twin" to the modern law but may use "reasoning by analogy" to show that the modern law is "relevantly similar" to a "well-established and representative historical analogue." *Id.* Although *Bruen* does not "provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment," it noted that where analogizing is allowed, *Heller* and *McDonald* "point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133. "Therefore, whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are 'central' considerations when engaging in an analogical inquiry." *Id.* (citations omitted). Of course, proposed historical analogues must actually be similar to the modern law. *Antonyuk v. Hochul*, 635 F. Supp. 3d 111, 131 (N.D.N.Y. 2022) (citing *Bruen*, 142 S. Ct. at 2133).

### 2.    Illinois's Registration Flunks *Bruen*'s Straightforward Test

#### a.    Illinois's registration implicates the Second Amendment's text

The Second Amendment's plain text covers individuals' keeping of arms. U.S. Const. amend. II; *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008). Illinois residents who do not register their Regulated Items will be unable to legally "keep" them beginning January 1, 2024. In its "preliminary look at the subject," the Seventh Circuit expressed doubts about this Court's conclusion that the firearms Illinois bans constitute "Arms" within the Second Amendment's text. *Bevis v. City of Naperville*, No. 23-1353, 2023 WL 7273709, at *14 (7th Cir. Nov. 3, 2023). The court made clear, however, that Plaintiffs could show that they are "Arms" with a more complete

record. *Id.* To the extent this Court believes that the Seventh Circuit's ruling precludes it from deciding Plaintiffs' Second Amendment challenge to *firearm* registration, Plaintiffs raise the issue here to preserve it for later merits motions or appeal. *See id.* at *36 (Brennan, J., dissenting).

In any event, the Second Amendment protects firearm parts, which the Seventh Circuit did not address. *See, e.g.*, *VanDerStok v. Garland*, 2023 WL 7403413, at *4 (5th Cir. Nov. 9, 2023) ("The tradition of at-home gun-making predates this nation's founding, extends through the revolution, and reaches modern times."); *Mock v. Garland,* No. 23-cv-00095-O, 2023 WL 6457920, at *11 (N.D. Tex. Oct. 2, 2023) ("The history interwoven with the 'right of the people to keep and bear Arms,' U.S. const. amend. II, indicates that the Second Amendment's text has long incorporated the right of personal gunsmithing, i.e., the right of private individuals to modify or acquire modifications to lawfully bearable firearms so as to increase their accuracy and safety for a more effective exercise of self-defense."); *see also Jackson v. City & Cnty. of S.F.*, 746 F.3d 953, 967 (9th Cir. 2014) (citing *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011)). And for good reason. If it did not, government could restrict protected *firearms* by targeting their critical *parts*. At minimum, this Court should thus require the State to show that there is a historical tradition of requiring firearm parts to be registered. The State cannot.

**b.      Illinois's registration requirement has no historical pedigree**

*Assuming* that the Regulated Items are "Arms" within the Second Amendment's text, the rest of the analysis is "fairly straightforward." *Bruen*, 142 S. Ct. at 2131. Indeed, because registration purports to address a problem that has existed since the Founding, criminal misuse of weapons, the State must show that "distinctly similar historical regulations" to its registration existed. *Id.* at 2131-32. Of course, the State cannot because no such laws existed during the relevant historical period. The State will thus no doubt urge this Court to allow analogical reasoning instead. But, because the societal ills registration purports to address are nothing new, such a "more

14

nuanced approach" is not appropriate here. *Id.* Regardless, even if that more liberal approach were appropriate, the State cannot show adequate historical analogues to its registration scheme.

The Second Amendment was written by people who had just revolted against a tyrannical government. They sought to guarantee the People had a final recourse should the new government they were forming turn tyrannical. Tench Coxe, a delegate to the Constitutional Convention, wrote that "[w]hereas civil rulers, not having their duty to the people duly before them, may attempt to tyrannize, … the people are confirmed by the article in their right to keep and bear their private arms." *Remarks on the First Part of the Amendments to the Federal Constitution*, under the pseudonym "A Pennsylvanian" in the Philadelphia Federal Gazette, June 18, 1789, p. 2 col. 1 (as quoted in the *Federal Gazette*, June 18, 1789). Coxe similarly wrote that "Congress have no power to disarm the militia. Their swords, and every other terrible implement of the soldier, are the birthright of an American." Tench Coxe, Letter to the *Philadelphia Gazette*, 20 February 1788. Coxe reaffirmed this view in 1813, writing that "militia" members "have all the right, even in profound peace, to purchase, keep and use arms of every description." Samuel Whiting, et al., *Second American Edition of the New Edinburgh Encyclopædia*, Volume 1 Part 2, at 652 (1813).

