# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CALEB BARNETT, *et al.*,<br>        Plaintiffs,<br>                         vs.<br>KWAME RAOUL, *et al.*,<br>        Defendants. | Case No.  3:23-cv-209-SPM<br>** designated Lead Case |
| DANE HARREL, *et al.*,<br>        Plaintiffs,<br>                         vs.<br>KWAME RAOUL, *et al.*,<br>        Defendants. | Case No.  3:23-cv-141-SPM |
| JEREMY W. LANGLEY, *et al.*,<br>        Plaintiffs,<br>                         vs.<br>BRENDAN KELLY, *et al.*,<br>        Defendants. | Case No.  3:23-cv-192-SPM |
| FEDERAL FIREARMS<br>LICENSEES OF ILLINOIS, *et al.*,<br>        Plaintiffs,<br>                         vs.<br>JAY ROBERT "JB" PRITZKER, *et al.*,<br>        Defendants. | Case No.  3:23-cv-215-SPM |

## THE STATE DEFENDANTS' CONSOLIDATED BRIEF
## IN OPPOSITION TO THE SECOND MOTION FOR PRELIMINARY INJUNCTION
## AND IN SUPPORT OF THEIR PARTIAL RULE 12(B)(6) MOTION TO DISMISS IN
## *FEDERAL FIREARMS LICENSEES OF ILLINOIS V. PRITZKER*

KWAME RAOUL
*Attorney General of Illinois*

Christopher G. Wells
Kathryn Hunt Muse
Darren B. Kinkead
Rebekah Newman
Illinois Attorney General's Office
100 W. Randolph St.
Chicago, Illinois 60601
*Counsel for the State Defendants*

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................ 2

LEGAL STANDARD ........................................................................................................ 8

ARGUMENT ..................................................................................................................... 9

I.   Plaintiffs' new claims are unlikely to succeed on the merits. ................................... 9

  A.   Plaintiffs' insufficient notice claim fails as a matter of law. ................................ 9

    1.   Plaintiffs lack standing because they have actual notice of the endorsement affidavit
process. ........................................................................................................... 10

    2.   The Act and its implementing regulations provide constitutionally sufficient notice of
the endorsement affidavit process. .................................................................. 13

  B.   Plaintiffs' vagueness claim fails as a matter of law. .......................................... 17

    1.   The definition of "assault weapon" has a core of meaning that forecloses Plaintiffs'
vagueness challenge. ....................................................................................... 18

    2.   The firearm parts referenced in the Act's features-based definition have a core of
meaning. .......................................................................................................... 22

    3.   Numerous courts have rejected Plaintiffs' argument challenging the anti-copycat
provision. ......................................................................................................... 25

    4.   The Act's multi-layered scienter requirement forecloses Plaintiffs' challenge to the
"part[s]" and "attachment[s]" provisions. ...................................................... 27

  C.   The Seventh Circuit has already held that any Second Amendment challenge to the
registration process is unlikely to succeed on the merits. ................................. 30

    1.   Plaintiffs' attempt to sidestep the Seventh Circuit's ruling is a ruse this Court must
reject. ............................................................................................................... 31

    2.   The registration process for grandfathered assault weapons does not reach conduct
covered by the Second Amendment's plain text. ........................................... 35

    3.   The registration process is consistent with the nation's historical tradition of firearm
regulation. ....................................................................................................... 38

II.   Plaintiffs have not shown the other requirements for preliminary relief are met. ... 41

III. In the alternative, an injunction should be limited and stayed pending appeal. ...... 42

  A.   Any injunction must be limited to the scope of Plaintiffs' request. .................... 42

  B.   Any injunction should be stayed for the pendency of an interlocutory appeal. .... 44

CONCLUSION ................................................................................................................ 45

## INTRODUCTION

Having failed to convince the Seventh Circuit that this Court's prior injunction of the Protect Illinois Communities Act (the "Act") should stand, plaintiffs ask this Court to subvert that ruling and enjoin significant portions of the Act again. Their request should be denied.

Plaintiffs say their new request is different: This time they claim to be targeting only the process for registering grandfathered "assault weapon[s]" regulated by the Act. But their prior injunction request—and this Court's prior injunction order—included the registration process. Not only that, in the consolidated appellate proceedings, the Seventh Circuit already considered whether to preliminarily enjoin the registration process specifically and decided against it.

Undeterred, plaintiffs press three claims that have no chance of success. First, plaintiffs ask for the registration process to be enjoined because some people—though not plaintiffs—might not know about the process and the impending January 1, 2024 deadline to complete it. Article III does not allow this Court to consider this hypothetical claim, but even if it did, public notice of the Act has more than satisfied constitutional due process. Not only will plaintiffs' insufficient notice claim fail to succeed, it should be immediately dismissed as a matter of law, as requested in the defendants' separate, concurrently filed partial motion to dismiss.

Second, plaintiffs feign confusion about the precise meaning of certain firearm *parts* referenced in one subsection of the Act's definition of "assault weapon". But the Act's definition has a core of meaning that defeats plaintiffs' facial vagueness challenge, and their speculation about hypothetical edge cases is irrelevant according to Seventh Circuit precedent. This claim too will fail and should also be immediately dismissed.

With those two decoy claims as cover, plaintiffs proceed with their true objective: re-litigating whether the Second Amendment protects the "assault weapon[s]" regulated by the Act. Plaintiffs try to sidestep the Seventh Circuit's ruling on that issue with an argument that defies

logic: They claim that the *parts* of an assault weapon are protected by the Second Amendment even though the Seventh Circuit just said the weapons as a whole are probably not. Plaintiffs quickly give up the ruse, however, and proceed to openly argue that the registration requirement must be preliminarily enjoined because assault weapons are protected by the Second Amendment. Plaintiffs remain free to press for preliminary injunctive relief based on that belief—just not in this Court. And that is in fact what they are doing: plaintiffs are continuing to seek appellate review of their first preliminary injunction motion. Given this procedural posture, what plaintiffs ask this Court to do is truly extraordinary. They want this Court to overrule the Seventh Circuit's decision declining to preliminarily enjoin the Act. The Court should not do so.

Even if the merits cut the other way (they don't), an injunction would inflict the very harm plaintiffs claim to want to prevent. The registration process allows people to continue lawfully possessing grandfathered assault weapons. If this Court enjoins that process, and that injunction is later vacated, non-parties may miss their window to register. Sowing confusion about whether the Act remains in effect—when the Seventh Circuit has just said it is—benefits no one. Plaintiffs' new injunction request should be denied and their new due process claims should be dismissed.

## BACKGROUND

**The Act.** On January 10, 2023, the Governor signed the Act into law.[1] Relevant to the current motions, the Act prohibited most sales, purchases, and possession of "assault weapon[s]," but provided a way for individuals who already lawfully possessed assault weapons to continue to lawfully possess them. To lawfully possess an assault weapon after January 1, 2024, by that date, an individual not otherwise exempted from the Act must submit to the Illinois State Police ("ISP") an endorsement affidavit stating: (1) their Firearm Owner's Identification Card number; (2) an

---

[1] A more complete background for the Act is in the State Defendants' March 2, 2023 opposition to the first set of motions for preliminary injunction. ECF 37 at 4–7.

affirmation that they possessed the assault weapon(s) prior to January 10, 2023; and (3) the make, model, caliber, and serial number of the assault weapon(s) that they possess. 720 ILCS 5/24-1.9(d). The Act provided ISP until October 1, 2023 to prescribe the form and manner for these affidavits, and allowed ISP until that date to identify "the list of assault weapons subject to the endorsement affidavit" via rulemaking. *Id.* The Act specifically authorized ISP to "adopt emergency rules" to accomplish this rulemaking. *Id*. § (d)(3).

**FFL-IL Plaintiffs' Lawsuit.** On January 24, 2023, plaintiffs sued alleging the Act's restrictions violate the Second Amendment. *FFL* ECF 1 ("Compl."). They named the Governor, the Attorney General, and the ISP Director as defendants ("State Defendants" or "State"). Plaintiffs include four gun rights advocacy organizations ("Advocacy Plaintiffs"). *Id.* ¶¶ 12–18. Plaintiff Piasa Armory is a gun store ("Gun Store Plaintiff"). *Id.* ¶¶ 19. There are three individual plaintiffs: Debra Clark and Jasmine Young want to purchase AR-15s, *id.* ¶¶ 20–21, while Chris Moore wants "to provide [his] wife with the firearms" he believes "are best suited to her needs"—an AR-15, *id.* ¶ 22 and *FFL* ECF 29-3, Moore Decl. ¶¶ 6–7 (collectively, "Individual Plaintiffs"). Plaintiffs acknowledged the Act allowed "[e]xisting owners [to] be 'grandfathered into' compliance with the law if they submit an affidavit to" ISP, but did not describe plaintiffs who already owned assault weapons and were thus eligible for that opportunity. *Id.* ¶ 133; *see also id.* ¶ 120. The complaint included conclusions regarding the constitutionality of registration. *Id*. ¶¶ 120–21, 197. On February 6, Plaintiffs filed their first preliminary injunction motion. *FFL* ECF 28.

**The Consolidated Proceedings**. On February 24, the *FFL-IL* action was partially consolidated with three similar actions. ECF 32.[2] All plaintiffs moved for a preliminary injunction to enjoin how the Act regulated assault weapons and large-capacity magazines, alleging it violated

---

[2] All references to docket entries are to the consolidated *Barnett* docket unless otherwise indicated.

the Second Amendment. The Court issued a preliminary injunction on April 28 purporting to enjoin the entire Act. ECF 101 ("Injunction Order"). On May 4, the Seventh Circuit granted the State Defendants' motion to stay the Injunction Order during their interlocutory appeal. ECF 108. The Seventh Circuit heard argument in June, along with appeals of two Northern District of Illinois interlocutory orders. *See Bevis v. Naperville*, No. 22-cv-4775, 2023 WL 2077392 (Feb. 17, 2023) (refusing to enjoin enforcement of the Act's weapons and magazine restrictions on Second Amendment grounds); *Herrera v. Raoul*, No. 23-cv-532, 2023 WL 3074799 (Apr. 25, 2023) (same, and further finding the Act's registration option did not violate Second Amendment).

While the appeal was being briefed, on May 19, the *Langley* plaintiffs filed a partial motion for summary judgment on their claims that the Act was vague, and again sought an injunction. ECF 111. The State Defendants filed a timely response. ECF 116. At a status hearing on August 14, the Court considered how to proceed with the vagueness claims and injunction request. The *FFL-IL* plaintiffs did not reveal an intention to add claims or seek another injunction based on confusion they were experiencing with how "assault weapon" was defined for the sale, purchase, and possession restrictions that had been in effect for months. And so, the Court denied Defendant Kelly's request for consolidated discovery, and only ordered that "[t]he stay on discovery is lifted as to depositions of affiants in the *Langley* case." ECF 121. On October 3, those two depositions took place. ECF 124. On October 11, the Court heard oral argument regarding the alleged vagueness of the Act's definition of assault weapons. *Id.* Once again, the *FFL-IL* plaintiffs did not disclose that they too had vagueness concerns with the definition and would want an injunction on that basis.