Coxe's view dominated the Founding era and 19th century. And the Second Amendment's original meaning has not changed. In a speech to the House of Representatives, Abolitionist Representative Edward Wade said the "right to 'keep and bear arms,' is thus guarantied, in order that if the liberties of the people should be assailed, the means for their defence shall be in their own hands."[7] Senator Charles Sumner's "The Crime Against Kansas" speech likewise bristled at the notion that slavery opponents in Kansas should be disarmed of their Sharps rifles by the pro-slavery government: "Never was this efficient weapon more needed in just self defence, than now

---

[7] Rep. Edward Wade of Ohio, in the House of Representatives, August 2, 1856.

in Kansas, and at least one article in our National Constitution must be blotted out, before the complete right to it can in any way be impeached." Charles Sumner, *The Kansas Question, Senator Sumner's Speech, Reviewing the Action of the Federal Administration Upon the Subject of Slavery in Kansas* 22-23 (Cincinnati, G.S. Blanchard, 1856). Thomas Cooley, a longtime Michigan Supreme Court Justice, likewise wrote that "[t]he right declared was meant to be a strong moral check against the usurpation and arbitrary powers of rulers, and as necessary and efficient means of regaining rights when temporarily overturned by usurpation." Thomas M. Cooley, LL.C., *The General Principles of Constitutional Law in the United States of America* 298 (1898).

Additional examples abound.[8] But there is no need to belabor the point. There can be no historical tradition of registering arms *with* the government when one of the main purposes of the Second Amendment was to be a "doomsday provision" for the People to protect themselves *from* a tyrannical government. *See Silveira v. Lockyer*, 328 F.3d 567, 570 (9th Cir. 2003) (Kozinski, J., dissenting from denial of rehearing en banc). The State cannot possibly square that circle.

Plaintiffs suspect that the State will put forth some well-known historical laws as supposed "analogues" to its registration that appear to have merit at first glance but fail upon closer scrutiny. First, the State will likely point to "muster" laws, some of which required militia members to present their arms for inspection. *See, e.g.*, *An Act to Amend and Reduce into one Act, the Several Laws for Regulating and Disciplining the Militia*, 1785 Va. Acts ch. 1, § III, p 2 (required militia members to keep arms, ammunition, and accoutrements ready for if called by their commanding officer). To be sure, these laws could be seen to share surface-level similarities with registration. But *Bruen* tells us that superficial similarity is not enough to establish the requisite historical

---

[8] C.D. Michel & Konstadinos Moros, *Restrictions That 'Our Ancestors Would Never Have Accepted': The Historical Case Against Assault Weapon Bans*, 24 Wyo. L. Rev. (forthcoming 2023), https://ssrn.com/abstract=4568820.

tradition. Instead, courts are to look at "how" and "why" historical regulations burdened a law-abiding citizen's right to armed self-defense and whether the modern regulation shares those attributes. *Bruen*, 142 S. Ct. at 2133. Illinois's registration shares neither the "how" nor the "why" with these militia laws.   In terms of "how" the militia inspection laws operated, they did not apply to the populace in general, just to militia members. Nor did they require registration of *all* firearms falling within a certain category as Illinois's law does. Rather, those laws merely required that each militia member present *one* arm suitable for militia duties. The "why" is also different. The militia inspection laws were not an exception to a categorical ban of firearms like the Illinois registration is. Rather, they sought the opposite—to guarantee that enough fighting-age males were *sufficiently armed*.[9] This is what the Northern District of Illinois missed in its analysis of colonial-era "muster" laws. *See Herrera v. Raoul*, No. 23-cv-532, 2023 WL 3074799, at *8-9 (N.D. Ill. Apr. 25, 2023). That court did not seriously analyze "how" and "why" militia members were inspected but relied solely on the superficial similarity of mandated firearm inspection. Ultimately, there can be no relevant similarity under *Bruen* when the goals and methods of the compared laws are entirely different, as here. Indeed, "a historical statute cannot earn the title 'analogue' if it is clearly more distinguishable than it is similar . . .." *Antonyuk*, 635 F. Supp. 3d at 131.