**ISP's Implementation of the Endorsement Affidavit Process.** Meanwhile, in accordance with § 1.9(d) of the Act, ISP issued rules governing the endorsement affidavit process

4

on September 15, 2023. *See* 20 Ill. Admin. Code § 1230.10, 1230.15, 1230.65, App'x A & B; *FFL* ECF 57-1, Ex. B. The rules included an appendix identifying "assault weapon[s]" subject to the endorsement affidavit process that tracked the Act's definition by including both a features-based definition and a make-and-model list of specific firearms. *FFL* ECF 57-1, Ex. B, at 37–47; 720 ILCS 5/24-1.9(a)(1); 20 Ill. Admin. Code § 1230, App'x A. The rules also indicated that ISP would make the list "available on the Illinois State Police website" and that the list would be "updated on the website" at least annually. *FFL* ECF 57-1, Ex. B at 47. On October 1, 2023, ISP published an *Assault Weapon Identification Guide* on its website with photos of illustrative examples of "assault weapon[s]" regulated by the Act, including examples of firearms not listed by make-and-model in the Act but that otherwise fell within the Act's definition of "assault weapon."[3]

Also on October 1, 2023, ISP began accepting endorsement affidavits electronically through ISP's online portal for obtaining, renewing, and updating a Firearm Owner's Identification Card ("FOID") or a Concealed Carry License ("CCL").[4] ISP also prepared and posted "[a] tutorial video on how to submit an endorsement affidavit through [a] FOID account,"[5] and invited "[i]ndividuals who need help submitting an endorsement affidavit" to refer to a "Frequently Asked Questions" ("FAQs") page on ISP's website, or to visit one of four ISP kiosks located throughout

---

[3]   ISP, *Assault Weapon Identification Guide*, Version 2023.10.01, available at https://isp.illinois.gov/StaticFiles/docs/Home/AssaultWeapons/PICA%20Identification%20Guide.pdf (last visited Nov. 30, 2023). Information on ISP's website, as the official website of a government agency, is subject to judicial notice. *See LaBella Winnetka, Inc. v. Village of Winnetka*, 628 F.3d 937, 944 n.3 (7th Cir. 2010) (taking judicial notice of municipal government's website); *accord Denius v. Dunlap*, 330 F.3d 919, 926 (7th Cir. 2003) (collecting cases taking judicial notice of information posted on government websites).

[4] ISP, Press Release, *Protect Illinois Communities Act Endorsement Affidavit Now Available* (Oct. 1, 2023), available at https://isp.illinois.gov/Media/CompletePressRelease/855 (last visited Nov. 30, 2023).

[5] *Id.* ISP's website includes a link to the tutorial, which is posted here: https://www.youtube.com/watch?v=Ml-yl-_NTDQ (last visited Nov. 30, 20223) (hereafter, "ISP Tutorial").

Illinois (in Lockport, Springfield, Collinsville, and Du Quoin).[6] As noted in ISP's tutorial video, anyone accessing the online FOID card portal receives a "System Alert" notification referencing the Act becoming law and linking to ISP's FAQs both before and after logging in.[7] The current version of the "System Alert" includes links to the FAQs, the *Assault Weapon Identification Guide*, and a description of "[w]ho needs to submit an affidavit[.]"[8]

On November 2, 3, and 6, ISP convened three public hearings in Springfield, Chicago, and Caseyville, respectively, regarding the rules governing the endorsement affidavit process and implementing the Act.[9] ISP has addressed various questions and comments from those hearings, as well as others ISP has received, through FAQs on its website, which currently lists 75 questions and answers regarding the Act.[10] ISP's website also invites members of the public with "questions about compliance with the [Act]" not addressed by the FAQs, or otherwise in "need of help submitting an endorsement affidavit," to submit questions by email or to visit one of its kiosks.[11]

**FFL-IL Plaintiffs Add Last-Minute Claims.** On November 2, the *FFL-IL* plaintiffs amended their complaint. It adds no new counts, plaintiffs, or facts about the plaintiffs. *FFL* ECF 55 ("Am. Compl."). Rather, it (mis)characterizes how ISP complied with the Act to adopt rules to enable registration of grandfathered weapons via electronic submission of endorsement affidavits, adds a litany of conclusory statements about the constitutionality of registration and ISP's

---

[6] ISP, Press Release, *supra*, note 4; ISP, *Protect Illinois Communities Act, Regulation on Assault Weapons*, available at: https://isp.illinois.gov/Home/AssaultWeapons (last visited Nov. 28, 2023) (hereafter, "ISP Protect Illinois Communities Act Webpage").
[7] ISP Tutorial, *supra*, note 5, at 00:52-01:03, 01:23-01:41.
[8] ISP, *System Alert*, available at: https://www.ispfsb.com/Public/Login.aspx (last visited Dec. 1, 2023).
[9] ISP Protect Illinois Communities Act Webpage, *supra*, note 6.
[10] *Id.*
[11] *Id.*

regulations, and asks the Court to enjoin the Act's provisions relating to endorsement affidavits before the statutory time expires for registration (January 1, 2024).

**The Seventh Circuit Vacates the Injunction Order.** On November 3, the Seventh Circuit published an order vacating this Court's Injunction Order and affirming the Northern District judges' denial of preliminary injunctive relief. *Bevis v. City of Naperville*, No. 23-1353, No. 23-1793, No. 23-1825, 2023 WL 7273709 (7th Cir. Nov. 3, 2023) (hereinafter "*Bevis*"). In a 2-1 decision, the majority found the State has "a strong likelihood of success in the pending litigation," and concluded that the Act should not be enjoined during the litigation. *Id.* at *1. Applying *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022), and *District of Columbia v. Heller*, 554 U.S. 570 (2008), the majority found all plaintiffs are likely to fail because the weapons regulated by the Act are not "Arms that ordinary people would keep at home for lawful purposes of self-defense," and thus fall outside the scope of the Second Amendment. *Bevis*, 2023 WL 7273709, at *11. That alone was enough to deny preliminary relief. But the majority went on to explain that even if the plaintiffs could meet their burden to show the text of the Second Amendment was implicated, the State Defendants are likely to succeed under *Bruen*'s test for the constitutionality of firearm regulations, because the Act's restrictions on weapons and magazines are "consistent with the history and tradition of firearms regulation" in this country. *Id.* at *14.

**The Seventh Circuit Declines to Preliminarily Enjoin the Registration Process.** Because a plaintiff in the Northern District, Javier Herrera, also asked the court to enjoin the Act's requirement that he register assault weapons he currently owns to continue to possess them, the Seventh Circuit addressed that too. On that issue, the panel unanimously agreed that the registration process should not be enjoined. The majority explained that in light of its prediction that the State will prevail against the Second Amendment arguments, registration "will be valid as

long as it can withstand rational basis review," and "should not be enjoined." *Id.* at *18. Although otherwise dissenting, Judge Brennan agreed with the majority "that on this record, the registration requirement does not appear to be unconstitutional." *Id*. at *30.

 **The *FFL-IL* Plaintiffs Ask for Another Preliminary Injunction.** Ten days later, on November 13, the *FFL-IL* plaintiffs (hereinafter "Plaintiffs") filed a second motion for preliminary injunction here, asking the Court to enjoin the registration provisions. *FFL* ECF 57. The motion argues: (1) the State failed to provide adequate notice and time to submit endorsement affidavits; (2) the statutory terms for identifying assault weapons are "vague," and (3) the registration process for grandfathered assault weapons violates the Second Amendment because there is no historical tradition of requiring individuals to register "every firearm or part of a certain type that they own." *Id.* at 1. The motion attached a declaration from a former National Rifle Association ("NRA") lobbyist and current member of the Advocacy Plaintiffs. *FFL* ECF 57-2.

## LEGAL STANDARD

 For the second time, Plaintiffs seek a preliminary injunction against the Act. Preliminary injunctive relief is "an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). For this reason, a "preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Orr v. Shicker*, 953 F.3d 490, 501 (7th Cir. 2020). To warrant such relief, the movant "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008). More than "the mere possibility of success" is necessary; rather, the movant must "make a 'strong' showing on the merits." *Protect Our Parks, Inc. v. Buttigieg*, 10 F.4th 758, 763 (7th Cir. 2021) (per curiam). If the movant makes

a "strong showing" of likely success and irreparable harm with no relief, the court applies a balancing test, "weigh[ing] the harm that the plaintiff will suffer absent an injunction against the harm to the defendant from an injunction, and consider[ing] whether an injunction is in the public interest." *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019).

Because Plaintiffs' newly added due process claims fail as a matter of law, the State Defendants seek dismissal of those claims through a concurrently filed motion under Rule 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although the Court must accept as true the well-pleaded factual allegations in the complaint, the Court need not credit legal conclusions, or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.*

## ARGUMENT

### I.   Plaintiffs' new claims are unlikely to succeed on the merits.

#### A.   Plaintiffs' insufficient notice claim fails as a matter of law.

When the Act became law on January 10, 2023, it established a process for allowing lawful owners of previously acquired "assault weapon[s]" to continue possessing them by submitting an endorsement affidavit to ISP identifying the exempted weapons by January 1, 2024. Paradoxically, Plaintiffs want this Court to enjoin that process. They want this "registration requirement" enjoined because they argue some people in Illinois may "not have been provided specific notice" of the Act's "mandates." *FFL* ECF 57 at 3, 19. But Plaintiffs admit they have notice of the provisions they challenge; as a result, they have no standing to bring their new due process claim. Nor have the Advocacy Plaintiffs established standing to seek relief for unidentified non-parties. Even if Plaintiffs had standing, Plaintiffs' insufficient notice claim fails as a matter of law and cannot be

the basis for a preliminary injunction. In both timing and form, the notice provided by the Act satisfies constitutional due process for a legislative enactment and accompanying regulations.

### 1. Plaintiffs lack standing because they have actual notice of the endorsement affidavit process.

Plaintiffs must "'demonstrate standing for each claim they press.'" *Dinerstein v. Google, LLC*, 73 F.4th 502, 511 (7th Cir. 2023) (quoting *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021)). "[Their] burden to demonstrate standing in the context of a preliminary injunction motion is at least as great as the burden of resisting a summary judgment motion," which means they "must set forth by affidavit or other evidence specific facts, rather than general factual allegations of injury." *Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020) (cleaned up). Because their due process claim challenges an alleged lack of notice of the endorsement affidavit process, Plaintiffs' "burden" is to "show that they personally have been injured" by the allegedly insufficient notice, "not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Warth v. Seldin*, 422 U.S. 490, 502 (1975). Plaintiffs have not come close to carrying this burden.

Quite the opposite: Plaintiffs admit they "are generally aware of" these "new requirements." *FFL* ECF 57 at 3–4. But their "members and other Illinoisans cannot be expected to be" because "[t]he State did not provide direct notice to firearm owners about what items must be registered." *Id.* at 4. In other words, Plaintiffs do not seek redress for their own injuries; rather, they seek redress for injuries they speculate may have been suffered by hypothetical non-parties not before the Court. *See, e.g.*, *id.* at 5 n.2 (asking the Court to "[i]magine" people who may not know about the endorsement affidavit process). Plaintiffs' hypothesizing about unidentified "Illinoisans" is not a basis for standing.

"The general rule is that plaintiffs must allege their own injuries to establish standing." *Bria Health Services, LLC v. Eagleson*, 950 F.3d 378, 384 (7th Cir. 2020); *see Hollingsworth v. Perry*, 570 U.S. 693, 705 (2013) ("To have standing, a litigant must seek relief for an injury that affects him in a 'personal and individual way.'"). "If the plaintiff does not claim to have suffered an injury that the defendant caused and the court can remedy, there is no case or controversy for the federal court to resolve." *Casillas v. Madison Avenue Associates, Inc.*, 926 F.3d 329, 333 (7th Cir. 2019). When a plaintiff has no standing for a claim, a federal court has no Article III jurisdiction over it. *Simic v. Chicago*, 851 F.3d 734, 737–38 (7th Cir. 2017) (finding no Article III standing for preliminary injunction and suggesting claim should therefore be dismissed on remand); *MainStreet Org. of Realtors v. Calumet City, Ill.*, 505 F.3d 742, 749 (7th Cir. 2007) (same); *Elec. Privacy Info. Center v. U.S. Dep't of Commerce*, 928 F.3d 95, 104 (D.C. Cir. 2019) (same). Here, the Individual Plaintiffs cannot be injured by the endorsement affidavit process because none have alleged they lawfully owned an assault weapon prior to the Act's effective date; and in any event, their amended complaint confirms they all have notice of the process and the deadline for registering such weapons. The Gun Store Plaintiff is not an individual and thus cannot be injured by a process provided to allow individuals a path to continue their lawful possession of grandfathered weapons. The Advocacy Plaintiffs do not bring any claims on their own behalf and do not attempt to show "their own injuries" from the allegedly insufficient notice; because they admit to having notice, there are no such injuries. *Bria Health*, 950 F.3d at 384.