A second set of relatively common Founding-era laws that the State will likely point to is those that required inspection of firearms and gunpowder before they could be commercially sold. *See, e.g.*, *Act for the Inspection of Gunpowder*, 1776-1777, N.J. Laws 6, ch. 6 (requiring inspection of gunpowder before sale and appointed state inspectors to "mark" lots that passed inspection);

---

[9] Indeed, as another court recently explained, the State "ignores Founding-era laws that present the best analogue to its present-day magazine law. These are the manifold early militia laws requiring each citizen, not to limit the amount of ammunition he could keep, but to arm himself with *enough* ammunition: at least 20 rounds." *Duncan v. Bonta*, No. 17-cv-1017, 2023 WL 6180472, at *34 (S.D. Cal. Sept. 22, 2023).

*see also* 8 *Documents and Records Relating to the State of New Hampshire During the Period of the American Revolution from 1776-1783* at 15-16 (Nathaniel Bouton ed. 1874), Jan. 12, 1775 (requiring each firearm sold in New Hampshire to pass safe firing inspection). But these were "quality control" laws with a different "why" than Illinois's registration. They were designed to assure firearms' safe and reliable use. They also differed in "how" they operated, as vendors or manufacturers were inspected, not individual owners. And when laws did address home storage of gunpowder, it was to prevent harm from fires or explosions, not to keep a record of who owned what arms. *See Miller v. Bonta*, No. 19CV01537BENJLB, 2023 WL 6929336, at *23 (S.D. Cal. Oct. 19, 2023) ("These were *fire* safety regulations—nothing more.").

Registration laws did not appear until the 20th century. Most prominently, the National Firearms Act required registration of certain firearms like machine guns. 26 U.S.C.A. § 5811. The stated goal of that registration, however, was taxation. *United States v. Dalton*, 960 F.2d 121, 124-25 (10th Cir. 1992) (citing *United States v. Rock Island Armory, Inc.*, 773 F. Supp. 117, 120 (C.D. Ill. 1991)). Illinois forbids new registrations after January 1, 2024, except for those who move into the state. 720 Ill. Comp. Stat. Ann. 5/24-1.9(d). New NFA arms, by contrast, can still be registered (except machine guns made after 1986, 18 U.S.C.A. § 922(o)). Thus, even if the NFA were from a relevant historical period that could "provide insight into the meaning of the Second Amendment," rather than "contradict[ing] earlier evidence," as it does, *Bruen*, 142 S. Ct. at 2154 n.28, it still fails as an analogue because it operates under a much different "why" and is thus not relevantly similar to Illinois's registration.

To the contrary, our historical tradition has been to maintain privacy around firearm ownership. Indeed, even as recently as the 1980s, the Firearms Owners' Protection Act forbade the federal government from keeping a registry directly linking non-NFA firearms to their owners, a

law still in effect today. *See* 18 U.S.C.A. § 926. This reveals a belief among Americans that firearm ownership is a private matter. That's unsurprising. Just as the Fourth Amendment "would be of little practical value if the State's agents could stand on a home's porch or side garden and trawl for evidence with impunity," *Florida v. Jardines*, 569 U.S. 1, 6 (2013), so too would it make little sense for government to have an accounting of individuals' firearms when the genesis of the Second Amendment was in part, as explained above, fear of government tyranny.

At bottom, no historical tradition supports requiring the registration of classes of commonly owned firearms and parts. If Regulated Items are "Arms," Illinois's requirement thus violates the Second Amendment. Nothing in the Seventh Circuit's superficial "preliminary assessment" doubting the unconstitutionality of registration precludes that conclusion. The court's doubt rested primarily on its (erroneous) conclusion that Regulated Items are outside the Second Amendment's text, *Bevis*, 2023 WL 7273709, at *14. Plaintiffs' analysis assumes that they are "Arms." While the Seventh Circuit passingly mentions that Illinois's registration is "no more onerous than many found in history," it cites no historical example nor provides further discussion. *Id.* at *16. Plaintiffs, on the other hand, provide a robust discussion of the relevant historical tradition against registration that the Seventh Circuit did not consider and that rebuts the *Herrera* court' errors.