Nor have any of the Advocacy Plaintiffs seriously attempted to show the type of "representational" standing that allows an organization to bring claims "solely as the representative of its members." *Warth*, 422 U.S. at 511; *accord Students for Fair Admissions, Inc. v President and Fellows of Harvard College*, 143 S. Ct. 2141, 2157–58) (2023) (hereinafter "*SFFA*"). While

the Advocacy Plaintiffs are associations, Am. Compl. ¶¶ 12-18, which can be allowed "to sue on behalf of [their] members" in certain circumstances, *Bria Health*, 950 F.3d at 384, they must show that "[their] members would otherwise have standing to sue in their own right[.]" *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977); *SFFA*, 143 S. Ct. at 2157 (quoting same). Plaintiffs attach a single declaration from Donald T. "Todd" Vandermyde who states he is a member of all three Advocacy Plaintiffs. *FFL* ECF 57-2, Vandermyde Decl. ¶ 13. But Mr. Vandermyde readily admits he is both aware of and "subject to the new registration requirements" that Plaintiffs challenge. *Id.* ¶ 14. Mr. Vandermyde's self-professed notice of these provisions means that he too lacks any injury from the allegedly insufficient notice, and that he too has no "standing to sue in [his] own right" on this claim. *Hunt*, 432 U.S. at 343. Absent evidence any of their members have insufficient notice of the challenged provisions in the Act, the Advocacy Plaintiffs have not met the requirements for representational standing for this claim.

The Advocacy Plaintiffs' speculation that some of their members *might not* know about the deadline to complete an endorsement affidavit, *FFL* ECF 57 at 4, is unsupported by any "evidence" of "specific facts," *Speech First*, 968 F.3d at 638. If the Advocacy Plaintiffs' members remain in the dark about the endorsement affidavit process, it is only because Plaintiffs, despite their educational missions, *e.g.*, Am. Compl., ¶¶ 13, 17, have elected not to enlighten them—a dubious gambit that cannot satisfy Article III. If associations cannot "manufacture standing merely by inflicting harm on themselves," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013), then they may not do so by inflicting harm on their members, *see, e.g.*, *Parvati Corp. v. Oak Forest*, 630 F.3d 512, 518 (7th Cir. 2010) ("self-inflicted injuries" are insufficient for Article III standing because they "break the causal chain linking the defendant's conduct to the asserted injury").

12

Plaintiffs disregard the constitutional requirement that "a federal court may resolve only 'a real controversy with real impact on real persons'"—and does not possess "a roving commission to publicly opine on every legal question." *TransUnion*, 141 S. Ct. at 2203. Plaintiffs admit they are not injured by the State's purportedly insufficient notice. *Contra Bria Health*, 950 F.3d at 384. They have no evidence anyone else has been injured. *Contra Speech First*, 968 F.3d at 638. And they offer no argument why Article III would permit them to represent these hypothetical victims. *Contra Hollingsworth*, 570 U.S. at 708 ("even when we have allowed litigants to assert the interests of others, the litigants themselves still 'must have suffered an injury in fact'"). "The desire to obtain a sweeping injunction cannot be accepted as a substitute for compliance with the general rule that the complainant must present facts sufficient to show that his individual need requires the remedy for which he asks." *McCabe v. Atchison, Topeka & Santa Fe Ry.*, 235 U.S. 151, 164 (1914). Plaintiffs have not done so.

## 2. The Act and its implementing regulations provide constitutionally sufficient notice of the endorsement affidavit process.

The Court does not need to assess Plaintiffs' likelihood of success on their insufficient notice claim because they have no standing to bring it. But even if the Court does consider the merits, Plaintiffs' claim will not succeed and should be dismissed as a matter of law. Plaintiffs fundamentally misunderstand the constitutional standard for adequate notice of legislative and regulatory enactments, which the Act and its implementing regulations easily meet.

Due process does not require the State to provide specific notice of new legislative requirements, much less "direct notice to firearm owners about what items must be registered." ECF 57 at 4. "Whether an affected party must receive individual notice depends upon the character of the [government] action." *Brown v. McGarr*, 774 F.2d 777, 784 (7th Cir. 1985). Plaintiffs' theory that due process requires "direct notice" of the challenged provisions is directly contrary to

black-letter law: "[I]t has never been suggested that each citizen must in some way be given specific notice of the impact of a new statute on his property before that law may affect his property rights." *Texaco, Inc. v. Short*, 454 U.S. 516, 536 (1982). "[T]he rule," rather, is "that the legislative publication of a statute satisfies the notice requirement of procedural due process." *Brown*, 774 F.2d at 785. "When individual interests are adversely affected by a legislation action, publication of the statute puts all individuals on notice of a change in the law of the jurisdiction; individual notice is not required." *Id.* at 784 (citing *Texaco*, 454 U.S. at 531–38). The same is true for agency rulemaking. *Id.* "On the other hand, in an adjudicatory hearing, procedural due process requires that an individual whose interest is at stake must be given, 'notice reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *Id.* (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)).

Plaintiffs challenge legislative and rulemaking actions, yet they improperly rely on cases addressing the notice required in adjudicatory actions. *E.g.*, *FFL* ECF 57 at 4 (citing *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 3–7 (1978), which concerns a public utility's procedures for discontinuing service to customers with disputed charges); *FFL* ECF 57 at 5 (citing *Snider Int'l Corp. v. Town of Forest Heights*, 739 F.3d 140, 142–43 (4th Cir. 2014), which concerns a town's procedures for contesting traffic citations). This mix-and-match approach is directly contrary to binding precedent. *E.g.*, *Brown*, 774 F.2d at 784. In the same vein, Plaintiffs rely on *Lambert v. California*, 355 U.S. 225 (1957), *FFL* ECF 57 at 4, which "concerns the *mens rea* that is necessary before the State may convict an individual of [a] crime" and is irrelevant here, *Texaco*, 454 U.S. at 537 n.33; *see also FFL* ECF 57 at 6 (citing *Bryan v. United States*, 524 U.S.

184, 190–91 (1998), which interprets the term "willfully" in a criminal statute). Due process does not require "direct notice" to all "firearm owners" in Illinois. ECF 57 at 4.

Plaintiffs' argument about the Act's timeline for implementation is similarly baseless. In considering "whether a statutory grace period provides an adequate opportunity for citizens to become familiar with a new law," federal courts "show[ ] the greatest deference to the judgment of state legislatures"; they will not "displace hastily the judgment of the legislature and [ ] conclude that a legitimate exercise of state legislative power is invalid because citizens might not have been aware of the requirements of the law." *Texaco*, 454 U.S. at 532–33; *accord Torres v. INS*, 144 F.3d 472, 474 (7th Cir. 1998) (30 days is sufficient). Here, the legislature provided more than enough time; the challenged law was enacted on January 10, 2023, almost a year before the deadline to submit endorsement affidavits by January 1, 2024. *See* 720 ILCS 5/24-1.9(d). And while Plaintiffs complain ISP did not issue its rules implementing the endorsement affidavit process until September 15, 2023, *FFL* ECF 57 at 4–5, they concede those rules "largely just re-state the statutory provisions," Am. Compl. ¶ 171. Both the deadline for and the scope of the endorsement affidavit process have been apparent on the face of the Act since it took effect nearly a year ago— far exceeding what due process requires.

Plaintiffs' last-ditch attempt to argue that the State has "retroactively criminalize[d] conduct that was lawful at the time it was performed" is a misrepresentation of the Act. *FFL* ECF 57 at 5. If that were true, Plaintiffs ought to have brought an *ex post facto* claim, *see, e.g.*, *Weaver v. Graham*, 450 U.S. 24, 28–29 (1981). They didn't because that is not what the Act does. The Act has only prospective effect: conduct occurring before the Act's effective date, January 10, 2023, has not been criminalized. Individuals who lawfully acquired and possessed assault weapons before that date can continue to possess them. These individuals have a choice to make: they can

submit an endorsement affidavit prior to January 1, 2024, that allows them to keep possessing these weapons in 2024 and beyond; or they can relinquish possession through selling the weapons, transferring them out of Illinois, or otherwise lawfully disposing of them. What Plaintiffs misleadingly label a retroactive "registration requirement," *FFL* ECF 57 at 6, is, in fact, a voluntary benefit with only prospective application.

Plaintiffs' retroactivity argument fails even on its own terms. Some of the cases they cite are inapposite because they address the question, not presented here, whether to apply a statute retroactively in the absence of any legislative prescription. *See FFL* ECF 57 at 6 (citing *Jideonwo v. INS*, 224 F.3d 692, 697–98 (7th Cir. 2000)). As for the others, while it is true "that retroactive legislation does have to meet a [due process] burden not faced by legislation that has only future effects," the standard is not particularly onerous; it "is met simply by showing that the retroactive application of the legislation is itself justified by a rational legislative purpose." *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 730 (1984).

The endorsement affidavit process has a plainly rational purpose, and Plaintiffs do not even attempt to suggest otherwise. The process enables law enforcement to distinguish assault weapons that may be lawfully possessed from those that may not. *See* 720 ILCS 5/24-1.9(d) ("a completed endorsement affidavit submitted to the Illinois State Police by a person under this Section creates a rebuttable presumption that the person is entitled to possess and transport the assault weapon"). As the Illinois Supreme Court recently explained, the endorsement affidavit process effectuates the rational legislative purpose to "balance" the public safety interest in "'limiting the number of firearms and magazines most likely to result in a mass shooting'" against Plaintiffs' "reliance interest in retaining possession of items legally acquired before such acquisition was prohibited." *Caulkins v. Pritzker*, 2023 IL 129453, ¶¶ 62–63. Plaintiffs' request to enjoin the endorsement

16

affidavit process based on allegedly inadequate notice should be denied, and their claim should be dismissed as a matter of law.

### B. Plaintiffs' vagueness claim fails as a matter of law.

Plaintiffs use the impending deadline for the endorsement affidavit process as an excuse to critique the Act's definition of "assault weapon," which they claim is vague. *FFL* ECF 57 at 8–11. But courts have consistently rejected vagueness challenges to assault weapons statutes, like the Act, that provide two independent means of assessing whether a given firearm is a regulated "assault weapon". *See, e.g.*, *Wilson v. County of Cook*, 2012 IL 112026; *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 267 (2d Cir. 2015);[12] *Coalition of N.J. Sportsmen, Inc. v. Whitman*, 44 F. Supp. 2d 666, 679 (D. N.J. 1999).

Under the Act's two-part definition, generally, a firearm qualifies as an "assault weapon" if: (1) it is semiautomatic, accepts a detachable magazine, and also has one or more of certain listed features (the "features-based" definition); or (2) it is included on the Act's make-and-model list specifically naming dozens of firearms. *Id.* § 1.9(a)(1)(A), (J)-(L).[13] With minor variation, this two-part format mimics similar statutes from around the country and has been used since the federal assault weapons ban adopted it in 1994. *See Bevis*, 2023 WL 7273709, at *2 (noting that the Act "defines 'assault weapon' using language that is largely borrowed from the expired Federal Assault Weapons Ban"). When read as a whole, as it must be, the Act's definition of "assault

---

[12] *Cuomo*'s Second Amendment ruling, which applied intermediate scrutiny, was abrogated by *Bruen*, 142 S. Ct. 2111, which clarified the text-and-history standard by which Second Amendment claims must be assessed. But *Bruen* did not disturb *Cuomo*'s vagueness analysis.