This Court should thus preliminarily enjoin Illinois's registration requirement for violating the Second Amendment, at least as to parts, but need not if it finds either of Plaintiffs' other two claims sufficient bases to do so. Plaintiffs are sensitive to the complexities of deciding legal issues that are *sub judice* by a higher court. But Illinois imposed an unconstitutional registration mandate on an equally unconstitutional timeframe. Plaintiffs have no other choice but to seek relief now.

* * * *

In sum, at least some of Plaintiffs' various challenges to Illinois's registration "ha[ve] some

likelihood of success on the merits" despite the Seventh Circuit's initial decision. *Eli Lilly and Co. v. Arla Foods, Inc.*, 893 F.3d 375, 381 (7th Cir. 2018); *see also Am. Hosp. Supply Corp. v. Hosp. Prod. Ltd.*, 780 F.2d 589, 613 (7th Cir. 1986). Plaintiffs are thus entitled to a preliminary injunction of that requirement, at least as to any item depending on a vague term identified above.

## II.    THE OTHER PRELIMINARY INJUNCTION FACTORS WARRANT RELIEF

If Plaintiffs are likely to succeed on any of their three claims, then "[t]he existence of a continuing constitutional violation constitutes proof of an irreparable harm." *Preston v. Thompson,* 589 F. 2d 300, 303 n.3 (7th Cir. 1978). This includes violations of Second Amendment rights. *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010); *see also Ezell*, 651 F. 3d at 700; *Baird v. Bonta*, No. 23-15016, 2023 WL 5763345, at *4 (9th Cir. Sept. 7, 2023). There is no question that the infringement on Plaintiffs' rights is real and imminent. If they do not comply with registration by January 1, 2024, despite its various constitutional infirmities described above, they face serious consequences, including incarceration. People who fail to register because of a lack of notice about the requirement, or because the vagueness described above makes them uncertain about *what* needs to be registered, are turned into criminals overnight. There is no un-ringing that bell.

The balance of hardships and equities with the public interest also favors Plaintiffs. When government is a party, these factors merge. *Nken v. Holder,* 556 U.S. 418, 435 (2009). And "'[i]t is always in the public interest to prevent the violation of a party's constitutional rights.'" *Mitchell v. Baker*, No. 13-cv-0860-MJR-SCW, 2015 WL 278852, at *7 (S.D. Ill. Jan. 21, 2015). On the other hand, "the public interest is not harmed by preliminarily enjoining … a law that is probably unconstitutional." *Am. Civ. Libs. Union v. Alvarez*, 679 F. 3d 583, 590 (7th Cir. 2012); *see also Baird v. Bonta*, No. 23-15016, 2023 WL 5763345, at *4 (9th Cir. Sept. 7, 2023) (citing *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005)). Every *Winter* factor thus favors Plaintiffs.

/ / /

/ / /

## CONCLUSION

For these reasons, this Court should preliminarily enjoin Illinois's registration requirement.

Dated: November 13, 2023                    Respectfully submitted,

                                            By: /s/ C.D. Michel
                                                 Attorneys for Plaintiffs

Mark L. Shaw, Esq.                          C.D. Michel, Esq. (pro hac vice)
Jennifer Craigmile Neubauer, Esq.           Sean A. Brady, Esq. (pro hac vice)
Michael A. Danforth, Esq.                   Konstadinos T. Moros, Esq. (pro hac vice)
SHAW LAW LTD.                               MICHEL & ASSOCIATES, P.C.
33 North County Street, Suite 300           180 East Ocean Blvd., Suite 200
Waukegan, Illinois 60085                    Long Beach, CA 90802
(T): (847) 244-4696                         (T): (562) 216-4444
(F): (847) 244-4673                         (F): (562) 216-4445
(E-1): mlshaw@shawlawltd.com                (E-1): cmichel@michellawyers.com
(E-2): jcneubauer@shawlawltd.com            (E-2): sbrady@michellawyers.com
(E-3): michael@danforthlawgroup.com         (E-3): kmoros@michellawyers.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 13, 2023, an electronic PDF of FEDERAL

FIREARMS LICENSEES OF ILLINOIS PLAINTIFFS' MOTION FOR A PRELIMINARY

INJUNCTION was uploaded to the Court's CM/ECF system, which will automatically generate

and send by electronic mail a Notice of Docket Activity to all registered attorneys participating

in the case. Such notice constitutes service on those registered attorneys.


Dated: November 13, 2023                       Respectfully submitted,

                                               *s/ C.D. Michel*
                                               C.D. Michel