[13] Plaintiffs' vagueness claim specifically addresses the portion of the "assault weapon" definition applicable to semiautomatic rifles. *See, e.g.*, *FFL* ECF 57 at 8 ("In relevant part, Illinois defines as an 'assault weapons' certain semiautomatic rifles having . . . ").The "assault weapon" definition also includes provisions regarding certain kinds of pistols and shotguns that Plaintiffs do not appear to specifically challenge as vague. *See* 720 ILCS 5/24-1.9(a)(1). It also expressly excludes various categories of firearms, such as antiques or firearms manually operated by bolt, pump, lever or slide action. *Id.* § 1.9(a)(2).

weapon" has a "core of understandable meaning," which is "enough to reject" Plaintiffs' "vagueness challenge[.]" *Trustees of Indiana Univ. v. Curry*, 918 F.3d 537, 540–41 (7th Cir. 2019). The Act also has a scienter requirement—only "knowingly" violating the Act is punishable, 720 ILCS 5/24-1.9(b)-(c)—that "reduces any potential for vagueness" and further forecloses Plaintiffs' vagueness challenge. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 21 (2010).

Plaintiffs' vagueness arguments misunderstand the relevant constitutional standard and the Act in at least four respects. *First*, Plaintiffs adopt a self-professed "piecemeal" focus on firearm *parts* referenced in one section of the Act's multi-pronged definition of "assault weapon." *FFL* ECF 57 at 11. But Plaintiffs' argument inverts the legal standard by focusing on hypothetical "edge cases," not the definition's "core of meaning," which is more than sufficient to defeat their vagueness challenge. *Trustees of Indiana Univ.*, 918 F.3d at 540–41. *Second*, Plaintiffs' own allegations reflect that the specific statutory terms they challenge have a core of meaning, and Plaintiffs do not contest (or even mention) the illustrative examples of those terms that ISP has published. *Third*, relying exclusively on California's experience from decades ago, Plaintiffs challenge the anti-copycat provision in the Act's definition of "assault weapon" with an argument that multiple federal courts, as well as the Illinois Supreme Court, have rejected. *Fourth*, plaintiffs demand an injunction against the entire endorsement affidavit process to prevent the risk of someone "*unintentionally* violat[ing]" the Act, but the Act's scienter requirement means that this hypothetical scenario is a legal impossibility and, in any event, not a basis for a facial challenge. *FFL* ECF 57 at 11. Plaintiffs' vagueness claim will not succeed and should be dismissed.

### 1. The definition of "assault weapon" has a core of meaning that forecloses Plaintiffs' vagueness challenge.

The Act restricts the purchase, sale, and possession of "assault weapon[s]," but allows those who lawfully possessed these weapons when the Act took effect to continue possessing them

by submitting an endorsement affidavit to ISP by January 1, 2024. 720 ILCS 5/24-1.9(a)(1), (d). Plaintiffs want an injunction because they now claim it is "unclear" which firearms must be identified in those affidavits due to allegedly vague statutory terms. *FFL* ECF 57 at 7, 20. But instead of arguing about what "assault weapon[s]" are subject to the Act's restrictions, Plaintiffs focus their vagueness argument on particular firearm parts referenced in the Act. Plaintiffs' part-by-part approach ignores the statutory structure of how the Act defines assault weapons and is the opposite of what Seventh Circuit precedent requires for a vagueness challenge.

Plaintiffs have brought a pre-enforcement facial challenge based on alleged vagueness.[14] Their burden for this type of challenge is immense. Vagueness claims arise from the Due Process Clause, which prohibits the government from depriving someone of life, liberty, or property based on a criminal law "so vague that it fails to (1) give ordinary people fair notice of the conduct it punishes, or (2) so standardless that it invites arbitrary enforcement." *Planned Parenthood of Indiana and Kentucky, Inc. v. Marion County Prosecutor*, 7 F.4th 594, 599 (7th Cir. 2021) (quoting *Johnson v. United States*, 576 U.S. 591, 595 (2015)). The Seventh Circuit has repeatedly held that

---

[14] Plaintiffs assert—in a single-sentence footnote citing three paragraphs from their 216-paragraph amended complaint—that they are also "challeng[ing] the law on an as-applied basis." *FFL* ECF 57 at 11 n.6. Based on the paragraphs cited, plaintiffs appear to believe that their alternative request to enjoin specific statutory terms, rather than the endorsement affidavit process writ large, makes their vagueness claim an "as-applied" challenge. But plaintiffs are requesting a statewide injunction as to these terms, which goes well beyond their "particular circumstances" and makes this a facial challenge. *See Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 475 (7th Cir. 2012) ("Where the 'claim and the relief that would follow . . . reach beyond the particular circumstances of the [] plaintiffs,' '[t]hey must . . . satisfy [the] standards for a facial challenge to the extent of that reach.'") (quoting *Doe v. Reed*, 561 U.S. 186, 194 (2010)); *see also Planned Parenthood of Indiana and Kentucky*, 7 F.4th at 605 (contrasting a pre-enforcement, facial challenge with an as-applied challenge). Nor have plaintiffs pled specific facts about their "particular circumstances" to support a pre-enforcement, as-applied challenge: they have identified no specific people or organizations against whom the defendants are imminently going to enforce the Act for possession of specific firearms, parts, or attachments that implicate any of the allegedly vague terms in the statute. *Ctr. for Individual Freedom*, 697 F.3d at 475.

"[o]utside of the First Amendment context," pre-enforcement facial challenges based on alleged vagueness are "disfavored." *Planned Parenthood of Indiana and Kentucky*, 7 F.4th at 603. When a "statute undoubtedly applies to [a litigant's] conduct, he will not be heard to argue that the statute is vague as to one or more hypothetical scenarios." *Id.* (citing *United States v. Cook*, 970 F.3d 866, 873 (7th Cir. 2020)).

Facial challenges asserting that a statute is unconstitutionally vague are disfavored because "the legal system offers a way to work out the uncertainties that lurk at every statute's periphery: the judiciary." *Trustees of Indiana Univ.*, 918 F.3d at 541. The existence of "edge questions" and "tough question[s] about just how far a statute reaches" is not a basis for facially invalidating a statute. *Id.* Instead, a court must reject a facial vagueness challenge to a statute when it has "a core of meaning . . . leaving to future adjudication the inevitable questions at the statutory margin." *Id.* A court considering a facial vagueness challenge misapplies this standard by "worr[ying] about the periphery." *Id.* at 540.

This Court must reject Plaintiffs' vagueness challenge because it is exclusively focused on the "periphery" and "edge questions," not whether the Act has "a substantial, understandable core." *Id.* at 541. Plaintiffs' peripheral focus is evident from the statutory terms they attack: instead of claiming that the Act's definition of "assault weapon" is vague, Plaintiffs attack subparts of that definition in isolation that describe, literally, parts of firearms. *FFL* ECF 57 at 6–8. In doing so, Plaintiffs ignore the overarching definition of "assault weapon," which combines both a features-based definition and a make-and-model list specifically naming dozens of firearms. 720 ILCS 5/24-1.9(a)(1)(J)-(L). It is difficult to imagine how the General Assembly could have provided a greater degree of "fair notice" that a particular weapon is an "assault weapon" subject to the endorsement affidavit process than by identifying that weapon by make and model. *Planned*

20

*Parenthood of Indiana and Kentucky*, 7 F.4th at 599. Nor can this Court "preliminarily enjoin Illinois's registration requirement" in its entirety when plaintiffs have not even attempted to challenge the several dozen firearms explicitly named in the Act. *FFL* ECF 57 at 7, 20.

Even plaintiffs' dissection of the features-based definition of "assault weapon" is, by their own admission, a "piecemeal" attempt to cause the Act to "crumble[]" by "excis[ing]" allegedly "problematic parts" one-by-one. *FFL* ECF 57 at 11. Plaintiffs' language betrays them. They are not focusing, as they must, on whether the Act's definition of "assault weapon[s]" subject to the endorsement affidavit process has a "substantial, understandable core." *Trustees of Indiana Univ.*, 918 F.3d at 540. The make-and-model list leaves no doubt that it does. Plaintiffs are instead presenting "edge questions" about the periphery of the definitional limits of firearm *parts* like a "flash suppressor," a "pistol grip," a "stock that is . . . adjustable," or a "shroud attached to the barrel[.]" *Id.* at 541; 720 ILCS 5/24-1.9(a)(1)(A)(i)-(vi).

The hypothetical nature of plaintiffs' argument is apparent from their failure to identify any actual firearm—not just a part, an actual firearm—for which inclusion or exclusion from the "assault weapon" definition turns exclusively, for example, on whether it has a "flash suppressor" or a "compensator[]." ECF 57 at 7. The same dearth of any concrete examples plagues their argument about "pistol grip[s]" and "folding" or "adjustable" stocks. ECF 57 at 7–8. In fact, their sole substantive declarant, Mr. Vandermyde, professes confusion about a grand total of one rifle: he is worried that the "forestock" on his Ruger 10/22 rifle qualifies as a "shroud," making the rifle potentially an "assault weapon."[15] *FFL* ECF 57-2, Vandermyde Decl. ¶ 19; *see also FFL* ECF 57

---

[15] Mr. Vandermyde is also not a plaintiff, so his personal concerns are irrelevant absent allegations that one of the Advocacy Plaintiffs has standing to pursue any purported vagueness claim he may have on his behalf. "To sue on behalf of its members, an association must show that: (1) at least one of its members would have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief

at 8. But even this cherry-picked example is self-defeating: ISP has publicly declared on its website that "[t]he wooden forestock on a base model Ruger 10/22 does not constitute a shroud."[16] *See Kolbe v. Hogan*, 849 F.3d 114, 149 (4th Cir. 2017) (*en banc*)[17] (rejecting vagueness challenge to the term "copies" in Maryland's assault weapons law based on state attorney general's opinion and state police bulletin "explain[ing] how to determine whether a particular firearm is a copy of an identified assault weapon"). Plaintiffs have not even identified a genuine "edge case," let alone any statutory term that "simply has no core[.]" *Planned Parenthood of Indiana and Kentucky*, 7 F.4th at 603 (quoting *Cook*, 970 F.3d at 873).

Plaintiffs' reliance on a grab-bag of nitpicks and hypotheticals is "fundamentally inconsistent" with what a facial vagueness challenge requires. *Trustees of Indiana Univ.*, 918 F.3d at 541. The Act's definition of "assault weapon" has a "core of understandable meaning," and Plaintiffs' attempt to dismantle it "piecemeal" fails as a matter of law. *Id.*; *FFL* ECF 57 at 11.

### 2.    The firearm parts referenced in the Act's features-based definition have a core of meaning.

Plaintiffs' primary vagueness argument boils down to their belief that the specific firearm parts referenced in the Act's features-based definition of "assault weapon" should be more elaborately defined, either in the Act itself or subsequent ISP regulation. *See FFL* ECF 57 at 7–8.

---

requested requires the participation of individual members." *Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 2 F.4th 1002, 1008 (7th Cir. 2021) (cleaned up). Plaintiffs make no argument, much less submit evidence of "specific facts," *Speech First*, 968 F.3d at 638, addressing the second and third requirements. As the parties invoking federal jurisdiction, it is Plaintiffs' burden to establish every element of representational standing. *E.g.*, *Disability Rights Wisconsin, Inc. v. Walworth County Board of Supervisors*, 522 F.3d 796, 800–02 (7th Cir. 2008). Their failure even to try is reason alone why they cannot obtain a preliminary injunction.

[16] ISP, *Protect Illinois Communities Act, Frequently Asked Questions*, #10, available at https://isp.illinois.gov/Home/AssaultWeapons (last visited Nov. 30, 2023).

[17] *Bruen* abrogated *Kolbe*'s Second Amendment analysis, which employed means-end scrutiny rather than the text-and-history approach specified in *Bruen*. *Bruen* did not disturb *Kolbe*'s vagueness analysis.

In particular, Plaintiffs object to subparts of the Act's features-based definition of an "assault weapon," under which, for example, a "semiautomatic rifle that has the capacity to accept a detachable magazine" is an "assault weapon" if it also has one or more of certain specified features, including: a "pistol grip," "a flash suppressor," "a shroud attached to the barrel," or "a folding, telescoping, thumbhole, or detachable stock[.]" 720 ILCS 5/24-1.9(a)(1)(A)(i)-(vi).

But Plaintiffs' complaint confirms that these terms have not only a "core of understandable meaning," but that Plaintiffs themselves understand what they mean. *Trustees of Indiana Univ.*, 918 F.3d at 540. Plaintiffs spend multiple paragraphs in their complaint describing what benefits these firearm parts provide in their view. *See* Am. Compl. ¶¶ 141–43 ("pistol grip"), 144–46 ("thumbhole," "adjustable," "telescoping" stocks), 147–48 ("flash suppressor"). If it were true that "pistol grip," "thumbhole stock," "adjustable stock," and "flash suppressor" have no "core" of meaning, then it would be impossible to make sense of Plaintiffs' allegations that they are "each designed to make a rifle or shotgun more comfortable, easier to use and, therefore, more accurate[.]" *Id.* ¶ 149. These admissions foreclose Plaintiffs' facial challenge to these terms.[18]

---

[18] Plaintiffs' arguments about the potential overbreadth of "pistol grip" and "shroud" are both hypothetical and fundamentally insufficient to establish that these terms lack a "core of meaning." *Trustees of Indiana Univ.*, 918 F.3d at 540. Plaintiffs' scant "pistol grip" argument relies on a single citation to an expert declaration from litigation in California wherein the expert asserts that the term "pistol grip" has at times been applied to wooden stocks with a certain curved shape. *FFL* ECF 57 at 7 (citing "Expert Declaration of Stephen Helsley"). But this same expert acknowledges that the AR-15 departed from this stock design and instead adopted "a plastic AR pistol grip . . . attached with a screw." *Id.* at Helsley Decl. ¶ 7. Read in the broader statutory context, as it must be, the Act's reference to a "pistol grip" refers to the latter, separately attached part. Similarly, Plaintiffs' fear-mongering about the Act's definition of a "shroud" as potentially sweeping in "virtually *every* semiautomatic rifle in existence" has been undercut by ISP's public guidance indicating that a "shroud" would not include a "forestock." *See* ISP, *Protect Illinois Communities Act, Frequently Asked Questions*, #10, available at:
 https://isp.illinois.gov/Home/AssaultWeapons (last visited Nov. 29, 2023).

Plaintiffs also do not contest the illustrative examples that ISP provided regarding what these statutory terms encompass. On October 1, 2023—six weeks before plaintiffs filed their motion—ISP published an *Assault Weapon Identification Guide* with annotated visual images of firearms identifying examples of each part included in the Act's features-based definition, including: a "pistol grip," a "thumbhole stock," a "protruding grip," a "folding stock," a "telescoping stock," a "thumbhole stock," a "detachable stock," a "flash suppressor," a "grenade launcher," and a "shroud".[19] Plaintiffs' motion does not even mention these examples, let alone dispute that they visually identify examples of the parts referenced in the features-based definition. These uncontested illustrative examples further confirm that the statutory subparts that Plaintiffs challenge have a "core of understandable meaning."[20] *Trustees of Indiana Univ.*, 918 F.3d at 540.

Knowing that they themselves recognize the core meaning of the parts referenced in the features-based definition, Plaintiffs attempt to invent a new legal standard. They cite a California regulation defining "pistol grip" and "flash suppressor" under California law, and a Washington regulation defining "flash suppressor" under Washington law, to argue Illinois has left it "unclear which iteration(s)" of these parts are referenced in the Act. *FFL* ECF 57 at 7–8. But Plaintiffs' policy preference for the General Assembly or ISP to provide more detailed definitions of these particular firearm parts does not mean that the Act is *unconstitutionally* vague on its face. *See FFL* ECF 57 at 7–8. Plaintiffs fail to cite any authority requiring a state to level-up to the greatest degree of specificity of any sister state when enacting a statute with similar terminology.[21] Due process

---

[19] *See* ISP, *Assault Weapon Identification Guide*, *supra*, note 3.

[20] In support of their opposition to Plaintiffs' first preliminary injunction motion, the State Defendants also introduced declarations describing these parts, which plaintiffs have also not contested. *See* ECF 37-3, Demuth Decl., Ex. A, at 1–4; ECF 37-9, Yurgealitis Decl. ¶¶ 78–84. This evidence also confirms these statutory terms have a "core" of meaning.

[21] Plaintiffs have cited regulations from two states, even though eight states, excluding Illinois, and the District of Columbia have assault weapon laws using similar, features-based definitions.

does not require perfect clarity from legislative drafters: "Some uncertainty at the margins does not condemn a statute." *Trustees of Indiana Univ.*, 918 F.3d at 540; *accord Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972) ("Condemned to the use of words, we can never expect mathematical certainty from our language."). Nor are these statutory terms, which all describe tangible objects, rather than abstract concepts, in need of further definition to provide constitutionally adequate notice. Each is considerably less "protean" than a word like "reasonable," which still has "enough of a core to allow its use" in legislative enactments, even when fundamental rights like the right to free speech are at issue. *Trustees of Indiana Univ.*, 918 F.3d at 540 (citing *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 324 (2002)).

Plaintiffs' attempt to individually deconstruct subparts of the features-based definition of "assault weapon" is directed at hypothetical edge cases. *Trustees of Indiana Univ.*, 918 F.3d at 541. Such an argument cannot support a facial challenge as a matter of law. *Trustees of Indiana Univ.*, 918 F.3d at 541. But even if considered on its own terms, Plaintiffs' claim fails because each of the challenged statutory terms has a core of meaning, as Plaintiffs' allegations confirm.

### 3. Numerous courts have rejected Plaintiffs' argument challenging the anti-copycat provision.

Plaintiffs recycle an argument from the *Langley* plaintiffs by challenging the Act's inclusion of "copies, duplicates, variants, or altered same facsimiles with the same capability of" specifically named firearms in the definition of "assault weapon". *FFL* ECF 57 at 9–10. Plaintiffs

---

The federal assault weapons law also had a features-based definition. Several of these state statutes have been in effect for decades, while the federal law was in effect for a decade. If the types of features included in these types of statutes truly lacked a "core" of meaning, Plaintiffs ought to have been able to cite case law from courts in these states invalidating them or, at least, narrowing their scope through as-applied challenges. *See generally* Giffords Law Center, *Assault Weapons*, available at
https://giffords.org/lawcenter/gun-laws/policy-areas/hardware-ammunition/assault-weapons/#:~:text=Ten%20states%20(California%2C%20Connecticut%2C,and%20transfer%20of%20assault%20weapons (last visited Nov. 30, 2023) (listing state assault weapons laws).

claim this anti-copycat provision improperly "leaves it up to laypersons to determine whether an existing firearm must be registered as a 'copy' of a firearm banned by make and model." *Id.* at 10; 720 ILCS 5/24-1.9(a)(1)(J)–(L). But as demonstrated in Director Kelly's briefs addressing the *Langley* plaintiffs' vagueness claims, ECF 116 & 124, which are incorporated here by reference, this type of argument has been repeatedly rejected by both federal and state courts considering statutes using similar language as the Act.

For example, the Illinois Supreme Court, applying federal law, rejected a similar vagueness challenge to Cook County's assault weapons ordinance, which included "copies or duplicates" of specifically named weapons in its definition of "assault weapon." *Wilson*, 2012 IL 112026. Citing the ordinance's inclusion of both a make-and-model list and a features-based definition, the *Wilson* court found that "[a] person of ordinary intelligence would understand that [the ordinance's definition of 'assault weapon'] includes the specific weapons listed and any imitations or reproductions of those weapons made by that manufacturer or another." *Id.* ¶ 32. The features-based definition also served to "put an individual on notice whether a particular weapon is banned based on the specific characteristics of that weapon." *Id.* The Second Circuit used the same reasoning to reject a vagueness challenge to Connecticut's assault weapons statute, which applied to "copies or duplicates . . . with the capability of" specifically named firearms. *Cuomo*, 804 F.3d at 267. Noting the "two independent means" provided by the Connecticut statute for assessing whether a particular firearm was covered—the make-and-model list and the features-based definition—the Second Circuit rejected an argument that the statute was unconstitutionally vague. *Id.*; *accord Coalition of N.J. Sportsmen*, 44 F. Supp. 2d at 679 (rejecting vagueness challenge to phrase "substantially identical" where assault weapons statute included list of specific firearms and list of prohibited characteristics).

26

Plaintiffs address none of this precedent but instead reference a single California case, *Harrott v. County of Kings*, 25 Cal. 4th 1138 (Cal. 2001), that is readily distinguishable. Unlike Plaintiffs' pre-enforcement facial challenge to the Act, *Harrott* was an as-applied challenge that turned on unique procedural provisions of California's assault weapons statute. The specific question the California Supreme Court decided in *Harrott* was whether a trial court had the authority to declare that a specific firearm was an "AK series" weapon given that the California statute authorized the California Attorney General to make such determinations. *Id.* at 1143–44. The California Supreme Court ruled that the trial court lacked such authority. *Id.* The version of the California statute at issue also lacked a "generic" or features-based definition. *Id.* at 1141–42 (noting that case arose under statute in effect prior to 1999 amendments adding definition using "generic characteristics"). *Harrott* therefore provides no support for invalidating the Illinois statute, which, like the statutes upheld in *Wilson*, *Cuomo*, and *Coalition of N.J. Sportsmen*, uses both a make-and-model list and a features-based definition to identify assault weapons. Plaintiffs' facial challenge to the Act's anti-copycat provision will fail.

### 4. The Act's multi-layered scienter requirement forecloses Plaintiffs' challenge to the "part[s]" and "attachment[s]" provisions.

Plaintiffs object to the endorsement affidavit process because they claim to be uncertain about what constitutes an "assault weapon attachment," whether "assault weapon attachment[s]" are coextensive with "parts designed or intended to convert a firearm into an assault weapon," and how exactly to list such "attachment[s]" and "part[s]" on an endorsement affidavit. ECF 57 at 8–9 (citing 720 ILCS 5/24 –1.9(a)(1)(I), (a)(3)). Once again, Plaintiffs' approach of gesturing to the possibility that there may be "edge questions" about "just how far" these terms reach is "fundamentally inconsistent" with how this Court must assess their vagueness challenge. *Trustees of Indiana Univ.*, 918 F.3d at 541. Plaintiffs' facial attack on the "part[s]" and "attachment[s]"

provisions in the Act is particularly baseless because the Act incorporates overlapping scienter requirements applicable to any potential enforcement action related to those provisions.

As already addressed extensively in the *Langley* briefing, which, again, the State Defendants incorporate by reference, ECF 116 & 124, both the Supreme Court and the Seventh Circuit have repeatedly indicated that scienter requirements in criminal statutes alleviate vagueness concerns. *See Humanitarian Law Project*, 561 U.S. at 21 ("knowledge" requirement in a criminal statute "reduces any potential for vagueness") (citing *Hill v. Colorado*, 530 U.S. 703, 732 (2002)); *Posters 'N' Things, Ltd. v. United States*, 511 U.S. 513, 523 (1994); *Vill. of Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489 (1982)); *United States v. Pacilio*, 85 F.4th 450, 458 (7th Cir. 2023) (Brennan, J.) ("A scienter requirement in a statute alleviates vagueness concerns.") (quoting *McFadden v. United States*, 576 U.S. 186, 197 (2015)); *accord Gonzalez v. Carhart*, 550 U.S. 124, 149 (2007) ("[S]cienter requirements alleviate vagueness concerns[.]"); *United States v. Johnson*, 911 F.3d 849, 853 (7th Cir. 2018) ("the word 'knowingly' . . . cure[d[ any potential vagueness' in parole condition). The Seventh Circuit has further held that "an intent requirement can cure an otherwise vague statute" in the context of "multi-purpose" objects that can have legal or illegal uses depending on a person's intent. *See Levas and Levas v. Vill. of Antioch, Ill.*, 684 F.2d 446, 452–53 (7th Cir. 1982) (rejecting vagueness challenge to ordinance banning sale of "drug paraphernalia").

This precedent forecloses Plaintiffs' attempt to obtain an injunction based on the "parts" and "attachment[s]" provisions in the Act. 720 ILCS 5/24-1.9(a)(1)(I), (a)(3). A person can only violate the Act if he or she "knowingly possess[es]" an "assault weapon" or "assault weapon attachment" after January 1, 2024 without qualifying for an exemption—such as the exemption facilitated by the endorsement affidavit process. 720 ILCS 5/24-1.9(c)-(d). Thus, any hypothetical

prosecutor pursuing prosecution of a hypothetical defendant for possessing an "assault weapon attachment" would have to show possession in *knowing* violation of the Act. *See* 720 ILCS 5/24-1.9(c) ("knowingly possess"). In this context, this hypothetical defendant would have to know "of the features of his [assault weapon attachment] that brought it within the scope of the Act." *Staples v. United States*, 511 U.S. 600, 619 (1994).

The Act in this case defines "assault weapon attachment[s]" as items "*specifically designed for making or converting* a firearm into any of the firearms listed" in the "assault weapon" definition in the Act. 720 ILCS 5/24 –1.9(a)(3). In other words, the definition of "assault weapon attachment" has an additional level of scienter requiring the item to exist *for the purpose* of creating an "assault weapon." This additional level of scienter likewise applies to assault weapon "parts," which only fall within the Act's scope if they are "*designed or intended* to convert a firearm into an assault weapon[.]" 720 ILCS 5/24-1.9(a)(1)(I). Given these multiple levels of scienter, Plaintiffs are wrong as a matter of law that "individuals may . . . *unintentionally* violate" the Act, *FFL* ECF 57 at 11—the Act punishes only "knowingly" violating its provisions. *See* 720 ILCS 5/24-1.9(c).

Furthermore, as Plaintiffs themselves acknowledge, anyone concerned about whether a particular firearm attachment is an "assault weapon attachment" could "register [it] out of caution[.]" *FFL* ECF 57 at 9. Doing so would create a "rebuttable presumption" in any future proceeding that "the person is entitled to possess" it—regardless of whether the attachment in fact qualifies as an "assault weapon attachment". 720 ILCS 5/24-1.9(d). This safe-harbor option provides yet another reason why this Court cannot facially enjoin part of the Act based on hypothetical vagueness concerns. Because of the Act's scienter requirement, as well as the safe-harbor option created by the endorsement affidavit process, Plaintiffs' vagueness challenge to the Act's "parts" and "attachment[s]" provisions fails as a matter of law and should be dismissed.

C.   **The Seventh Circuit has already held that any Second Amendment challenge to the registration process is unlikely to succeed on the merits.**

Plaintiffs audaciously ask this Court to issue a preliminary injunction based on a Second Amendment challenge to the endorsement affidavit process, even though the Seventh Circuit has already held that such a claim is unlikely to succeed on the merits. *Compare Bevis*, 2023 WL 7273709, at \*18, *with FFL* ECF 57 at 13–14, 19–20. Knowing their request is foreclosed, they ask for the same result under a different guise: by claiming that the Second Amendment "protects firearm parts," a proposition they say "the Seventh Circuit did not address." *FFL* ECF 57 at 14. Plaintiffs' argument is a transparent attempt to circumvent the Seventh Circuit's rejection of their first request for injunctive relief—which explicitly encompassed all of the Act's possession restrictions and related exemptions, including for grandfathered weapons, parts, and attachments registered with ISP. Given Plaintiffs' failure to show that assault weapons are likely to receive Second Amendment protection, it defies logic to conclude that disassembling those weapons into their constituent parts transforms the parts into constitutionally protected objects.

Notwithstanding their initial half-hearted parts-based argument, much of Plaintiffs' Second Amendment argument does not even attempt to conceal the extent to which they seek to re-litigate positions the Seventh Circuit just rejected. *See FFL* ECF 57 at 14–20. This is ground this Court should not re-tread—particularly when Plaintiffs are simultaneously pursuing *en banc* relief and the Seventh Circuit's mandate has not issued. *See Aljabri v. Holder*, 745 F.3d 816, 820 (7th Cir. 2014) (discussing interlocutory appeal statute, 28 U.S.C. § 1292, and noting that while the district court may "proceed with other aspects of the case" during an interlocutory appeal, the court may not "continue to modify the same order that is up on interlocutory appeal"); *accord Groves v. United States*, 941 F.3d 315, 320 (7th Cir. 2019) (Barrett, J.) (quoting same). But to preserve its defenses, the State explains below how the Act's registration process would survive Second

Amendment scrutiny for multiple independent reasons. To streamline briefing, the State points to the Seventh Circuit's November 3 decision explaining how the *Bruen* legal framework applies here and to the State's prior brief describing and applying the same. ECF 37 at 11–15, 39–40.[22] Plaintiffs' recycled request for a preliminary injunction based on the Second Amendment must be rejected, as the Seventh Circuit has already ruled.

### 1. Plaintiffs' attempt to sidestep the Seventh Circuit's ruling is a ruse this Court must reject.

In their first preliminary injunction motion, Plaintiffs challenged the Act as a "flat ban" on assault weapons because it generally prohibited their possession and the "corresponding right to obtain them." *FFL* ECF 28 at 9, 7. They complained that the only possession that non-trained professionals would be allowed after January 1, 2024 would be pursuant to the registration exemption for grandfathered assault weapons. *Id.* at 5 n.2, 8 n.3. In response, this Court found the entire Act unconstitutional and issued an order purporting to enjoin it (including all possession provisions). ECF 101.

That Injunction Order was stayed pending appeal, and on November 3, 2023, a divided Seventh Circuit panel vacated it and concluded that the Second Amendment challenges to the Act's "sale, possession, and use" restrictions are unlikely to prevail on the merits. *Bevis*, 2023 WL 7273709, at *1–2. Applying *Bruen*'s text-and-history framework, as well as *Heller*, 554 U.S. 570, the majority found that Plaintiffs had not shown likelihood of success on the merits of their broad

---

[22] To the extent the November 3 order does not clearly resolve every legal question previously briefed by the parties, such as the relevant historical timeframe for *Bruen* analysis or whether the more nuanced approach applies, the State Defendants re-incorporate those arguments here. *E.g.*, ECF 37 at 22 (explaining that how the right was understood when the Second Amendment *and* Fourteenth Amendments were ratified is relevant); *id.* at 40-43 (explaining why *Bruen*'s "more nuanced approach" applies to the Act); *see also Bevis*, 2023 WL 7273709, at *22 (Brennan, J., dissenting) ("The [Supreme] Court tells us that only two historical timeframes are relevant to the public understanding of the Second Amendment—the adoption of the Second Amendment in 1791 and the ratification of the Fourteenth Amendment in 1868.").

Second Amendment challenge to the Act. Specifically, Plaintiffs had not met their "burden of showing that the weapons addressed in [the Act] are Arms that ordinary people would keep at home for purposes of self-defense, not weapons that are exclusively or predominantly useful in military service, or weapons that are not possessed for lawful purposes." *Bevis*, 2023 WL 7273709, at *11. Reasoning that the "weapons addressed in [the Act]" were more akin to machineguns, which *Heller* said "may be banned" for civilian use, *id.* at *11, the majority concluded that these "weapons and feeding devices" did not "enjoy Second Amendment protection" under *Bruen*'s first step. *Id.* at *12. The majority likewise concluded under *Bruen*'s historical tradition step that "[b]oth the states and the federal government have long contemplated that the military and law enforcement may have access to especially dangerous weapons, and that civilian ownership of those weapons may be restricted." *Id.* at * 17. Finding that the Act "respects and relies on that distinction," the majority declined to enjoin the Act. *Id.* at *18.

The Seventh Circuit also considered a specific challenge by a separate plaintiff in one of the consolidated interlocutory appeals to the process for qualifying for an exemption to those restrictions: the registration process for grandfathered weapons. On this issue, the panel unanimously held that the Second Amendment challenge to the endorsement affidavit process was unlikely to succeed on the merits. The majority wrote:

> [W]e briefly comment on Herrera's challenge to the constitutionality of the registration requirement that implements the grandfather exemption. He regards it as a burden on his Second Amendment rights, and he worries that it may in the future lead to confiscatory acts on the part of the state. If we are correct in our prediction that the state will prevail in its defense of the Act against the Second Amendment arguments, then the registration requirement will be valid as long as it can withstand rational basis review. At this juncture, we see nothing particularly onerous about it, though as with everything we have said, this is a preliminary assessment. Herrera has until the end of 2023 to file the necessary forms, and if he does so, he may retain all of the covered weapons he already owns; the Act will prohibit only his acquisition of additional assault weapons or high-capacity feeding

32

devices. For its own reasons, the dissent agrees with us that the registration requirement should not be enjoined.

*Id.* at \*18; *see also id.* at \*30 (Brennan, J., dissenting but "agree[ing] with [his] colleagues that on this record, the registration requirement does not appear to be unconstitutional").

Undeterred, Plaintiffs ask this Court to functionally overrule the Seventh Circuit by enjoining the very same registration requirement. Plaintiffs' request for another injunction is not based on new evidence that the registration process is "particularly onerous"—there is none because it is not. *Bevis*, 2023 WL 7273709, at \*18. Rather, Plaintiffs rely on a distinction that cannot and does not make any logical difference: they claim the Seventh Circuit addressed firearms, but not firearm *parts*. *FFL* ECF 57 at 14.

Attributing any significance to this distinction would require open defiance of the Seventh Circuit's ruling. Given the Seventh Circuit's broader finding that prohibiting possession of assault weapons is unlikely to violate the Second Amendment, it defies logic that prohibiting possession of *parts* of these weapons would violate the constitution.[23] It further defies logic that *allowing* possession of grandfathered assault weapons (and their parts) through a registration process would somehow violate the Second Amendment when prohibiting possession of non-grandfathered weapons does not. As the Seventh Circuit observed, logic leads in exactly the opposite direction: if the majority is correct that the Act survives Plaintiffs' broader Second Amendment challenge, then the registration provisions will also be valid. *Bevis*, 2023 WL 7273709, at \*18. Even the dissent agreed that the registration provisions specifically do "not appear to be unconstitutional."

---

[23] The Seventh Circuit also considered and vacated the Court's prior injunction ruling, which took a parts-based approach to analyzing whether the assault weapons at issue here are protected by the Second Amendment. Specifically, this Court concluded the Act restricted constitutionally protected "Arms" by discussing various parts of assault weapons and then concluding "items that aid in accuracy may be considered 'arms." Injunction Order at 21. *See also id.* at 20 ("Thus, arm braces are an integral part of the meaningful exercise of Second Amendment rights for such individuals and can also be considered an 'arm.'").

*Bevis*, 2023 WL 7273709, at *30. Indeed, enjoining the registration provisions now, when the Act's broader prohibitions must continue in effect per the Seventh Circuit, would make the Act's possession prohibitions *broader* by eliminating the means through which people can take advantage of the Act's exemption for grandfathered weapons. Plaintiffs' attempt to enjoin the registration process through their parts-based argument is not only illogical, but also self-defeating.

Plaintiffs' invocation of various purported ancillary rights derived from the Second Amendment does not cure their illogic. Citing two cases espousing the view, unique to the Fifth Circuit at this point, that there is a Second Amendment "right of personal gunsmithing," *Mock v. Garland*, No. 23-cv-00095-O, 2023 WL 6457920, at *11 (N.D. Tex. Oct. 2, 2023), and a "tradition of at-home gun-making," *VanDerStok v. Garland*, 86 F.4th 179, 185 (5th Cir. 2023), Plaintiffs assert that the Act's inclusion of assault weapon parts and attachments in the registration process must be separately justified. *FFL* ECF 57 at 13–14. Leaving aside the limited value of this non-binding, out-of-circuit precedent, Plaintiffs' argument proves too much. Even if there were some "right of personal gunsmithing" attendant to the Second Amendment right to keep and bear firearms for self-defense, that ancillary right would not extend to converting otherwise-lawful firearms into firearms that receive no Second Amendment protection. Indeed, the Seventh Circuit justified rejecting Plaintiffs' first injunction request based in part on the ease with which an assault weapon like the AR-15 can be converted to a fully automatic weapon with the addition of a bump stock or auto-sear—i.e., firearm parts. *Bevis*, 2023 WL 7273709, at *12. The Act's regulation of parts and attachments "*specifically designed for making or converting* a firearm into any of the firearms listed" in the Act as an "assault weapon" follows this same logic. 720 ILCS 5/24-1.9(a)(3) (emphasis added); *accord id.* § (a)(1)(I). If, as the Seventh Circuit found, assault weapons receive no Second Amendment protection, then parts that exist for the specific purpose of converting a

firearm into an assault weapon also receive no Second Amendment protection. Nor does requiring registration of such previously acquired parts infringe the Second Amendment.

Plaintiffs' reliance on a Ninth Circuit ruling finding an ancillary Second Amendment right to ammunition is equally unavailing. *FFL* ECF 57 at 14 (citing *Jackson v. City of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014)). Unlike ammunition, none of the parts or attachments subject to registration under the Act are integral to a constitutionally protected firearm's ability to fire. And nothing in the Seventh Circuit's recognition of a right to maintain firearm proficiency through range training in *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011), supports Plaintiffs here. Nothing in the opinion implies that ancillary right would extend to training with firearms, like machineguns, that receive no Second Amendment protection. An ancillary right is just that— it does not exist without the predicate right. Here, there is no predicate right to possess assault weapons, no ancillary right to possess assault weapon parts and attachments, and no constitutional impediment to the Act's registration exemption for grandfathered iterations of these instruments. Consistent with what the Seventh Circuit has already said, the Act's registration provisions do not violate the Second Amendment and Plaintiffs' claim will therefore fail.

### 2. The registration process for grandfathered assault weapons does not reach conduct covered by the Second Amendment's plain text.

The Seventh Circuit has already applied *Bruen*'s framework to conclude that the assault weapons regulated by the Act are not within the category of "Arms" eligible for Second Amendment protection, and that the Act's process for registering grandfathered assault weapons should not be enjoined. *Bevis*, 2023 WL 7273709, at *10–14, *18. That ruling forecloses Plaintiffs' Second Amendment argument, which they concede depends on a contrary legal conclusion. *FFL* ECF 57 at 19 ("Plaintiffs' analysis assumes that [the regulated items] are 'Arms'" within the scope of the Second Amendment.) But Plaintiffs' Second Amendment challenge to the endorsement

affidavit process will fail for an additional reason: The endorsement affidavit process works in conjunction with Illinois's FOID card process "to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens." *Bruen*, 142 S. Ct. at 2138 n.9.

Even if Plaintiffs could prove that assault weapons are the "*type of weapon* . . . eligible for Second Amendment protection," *Heller*, 554 U.S. at 622, they would still need to show how registration of these weapons impacts the right protected by the text of the Second Amendment. They can't, because it doesn't. The Act's registration process is a mechanism through which people who acquired assault weapons lawfully prior to the Act can continue to possess them. Far from depriving Plaintiffs of any firearms, the filing of an endorsement affidavit offers Plaintiffs the ability to lawfully keep *more* firearms. By simply listing their FOID card number, providing the make, model, and serial number of their grandfathered assault weapons, and attesting that they lawfully owned the weapons prior to January 10, 2023, Plaintiffs will be automatically entitled to keep possessing those weapons.

This automatic, discretion-free process—which exists to preserve existing, lawful firearm possession—presents an independent reason why the Act's registration option does not implicate the Second Amendment's text. In *Bruen*, the Supreme Court recognized that registration and licensing regimes are not forbidden by the Second Amendment. Quite the contrary: *Bruen* noted that "nothing in [its] analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes," because "these shall-issue regimes, which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms are, in fact, 'law-abiding responsible citizens.'" 142 S. Ct. at 2138 n.9 (quoting *Heller*, 554 U.S. at 635). In other words, pre-possession licensing and registration requirements allow states to ensure that firearm possession is limited to the "People" whom the

text of the Second Amendment protects. *See Heller*, 554 U.S. at 635; U.S. Const. amend. II. The problem with the so-called "may-issue" regime challenged in *Bruen* was that it operated to deprive members of the "People"—including the petitioners, "two ordinary, law-abiding adult citizens"— of their right to "carry[] handguns publicly for self-defense" because of discretionary licensing decisions "based on a perceived lack of need or suitability." 142 S. Ct. at 2123, 2134.

Here, by contrast, the Act's registration process allows no discretion. Like the shall-issue licensing laws that *Bruen* condones, the Act's endorsement affidavit process is governed by "narrow, objective, and definite standards" designed to ensure that affiants are "in fact, law-abiding citizens." *Id*. at 2138 n.9 (cleaned up). All that is required is the submission of certain information: who the affiant is, confirmation that he or she has a FOID card, identifying information about what firearms are being registered, and an affirmation that those firearms were acquired prior to the Act's effective date. The Act's registration process does not require "the appraisal of facts, the exercise of judgment, [or] the formation of an opinion" on the part of licensing officials, nor is the requirement being "put toward abusive ends" in order to "deny ordinary citizens" their rights. *Id*. (cleaned up). Rather, the mere submission of an endorsement affidavit with the required information creates a "rebuttable presumption" that the affiant is entitled to possess the weapons listed. 720 ILCS 5/24-1.9(d).

Plaintiffs do not address *Bruen*'s explicit recognition that non-discretionary licensing and registration requirements are permissible conditions on firearm possession. Nor do they claim that the Act's endorsement affidavit process is anything other than automatic and non-discretionary. Instead, Plaintiffs resort to fear-mongering about how registration is the first step down a road that inevitably leads to future confiscation. Mirroring the argument from *Herrera* the Seventh Circuit already explicitly rejected, *Bevis*, 2023 WL 7273709, at *18, Plaintiffs allege "registration—

always and everywhere—eventually leads to effective, if not actual, confiscation." Am. Compl. ¶ 121. Not only that, Plaintiffs apparently reject any form "of registering arms *with* the government," because they claim that the Second Amendment is a "doomsday provision" created to allow the "the People to protect themselves *from* a tyrannical government." *FFL* ECF 57 at 16.

While Plaintiffs may hope this extremist position becomes the law, it is a far cry from anything the Supreme Court or the Seventh Circuit has actually said. *Heller* recognized an individual right to self-defense, not a right to violently overthrow the government, as the animating principle behind the Second Amendment. 554 U.S. at 599. *Bruen* confirmed *Heller*'s understanding. *Bruen*, 142 S. Ct. at 2125. Both *Heller* and *Bruen* likewise recognized that the scope of the Second Amendment's protection is limited to certain weapons—like handguns, "the quintessential self-defense weapon"—and certain people—"'law-abiding, responsible adult citizens.'" *Heller*, 554 U.S. at 629; *Bruen*, 142 S. Ct. at 2138 n.9 (quoting *Heller*). *Bruen* further recognized that licensing requirements that enable states to adhere to these limitations do not infringe the Second Amendment. *Bruen*, 142 S. Ct. at 2138 n.9. With its automatic, non-discretionary process, the Act's registration exemption for grandfathered assault weapons does not either. *See Bevis*, 2023 WL 7273709, at *18.

     **3.**      **The registration process is consistent with the nation's historical tradition of firearm regulation.**

As the Seventh Circuit already predicted, even if Plaintiffs could meet their burden at *Bruen*'s first step, the State Defendants will be able to satisfy *Bruen*'s second step by showing the Act's restrictions on assault weapons are consistent with the nation's history and tradition of firearm regulation. *See Bevis*, 2023 WL 7273709, at *14–18. Since the Seventh Circuit ruled, Plaintiffs have not uncovered previously unknown historical laws to cast doubt on that holding.

Nor have Plaintiffs uncovered evidence undermining the Seventh Circuit's specific conclusion that the Act's registration process "is no more onerous than many found in history." *Id.* at *16.

The State Defendants have already defeated a request to enjoin the registration process in *Herrera*, 2023 WL 3074799, at *8–9, which the Seventh Circuit considered together with the State Defendants' appeal from this Court's Injunction Order. The only historical support the State provided in the consolidated appellate record that had not yet been filed in this Court was Table 5 of Exhibit 14 to the State's opposition to the *Herrera* preliminary injunction motion. *See Herrera v. Raoul*, No. 23-cv-532 (N.D. Ill.), ECF 52-15, at Table 5. That table is attached here as Exhibit A. Based on this same historical evidence, the *Herrera* court concluded the Act's registration process was consistent with historical tradition, and the Seventh Circuit affirmed based on that record.

This historical evidence confirms that Plaintiffs' specific challenge to the registration process will fail. Firearms registration requirements trace to the earliest days of the Colonial Era. By 1631 in Virginia, just two decades after the founding of Jamestown, the colony had a "muster" law requiring an annual accounting of "arms and munition" held by its inhabitants. Ex. A (1631 Va. Acts 174, Acts of Feb. 24, 1631, Act LVI); *see also United States v. Holton*, 639 F. Supp. 3d 704, 711–12 (N.D. Tex. Nov. 3, 2022) (citing, *inter alia*, the heavy control of colonial governments over the firearms trade and specific laws requiring recording and registration of firearms).

As the State Defendants previously demonstrated, there is also a long-standing tradition in this country of regulating dangerous and unusual weapons. *See* ECF 37 at 39–63. That tradition includes specific taxation and registration requirements aimed at particular weapon-types associated with increased danger to the public. *See* Ex. A. The weapon-types subject to these taxation requirements were often the same as those targeted for specific regulation as dangerous and unusual weapons. *Compare* ECF 37-15 *with* Ex. A (referring to "dirks," "swordcanes,"

"bowie-kni[ves]," "dueling" or "pocket pistol[s]"). And, as noted in *United States v. Miller*, the National Firearms Act ("NFA") of 1934 required registration for the firearms it regulated, like machineguns and short-barreled shotguns. *See* 307 U.S. 174, 175 n.1 (quoting, *inter alia*, § 5 of the NFA, requiring owners of grandfathered weapons to register their weapons within 60 days by providing "the number or other mark identifying such firearm, together with [the owner's] name, address, place where such firearm is usually kept, and place of business or employment").

Plaintiffs largely ignore this historical evidence. Their current injunction motion opts instead to criticize a single law mentioned by the *Herrera* court, *FFL* ECF 57 at 16,[24] to cite to Plaintiffs' counsel's forthcoming law review article and their litigation in California, *id.* at 16 n.8, 17 n.9, and to shadow-box an argument about gunpowder the State has not made, *id.* at 17–18. None of this provides any basis for this Court to revisit the Seventh Circuit's ruling that the Act as a whole is "consistent with the history and tradition of firearms regulation," and that the registration process in particular "is no more onerous than many found in history." *Bevis*, 2023 WL 7273709, at *14, *16.

Plaintiffs do not explain why merely having to disclose their ownership of grandfathered assault weapons is more burdensome than historical statutes that required ownership of certain weapons not only to be reported, but also taxed. Long-standing Supreme Court precedent also validates the use of registration to differentiate lawful and unlawful possession of particular firearm-types. *Miller* found no constitutional infirmity with the NFA's prohibition on possession of an unregistered short-barreled shotgun subject to that statute. 307 U.S. at 175–78. *Heller*

---

[24] Plaintiffs criticize the *Herrera* court for citing a "muster" law because in their view such laws meant to ensure an adequately armed citizenry capable of militia service. *FFL* ECF 57 at 16–17. But several of the historical taxation and registration laws cited by the State Defendants exempt weapons used for mustering or militia service, focusing the tax burden instead on weapons possessed for other, more potentially deleterious purposes. *See* Ex. A.

affirmed *Miller*'s conclusion, *see* 554 U.S. at 621–25, and *Bruen* said nothing to the contrary. And as noted, *Bruen* also recognized that states may use non-discretionary licensing and registration requirements to ensure firearms are possessed only by the law-abiding citizens whom the Second Amendment protects. The "shall-issue" licensing regimes that *Bruen* endorsed included pre-issuance background checks and safety courses that are comparably more burdensome than the Act's endorsement affidavit process. *See* 142 S. Ct. at 2138 n.9.

The Seventh Circuit has already declined to preliminarily enjoin the Act's registration process for grandfathered assault weapons. Plaintiffs' recycled Second Amendment challenge identifies no way for this Court to reach a different outcome.

## II.   Plaintiffs have not shown the other requirements for preliminary relief are met.

Even if plaintiffs had shown they are likely to succeed on the merits (they haven't), they still must show the remaining three factors justify preliminary injunctive relief (they don't). For reasons the State Defendants cited in their response to the first preliminary injunction motion, these factors prevent injunctive relief. ECF 37 at 63–69.

Plaintiffs have also made no effort to show they will be harmed by registration. Neither the Gun Store Plaintiff nor the Advocacy Plaintiffs are eligible for registration as they are not individuals. None of the Individual Plaintiffs allege they owned assault weapons prior to the Act, rendering the endorsement affidavit provisions inapplicable to them. To the extent the Advocacy Plaintiffs believe they have a member who will be harmed by the opportunity to register grandfathered assault weapons, the amended complaint does not explain how. The only declaration provided in support of the current motion does not describe an impact the declarant fears on his ability to defend himself (or even how registration interferes with some other purpose for which he uses weapons subject to registration). Instead, the motion professes fear for "[p]eople who fail to register because of a lack of notice." *FFL* ECF 57 at 20. This fear is entirely speculative. In any

event, at some point in the more than nine months since they filed a lawsuit on their behalf, Plaintiffs' counsel should have notified (and still could notify) their clients that the January 10, 2023 Act set a January 1, 2024 deadline for owners of grandfathered assault weapons to register them. Indeed, both the January and November complaints Plaintiffs filed on behalf of themselves and the Advocacy Plaintiffs' members drew attention to these facts. Compl. ¶¶ 120-121, 133, 497; Am. Compl. ¶¶ 164–65, 170, 173–74.

On the one hand, Plaintiffs have not shown irreparable harm is likely absent an injunction[25] or that the other equitable factors justify issuing a preliminary injunction. On the other hand, it is well-established that "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (citation omitted). The motion must be denied.

## III.   In the alternative, an injunction should be limited and stayed pending appeal.

### A.   Any injunction must be limited to the scope of Plaintiffs' request.

While Plaintiffs are not entitled to an injunction, any injunction that is nonetheless imposed must be limited to specific provisions of the Act the Court finds are likely to be held unconstitutional. As the Seventh Circuit has already observed about the Act, "there are many provisions of the Act that have nothing to do with gun ownership or regulation." *Bevis*, 2023 WL 7273709, at *5. The Act has a severability clause that explicitly references Illinois's statute on statutes, 5 ILCS 70/1.31. "Whether invalid provisions in a state law can be severed from the whole to preserve the rest is a question of state law." *Burlington N. & Santa Fe Ry. Co. v. Doyle*, 186

---

[25] In the Injunction Order, the Court interpreted *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) to mean that irreparable harm should be presumed when plaintiffs challenge a regulation restricting activity protected by the Second Amendment, and that such a presumption applied to the first preliminary injunction motion because the Act's challenged sale and purchase restrictions impacted plaintiffs' right to armed self-defense. Here, registration does not restrict the right to armed self-defense, and thus this Court's irreparable-harm presumption does not apply.

F.3d 790, 804 (7th Cir. 1999) (finding provisions of a state law severable due to that state's general statute on severability). When a statute clearly states that the legislature intends it to be severable, that language is determinative. *Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996) (finding statute's severability clause applied). Here, state law could not be clearer. Thus, any injunction referencing the Act must specify which statutory terms or provisions the Court considers invalid and allow all other sections to remain in effect.

Any injunction must also be based on Plaintiffs' request for relief. Plaintiffs now ask the Court to enjoin defendants "from enforcing the registration provisions of 720 ILCS 5/24-1.9, *et seq.*" *FFL* ECF 57 at 1.[26] But an order using Plaintiffs' language would violate Rule 65(d)(1)(C), which requires injunctions to "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." The word "registration" does not appear in 720 ILCS 5/24-1.9, so it is unclear what "the registration provisions" in that section are. *See Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) (vacating injunction against enforcement of "'the present Wisconsin scheme'" because "basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed"). Plaintiffs' use of "*et seq.*" only adds to the confusion: Does this refer to other sections in Article 24 of the Criminal Code? All that follow?

Presumably by "registration" Plaintiffs mean the description of an endorsement affidavit set forth in 720 ILCS 5/24-1.9(d). But the State Defendants do not "enforce[e]" any "requirement" relating to endorsement affidavits. No one is *required* to register anything. Endorsement affidavits are used to create a voluntary benefit. It seems Plaintiffs really want this Court to order other people not to exercise their right to file endorsement affidavits, but this Court's jurisdiction and

---

[26] Later, Plaintiffs ask the Court simply to "enjoin Illinois's registration requirement." *Id.* at 19, 21. This must be a mistake. An injunction has to be "directed at someone, and govern[ ] that party's conduct"; a court cannot enjoin a statute per se. *Nken v. Holder*, 556 U.S. 418, 428 (2009).

authority is not so far-reaching. Plaintiffs' proposed language leaves it "so unclear what [defendants would be] enjoined from doing that [they] could not be punished for violating [such an] injunction." *Dupuy v. Samuels*, 465 F.3d 757, 759 (7th Cir. 2006); *see Chicago Bd. of Educ. v. Substance, Inc.* 354 F.3d 624, 631–32 (7th Cir. 2003) (court has "independent duty . . . to assure that the injunctions it issues comply with the directive of Fed. R. Civ. P. 65(d)"); *Patriot Homes, Inc. v. Forest River Housing, Inc.*, 512 F.3d 412, 415–16 (7th Cir. 2008) (vacating injunction that "requires a lot of guesswork on [defendant's] part in order to determine if it is engaging in activities that violate" it).

Plaintiffs' request to enjoin enforcement of "the registration requirements" is also patently overbroad. *FFL* ECF 57 at 1, 19, 21. "The fundamental problem with this [proposed] injunction is that plaintiffs lack standing to seek—and the [Court] therefore lacks authority to grant—relief that benefits third parties." *McKenzie v. Chicago*, 118 F.3d 552, 555 (7th Cir. 1997). And while "a court may impose the equitable relief necessary to render complete relief to the plaintiff, even if that relief extends incidentally to non-parties," *Chicago v. Barr*, 961 F.3d 882, 920–21 (7th Cir. 2020), such circumstances are not present here. An injunction allowing these Plaintiffs to forego the endorsement affidavit process and maintain possession of whatever (unidentified) assault weapons and other grandfathered items they have gives them the relief they claim to need. Plaintiffs do not have standing—and this Court therefore does not have the power—to impose anything more. Even if it were possible to determine what "the registration requirements" are (it is not), at most, the Court could enjoin the State Defendants from taking enforcement action against these Plaintiffs based on those "requirements"—but not against anyone else.

## B.     Any injunction should be stayed for the pendency of an interlocutory appeal.

If the Court issues an injunction, it should be stayed while the State Defendants pursue an interlocutory appeal in the Seventh Circuit. A stay pending interlocutory appeal is required here

because it will "minimize the costs of error" and is "necessary to mitigate the damage that can be done during the interim period before a legal issue is finally resolved on its merits." *In re A & F Enters., Inc. II*, 742 F.3d 763, 766 (7th Cir. 2014). Given the Seventh Circuit's rejection of an injunction request based on a virtually identical Second Amendment challenge, the State Defendants are likely to prevail on appeal of another preliminary injunction order.

Meanwhile, allowing an injunction to be in effect before the Seventh Circuit can review it sows public confusion and harms non-parties who may rely on this Court's injunction. While Plaintiffs have counsel to explain the risk of not filing an endorsement affidavit and missing the time-limited opportunity to qualify for the exemption for grandfathered assault weapons, non-parties may not receive such legal advice. Those non-parties might, after hearing news of an order enjoining the Act, not understand the order's interlocutory nature and decide not to file an affidavit by the January 1, 2024 deadline statutorily set by the General Assembly. Any minor inconvenience that registration would inflict on Plaintiffs pending appeal is far outweighed by the potential harm to the many assault weapon owners in Illinois who could rely on the Court's interlocutory order to forgo their opportunity to file an affidavit. And because the record does not show filing an affidavit will injure any Plaintiff in any way, there is no reason to find irreparable harm will result from staying an injunction during appellate review. Any injunction this Court issues should be stayed pending the State Defendants' interlocutory appeal.

## CONCLUSION

For the foregoing reasons, the State Defendants request that the Court deny the *FFL-IL* Plaintiffs' Motion for Preliminary Injunction (*FFL* ECF 57), and grant the State Defendants' concurrently filed partial motion to dismiss Plaintiffs' two due process claims. In the alternative, the State Defendants request any injunction that issues be limited in scope, and that it be stayed for the pendency of the State Defendants' interlocutory appeal.

Date: December 1, 2023

Respectfully submitted,

KWAME RAOUL
*Attorney General of Illinois*

/s/ Christopher G. Wells
*Division Chief,*
*Public Interest Division*

/s/ Kathryn Hunt Muse
*Deputy Division Chief,*
*Public Interest Division*

Christopher G. Wells
Kathryn Hunt Muse
Darren B. Kinkead
Rebekah Newman
Illinois Attorney General's Office
100 W. Randolph Street
Chicago, IL 60601
(312) 814-3000

*Counsel for Governor Pritzker,*
*Attorney General Raoul, and*
*ISP Director Kelly*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on December 1, 2023, I caused a copy of the foregoing, the State Defendants' Consolidated Brief in Opposition to the Second Motion for Preliminary Injunction and in Support of Their Partial Rule 12(b)(6) Motion to Dismiss in *Federal Firearms Licensees of Illinois v. Pritzker*, to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification to all counsel of record.

By: <u>/s/Christopher G. Wells</u>

Christopher G. Wells
Division Chief, Public Interest Division
Illinois Attorney General's Office
100 W. Randolph Street
Chicago, IL 60601
(312) 814-3000

*Counsel for the State Defendants*