# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CALEB BARNETT, et al.,<br>　　　　　Plaintiffs,<br><br>v.<br><br>KWAME RAOUL, et al.,<br>　　　　　Defendants, | Case No. 3:23-cv-209-SPM<br>**designated Lead Case |
| DANE HARREL, et al.,<br>　　　　　Plaintiffs,<br><br>v.<br><br>KWAME RAOUL, et al.,<br>　　　　　Defendants, | Case No. 3:23-cv-141-SPM |
| JEREMY W. LANGLEY, et al.,<br>　　　　　Plaintiffs,<br><br>v.<br><br>BRENDAN KELLY, et al.,<br>　　　　　Defendants, | Case No. 3:23-cv-192-SPM |
| **FEDERAL FIREARMS LICENSEES OF ILLINOIS, et al.,**<br>　　　　　**Plaintiffs,**<br><br>v.<br><br>**JAY ROBERT "J.B." PRITZKER, et al.,**<br>　　　　　**Defendants.** | **Case No. 3:23-CV-215-SPM** |

### FEDERAL FIREARMS LICENSEES OF ILLINOIS PLAINTIFFS' REPLY TO STATE DEFENDANTS' OPPOSITION TO THE SECOND MOTION FOR PRELIMINARY INJUNCTION AND OPPOSITION TO PARTIAL RULE 12(B)(6) MOTION TO DISMISS

1

I.  **THE STATE FAILED TO PROVIDE SUFFICIENT ACTUAL NOTICE OF THE REGISTRATION REQUIREMENT.**

Illinois residents who must either comply with the Act's registration requirement or lose the legal right to maintain their property and potentially face criminal charges have not been provided sufficient notice of the need to make that decision. That requirement thus violates Due Process. As the Supreme Court has explained:

> "Engrained in our concept of due process is the requirement of notice. Notice is sometimes essential so that the citizen has the chance to defend charges. Notice is required before property interests are disturbed, before assessments are made, before penalties are assessed. Notice is required in a myriad of situations where a penalty or forfeiture might be suffered for mere failure to act."

*Lambert v. People of the State of California*, 355 U.S. 225, 228 (1957). After making that proclamation, the Court provided various "cases illustrating the point . . .." *Id*. While "[t]hese cases involved only property interests in civil litigation," the Court expressly clarified that "the principle is equally appropriate where a person, wholly passive and unaware of any wrongdoing, is brought to the bar of justice for condemnation *in a criminal case*." *Id*., (emphasis added).[1]

For example, one of the cases cited by *Lambert* provides, in relevant part, that:

> "Exceptions in the name of necessity do not sweep away the rule that within the limits of practicability *notice must be such as is reasonably calculated to reach interested parties*. Where the names and post office addresses of those affected by a proceeding are at hand, the reasons disappear for resort to means less likely than the mails to apprise them of its pendency."

*Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 318 (1950), (emphasis added). A later Supreme Court case relying on *Mullane* explained that a "new wrinkle" in determining whether

---

[1] The State dismisses *Lambert* as "irrelevant here" because it "concerns the mens rea that is necessary before the State may convict an individual of [a] crime." Opp. at 14, citing *Texaco, Inc. v. Short*, 454 U.S. 516, 537 n.33 (1982). That is wrong. The *Lambert* quote above speaks of due process *notice* requirements. None of the civil cases *Lambert* cites involved mens rea. *Texaco* was simply explaining that *Lambert*, a *criminal* case, did not affect the *civil* action at issue there. The inverse, that the due process principle demanded in those civil cases "is equally appropriate," (*Lambert*, 355 U.S. at 228) in a criminal context, is thus unaffected by *Texaco*.

notice "was reasonably calculated to reach the intended recipient when sent" in the context of a forced sale of property must be considered "when the government becomes aware prior to the taking that its attempt at notice has failed." *Jones v. Flowers*, 547 U.S. 220, 226 (2006). "The Courts of Appeals and State Supreme Courts have addressed this question on frequent occasions, and most have decided that when the government learns its attempt at notice has failed, due process requires the government to do something more . . .." *Id*. Because the notice that the government mailed the petitioner in *Jones* was returned unclaimed, the Supreme Court held that the government "should have taken additional reasonable steps to notify [the petitioner], if practicable to do so." *Id*. at 234.

Here, just like the returned mail in *Jones*, the State knows from the very low registration rates to date that a significant number of residents are likely unaware of registration. A fraction of 1% of FOID card holders have registered firearms or parts.[2] At least some portion of this significant noncompliance is due to lack of notice. Clearly, the State's "efforts" at notice have failed. The State thus must take "additional reasonable steps to notify [Illinois residents], if practicable to do so." *Jones*, 547 U.S. at 234. Plaintiffs have already suggested that such steps are available: send FOID holders a notice, as having a FOID is a prerequisite to registration, 720 Ill. Comp. Stat. Ann. 5/24-1.9(d)(1), and Illinois maintains a contact list of all FOID holders. 430

---

[2] As of late October, "[o]f more than 2.4 million FOID card holders, the total for Week 3 of the registry shows 2,046 individuals have disclosed more [sic] 3,880 firearms, more than 2,100 accessories. There's also been almost 40 ammunition disclosures. That's 0.08% of FOID card holders, up from **0.07%** the prior week and up from **0.04%** for the first week." Greg Bishop, *Just 0.08% of Illinois gun owners register banned firearms in Week 3 of registry*, The Center Square (October 25, 2023). Available at <https://www.thecentersquare.com/illinois/article_1ddd6e46-737e-11ee-89d9-73b7b802bd68.html> (last accessed December 6, 2023). According to the ISP, as of December 6, 2023, only 4,877 individuals have completed a disclosure.

ILCS 65/0.01 et seq. The State poopoos this suggestion as unnecessary without explanation other than it does not believe it is obligated to do so. Opp. at 13.

The State is wrong. But there is a more fundamental problem with Illinois's registration: *nobody* has sufficient notice of the *actual* registration requirement because the PICA Rules are still in flux as of the filing of this brief. The day before this brief was due, ISP submitted a *second* set of proposed revisions for the PICA Emergency Rules to JCAR, which JCAR is not scheduled to consider until December 12, 2023. Brady Decl., Exhibit C, D, and F. Even if the proposed amendments are adopted then, that leaves just over two weeks (during the Holiday season) for Illinoisans to comply before the deadline. What's more, the ISP has continuously amended the FAQ on its website addressing questions raised by Plaintiffs and the public about registration.[3] The State has thus failed to provide notice sufficient to satisfy due process, even assuming it would not have needed to take the additional steps for notice described above.

According to the State, however, that does not matter because there can never be a pre-enforcement challenge to government providing insufficient notice, only individuals can raise it as a defense if prosecuted. Opp. at 10-13. But the State cites no authority precluding such a pre-enforcement challenge. To be sure, Plaintiffs cite no authority involving such a pre-enforcement challenge. But that does not mean such relief is unavailable. Notably, pre-enforcement challenges for lack of notice due to vagueness are allowed, even in cases not involving constitutional issues. *See, e.g.*, *Nova Recs., Inc. v. Sendak*, 706 F.2d 782, 786, 788-792 (7th Cir. 1983). Why challenges for lack of actual notice would not be, the State does not explain.

---

[3] A "frequently asked questions" website maintained by the ISP had over 15 items edited just on November 22, 2023, *after* Plaintiffs' motion was filed. Brady Decl., Exhibit A.

To the extent that legal question is one of first impression, the Court should decide it in Plaintiffs' favor, due to the unique nature of the burdens this registration imposes. Specifically, if individuals currently in lawful possession of a Regulated Item do not learn about the registration requirement via mere publication of the statute or the State's internet posts and understand that it applies to their item, despite the rules governing registration still not being final with only weeks left to comply (see also vagueness discussion below), they are subject to both loss of their property and criminal prosecution for failing to take such affirmative step, even if they acquired the item many years ago.[4]

## II. PLAINTIFFS HAVE STANDING TO CHALLENGE THE STATE'S LACK OF NOTICE.

Because the registration requirement applies to *everyone* in current possession of an "assault weapon" or "assault weapon attachment," it necessarily applies to the organizational Plaintiffs' members and supporters, who are, by definition, gun owners in Illinois. And, as explained above, very few people have registered to date, suggesting, with mere weeks left to comply, widespread ignorance of the requirement. The State's attempt to put the onus on the organizational Plaintiffs to inform its members about the registration requirement falls flat. Opp. at 12. Those organizations did not *cause* the harm resulting from the State's lack of sufficient notice. Nor are they obligated to remedy it. Regardless, those organizations have distributed information to their members about registration and the Act generally. Pratt Decl., ¶ 4. But they cannot be certain all of their messaging is received, let alone read. Nor will their members necessarily click on the emails they send, especially during the busy holiday season. *Id*., at ¶ 5.

---

[4] The State's claim that "conduct occurring before the Act's effective date, January 10, 2023, has not been criminalized," is simply untrue. Opp. at 15. Suppose an Illinois resident purchased an item in, e.g., 2020, that the Act later deemed an "assault weapon" or regulated part in 2023, and that individual takes no action. In that case, the Act criminalizes the continued possession of that item lawfully purchased in 2020 and thus applies retroactively.

Additionally, the State's attack on Plaintiffs' standing is disingenuous. Plaintiffs voluntarily met and conferred extensively with the State's counsel prior to filing their amended complaint and their preliminary injunction. Brady Decl., ¶ 2. During the meet and confer process, the State's counsel expressed concerns about the scope of the arguments Plaintiffs would be making in support of their preliminary injunction and the evidence they would marshal in support before agreeing to any briefing schedules. *Id*. In response, Plaintiffs' counsel agreed to provide the State a draft of their preliminary injunction in advance of filing it so that the State would not be blindsided during the meet and confer process. *Id*., at ¶ 3. Plaintiffs' counsel also stipulated to allow the State significantly more time to oppose their motion than entitled to under the rules. *Id*., at ¶ 6, and L.R. 7.1(b)(2)(A). In a good faith attempt to narrow issues to be addressed in the motion, Plaintiffs' counsel sent an email to the State's counsel asking whether it intended to challenge standing so Plaintiffs could address any concerns so as to avoid unnecessary litigation if standing would not be disputed. *Id*., at ¶ 5. In sum, Plaintiffs went beyond what was required of them under the rules to try to inform the State of what it intended to do, and recognizing the significant amount of work that the State would need to do in a short amount of time, voluntarily worked with the State in good faith to keep their motion as streamlined as possible and expecting that would raises standing beforehand to avoid litigating it.

For that reason, and because Plaintiffs do not object to this Court allowing the State an opportunity to respond to it, the Court should admit the declaration from organizational Plaintiffs in support of this Reply, explaining how their members have standing to challenge the lack of notice. Pratt Decl., *passim*. *See Black v. TIC Inv. Corp.*, 900 F.2d 112, 116 (7th Cir. 1990). Equity demands as much. Other courts have allowed additional evidence on reply to rebut new arguments made in opposition. *See California Rifle & Pistol Ass'n, Inc. v. City of Glendale*, 644

6

F. Supp. 3d 610, 616 (C.D. Cal. 2022) ("Because Defendants challenged Plaintiffs' standing in their opposition, Plaintiffs were permitted to submit rebuttal evidence in their reply."); *Gelaj v. Gelaj*, 164 A.D.3d 878, 879 (2018) ("There are exceptions to this rule, including when evidence is submitted in response to allegations made for the first time in opposition, or when the other party is given an opportunity to respond to the reply papers.").

### III.    THE REGISTRATION REQUIREMENT IS UNCONSTITUTIONALLY VAGUE.

A law is unconstitutionally vague if it (1) "fails to provide a person of ordinary intelligence fair notice of what is prohibited," or (2) "is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008); *City of Chicago v. Morales*, 527 U.S. 41, 60 (1999). Various critical terms that the Act employs for determining what items it regulates suffer from each of these deficiencies and are thus each vague, which, in turn, makes its registration requirement as to those terms unenforceable.

The initial layer of vagueness is deciphering the term "assault weapon attachment." It is defined as "any device capable of being attached to a firearm that is specifically designed for making or converting a firearm into any of the firearms listed in paragraph (1) of this subsection (a)." 720 Ill. Comp. Stat. Ann. 5/24-1.9(a)(3). A person of ordinary intelligence cannot be expected to know whether any given part "is specifically designed for making or converting a firearm into" a particular make and model. What a part is designed for would be within the exclusive knowledge of the manufacturer. Additionally, there are no such products that the State can point to. A firearm is either a particular make and model or it is not. The State simply assumes this term itself is clear without explanation. It is not.

Likewise, it is hopelessly unclear whether "[a]ny part or combination of parts" is "designed or intended to convert a firearm into an assault weapon." 720 Ill. Comp. Stat. Ann.

7

5/24-1.9(a)(1)(I). Again, what a part is designed or intended for would be within the exclusive knowledge of the manufacturer. Assuming this provision is aimed at the features that qualify a firearm as being an "assault weapon" under the Act, e.g., a "pistol grip," it remains unclear whether such features would need to be registered without knowing the manufacturer's intent (assuming one knows what those parts are). What's more, the State tellingly does not answer the question Plaintiffs posed: whether "parts" used for *non*-"assault weapons" that are compatible with "assault weapons"—such as pistol grips or adjustable stocks for an otherwise legal pump action shotgun—would need to be registered because they *could* be used as part that would qualify a firearm as an "assault weapon"? Motion at 9. It is therefore unclear what, if any, such parts must be registered.

Plaintiffs have already explained in their motion why the terms for various parts that would qualify a firearm as an "assault weapon" are vague. Motion at 6-11. The State responds by arguing that those terms do not need to be further clarified because Plaintiffs focus on hypothetical "edge cases" not the definition's "core of meaning." Opp. at 18, (citing *Trustees of Indiana Univ.*, 918 F.3d at 540–41). No such "core" understanding exists here for these undefined terms.

The State cites a handful of cases rejecting vagueness challenges to other "assault weapon" laws. Opp. at 17. As an initial matter, some of those cases do not even address the terms at issue here. What's more, unlike in those cases, the Act is unique by (apparently) targeting those parts themselves for regulation, not when they are attached to a firearm. This makes a significant difference in determining whether an item falls within a given term. For example, in California a "pistol grip" is defined as a grip that conspicuously protrudes beneath the action and that the web of the hand is above the trigger. Cal. Code Regs. tit. 11, § 5471(z). That cannot be

8

determined if a pistol grip is in isolation, unattached to a firearm. Similarly, the various impermissible "stocks," are defined as those that "operate[] to reduce the length, size, or any other dimension, or otherwise enhance[] the concealability of" a rifle. 720 Ill. Comp. Stat. Ann. 5/24-1.9(a)(1)(A)(iii). Again, that cannot be determined without being attached to the rifle.

Even if it can be said that the terms have a "core meaning," that would not doom Plaintiffs' vagueness challenges, as the State suggests. Indeed, where, as here, constitutional rights are implicated, courts are concerned with intrusions even outside of the "core of meaning." "In vagueness challenges alleging infringement of constitutionally protected rights, courts may strike down a statute as vague and facially invalid even if that statute is not impermissibly vague in all of its applications." *Karlin v. Foust*, 188 F.3d 446, 458 (7th Cir. 1999); *see also Copeland v. Vance*, 893 F.3d 101, 111 n.2 (2d Cir. 2018), *cert. denied*, -- U.S. --, 139 S. Ct. 2714 (2019); *see also Planned Parenthood of Indiana & Kentucky, Inc. v. Marion Cnty. Prosecutor*, 7 F.4th 594, 606 (7th Cir. 2021) (citing *Colautti v. Franklin*, 439 U.S. 379, 391 (1979) ("This appears to be especially true where the uncertainty induced by the statute threatens to inhibit the exercise of constitutionally protected rights.")). Additionally, "[t]he Constitution tolerates a lesser degree of vagueness in enactments 'with criminal rather than civil penalties because the consequences of imprecision' are more severe." *Karlin*, 188 F.3d at 457 (citing *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982)). Because the Act involves both criminal penalties and constitutionally protected conduct, the State thus cannot get away with simply showing that the terms have some understandable application.

The State's arguments as to the scienter requirement are misleading. The Act prohibits someone from "knowingly" possessing Regulated Items. 720 ILCS 5/24-1.9(a)(8)(c). It does not require that individuals know that what they possess is *illegal* if not registered. The only people

who will escape prosecution thus are those who are unaware that they possess some unregistered item, e.g., stored away somewhere. There is no protection of the sort Plaintiffs seek here, for people who do not know whether a particular item is a Regulated Item, due to its vagueness. The State's argument that the Act's supposed scienter requirements save it from a vagueness challenge thus falls flat.

The State believes it has a "gotcha" argument that Plaintiffs understand the disputed terms to have a core meaning by defending the features' virtues in their complaint. Opp. at 23. But Plaintiffs were merely referencing items that *may* fall within those terms without having seen the precise definitions. Virtually any grip ("pistol grip" or otherwise) is intended to increase control and accuracy of a firearm. An adjustable stock is intended to facilitate the right "fit" for the particular user of the firearm. And "flash suppressors" *can* also aid in control and accuracy, depending on what is being referred to. The issue is that the Act does not make clear which specific items it considers covered by those terms.

Despite the detailed, practical explanations Plaintiffs have provided of how the various terms are vague, the State accuses Plaintiffs of "feign[ing] confusion about the precise meaning of certain firearm parts." Opp. at 1. But the State's own police force, which is tasked with implementing these terms, has struggled to achieve clarity. Indeed, as of the filing of this brief, it is still in the process of refining its implementing Rules, despite there only being a few weeks left until the deadline to register. Brady Decl, ¶ 9, Exhibit B. The ISP has also repeatedly amended its FAQ on its website about what is covered. *Id*., Exhibit A. This is because the terms are vague.

The complex web related to "barrel shrouds" provides an excellent example to illustrate all the conflicting authorities regular citizens are supposed to sort through in time for the

registration deadline. The Act defines "barrel shroud" as "a shroud attached to the barrel or that partially or completely encircles the barrel, allowing the bearer to hold the firearm with the non-trigger hand without being burned, but excluding a slide that encloses the barrel." 720 Ill. Comp. Stat. Ann. 5/24-1.9(a)(1)(A)(vi).

The ISP, likely in response to Plaintiffs' amended complaint, ECF No. 55, states on its FAQ webpage that a "shroud is not an integral component of the stock, but rather a separate piece. For example, the wooden forestock on a base model Ruger 10/22 does not constitute a shroud." It also states that a handguard is not considered a shroud under PICA.[5] The FAQ has been edited several times just on this issue. The first FAQ question and answer about shrouds was added on November 1, 2023 and edited on November 22, 2023. The second FAQ question and answer was added on November 22, 2023. Brady Decl., Exhibit A.

The FAQ, however, is inconsistent with what the law *states*. One set of proposed amendments to the PICA Emergency Rules submitted to JCAR includes additional language about shrouds, while the other does not. *Compare* Brady Decl. Exhibit D to Brady Decl., Exhibit F, p. 41. No revisions have been voted on yet, and will not be until December 12 at the earliest.

To make matters even more confusing, the illustrations provided in the ISP's PICA Identification Guide are plainly not barrel shrouds under the definition given by PICA. For example:



---

[5] *See* https://isp.illinois.gov/Home/AssaultWeapons, question nos. 10 and 25.

Brady Decl., Exhibit E, p. 6 (highlight added). Even a novice could see that the part pointed to is not meant for the bearer to "hold the firearm with the non-trigger hand without being burned." This is just one example of one term.

The State further argues that Plaintiffs should not "focus their vagueness argument on particular firearm parts referenced in the Act" but rather on particular firearms, Opp. at 19, and that "[t]he hypothetical nature of plaintiffs' argument is apparent from their failure to identify any actual firearm—not just a part, an actual firearm—for which inclusion or exclusion from the 'assault weapon' definition turns exclusively." Opp. at 21. That is a strange argument considering that Plaintiffs' vagueness challenge is to the Act's registration requirement for firearms that the Act itself defines as "assault weapons" *by those particular parts*, not to particular firearms. To be clear, Plaintiffs' vagueness challenge does not extend to those firearms listed as "assault weapons" by make and model. 720 ILCS 5/24-1.9(a)(1)(J). Nor does it seek to enjoin registration entirely (as their insufficient notice and Second Amendment challenges do).

Finally, the State criticizes Plaintiffs for not bringing their vagueness claims sooner. Opp. at 6. But Plaintiffs' vagueness concerns are in the context of registration only and thus could have potentially been resolved by the PICA Rules, which were not initially released until September 15, 2023, and which remain unfinalized as of the date of this brief. Brady Decl., ¶ 9, 11, and 13. Surely the State would have complained that an earlier challenge would have been unripe.

IV.   **THE STATE FAILS TO MEET ITS BURDEN UNDER THE SECOND AMENDMENT.**

The Seventh Circuit's ruling is not final until a mandate has issued. *Clipper v. Takoma Park, Md.*, 898 F.2d 18, 20 (4th Cir. 1989) (Widener, J., dissenting). The Seventh Circuit may yet take the case en banc. And one set of plaintiffs is currently asking the Supreme Court to stay the

Seventh Circuit's ruling in the meantime, with Justice Barrett ordering the State to respond by December 6.[6] Plaintiffs are not suggesting that this Court ignore the panel ruling on a technicality of when the mandate has issued. But Plaintiffs are preserving their Second Amendment arguments as to registration should the controlling law of the case change or for appeal. Moreover, the panel ruling was limited to "assault weapons", and its discussion concerned the AR-15. Its entire discussion on registration was only a paragraph long, and certainly did not touch on the depth of the arguments Plaintiffs have presented here. *Bevis*, 85 F.4th at 1179.

The State erroneously argues that Plaintiffs' challenge to the Act's registration would be "self-defeating" because it would result in "eliminating the means through which people can take advantage of the Act's exemption for grandfathered weapons." Opp. at 34. Plaintiffs merely seek to be relieved from the *requirement* of registration. If the State wishes to keep registration open, Illinois residents are free to register, assuming they are aware of the registration process and understand what needs to be registered.

What's more, Plaintiffs' Second Amendment challenge as to the registration of parts remains unaffected. The State argues that "parts and attachments 'specifically designed for making or converting a firearm into any of the firearms listed' in the Act as an 'assault weapon'" cannot be protected under the Second Amendment if so-called "assault weapons" themselves are supposedly not protected per the Seventh Circuit's ruling. Opp. at 34. But the State assumes (wrongly) that just because the inclusion of a part *may* cause an otherwise lawful firearm to fall within Illinois's definition of an "assault weapon" that such part is "specifically designed" for

---

[6] Greg Bishop, *Illinois has until Wednesday to respond to gun ban challenge in U.S. Supreme Court*, The Center Square Illinois (December 3, 2023), available at <https://www.thecentersquare.com/illinois/article_8f57d86a-9087-11ee-a69f-3fb7acd7584d.html> (Last accessed December 3, 2023).

13

that purpose. As Plaintiffs have explained, Motion at 9, the same adjustable stock or pistol grip that can be used on a semiautomatic rifle can be used on a single-shot rifle or a pump-action shotgun, neither of which would be an "assault weapon." The State's only purported defense to Plaintiffs' parts argument is thus irrelevant.

The State's claim that registration does not even implicate the Second Amendment's text is not serious. The Second Amendment protects the right to "keep and bear arms." U.S. Const. amend. II. If one does not register a currently-owned Regulated Item in his possession, he will not only be unable to continue to keep that item but would be subject to felony prosecution, thereby potentially losing his right to possess *any* firearm. 720 ILCS 5/24-1(b). To say the text of the Second Amendment would have nothing to say about such a law is inconceivable.

The Seventh Circuit discussed registration only in passing, calling the requirement "no more onerous than many found in history." *Bevis*, 85 F.4th at 1179. Of course, it did not actually cite any of these "many" examples. Nor could it, because they do not exist. As then-Judge Kavanaugh explained, the "fundamental problem with [the] gun registration law is that registration of lawfully possessed guns is not 'longstanding.' Registration of all guns lawfully possessed by citizens in the relevant jurisdiction has not been traditionally required in the United States and, indeed, remains highly unusual today." *Heller v. D.C.*, 670 F.3d 1244, 1291 (D.C. Cir. 2011) (Kavanaugh, J., dissenting). While that was a dissenting opinion, the majority acknowledged that registration requirements, at least as to long guns, are not longstanding. *Id*. at 1255-56 ("The requirements that are not longstanding, which include … all the requirements as applied to long guns."). Registration was upheld in that case only because the majority went on to apply intermediate scrutiny, which *Bruen* now forecloses.

To be sure, the State presents some proposed analogues. But its "historical record" is merely a smattering of historical outliers, eight in total. Opp., Exhibit A. The earliest dates to 1631, a "muster" law that is dissimilar to the registration requirement for the reasons discussed in Plaintiff's opening brief. Motion at 16-17. Moreover, it is far too early in time to be of much value. The Supreme Court gave pre-founding and English history very little weight because "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Bruen*, 142 S. Ct at 2136 (citing *Heller*, 554 U.S. at 634).

The rest of the State's cited laws range from 1848 to 1918, with none from the founding era. Most are taxes on things like small pistols, bowie knives, and dirks. Two of the taxes only applied when the aforementioned weapons were carried in the past year. Only one of these taxes applied to rifles. *See Bruen*, 142 S. Ct. at 2144 (rejecting a historical analogy to a regulation that "prohibited the public carry of pistols" because "it did not prohibit planters from carrying long guns for self-defense—including the popular musket and carbine"). Regardless, taxation in general is a completely different "how" of operation than the current registration requirement. "[A] historical statute cannot earn the title 'analogue' if it is clearly more distinguishable than it is similar to the thing to which it is compared." *Antonyuk v. Hochul*, 635 F. Supp. 3d 111, 131 (N.D.N.Y. 2022) (citing *Bruen*, 142 S. Ct. at 2133).

None of these few historical laws banned any weapons,[7] let alone the most popular firearms in the country. That is because no such bans ever existed prior to the 20th century. "It is

---

[7] In fact, many of the laws cited went out of their way to avoid taxing long arms. The 1848 Mississippi statute applied only to "dueling or pocket pistol[s]," and excepted those "kept for use by military companies." Opp., Exhibit A (No. 2). North Carolina's 1856 statute taxed pistols, except those "used exclusively for mustering," and arms like the Bowie knife. *Id.* (No. 3). North Carolina's 1858 statute taxed similarly unusual arms and stated "[a]rms used for mustering shall be exempt from taxation." *Id.* (No. 4). And Alabama's 1867 statute targeted pistols, revolvers, and arms like the Bowie knife, but not rifles. *Id.* (No. 6).

remarkable to discover that there were no outright prohibitions on keeping or possessing guns. No laws of any kind." *Duncan v. Bonta*, No. 17-CV-1017-BEN (JLB), 2023 WL 6180472, at *24 (S.D. Cal. Sept. 22, 2023). Illinois cited historical laws that covered a small minority of the population even when they were in effect and cannot be sufficient to save the registration requirement now.

Finally, the State calls the idea that the Second Amendment is a "doomsday provision"[8] created to guard against tyranny an "extremist position". Opp. at 38. But if Plaintiffs are "extrem[ely]" pro-Second Amendment, that is certainly not a fault. No doubt, Illinois would have considered the Founders extremists as well. It is no surprise that government would object to the notion of any check on its power. But the history on this is so overwhelming as to be beyond debate—as the forthcoming law review article Plaintiffs presents discussed at length, Americans of the 18th and 19th centuries said so repeatedly, even in schoolbooks of the era.[9] Moreover, this Court acknowledged that history in its prior ruling. ECF No. 101, pp. 12-13.

---

[8] This term which the State mocks was used by former Ninth Circuit Chief Judge Alex Kozinski in *Silveira v. Lockyer*, 328 F.3d 567, 570 (9th Cir. 2003) (Kozinski, J., dissenting from denial of rehearing en banc).

[9] *See, e.g.,* HENRY FLANDERS, AN EXPOSITION OF THE CONSTITUTION OF THE UNITED STATES 258 (1860) ("With arms in their hands, the people will not be likely to permit the overthrow of their institutions by the unscrupulous ambition of a civil magistrate or military chieftain. The very fact of their being armed will serve as a check to any arbitrary or forcible invasion of their constitutional rights."); EDWARD D. MANSFIELD, THE POLITICAL MANUAL: BEING A COMPLETE VIEW OF THE THEORY AND PRACTICE OF THE GENERAL AND STATE GOVERNMENTS OF THE UNITED STATES, ADAPTED TO THE USE OF COLLEGES, ACADEMIES, AND SCHOOLS 205 (1861) ("It is scarcely necessary to say, that the right of the people thus to bear arms is the foundation of their liberties; for, without it, they would be without any power of resistance against the existing government."); GEORGE W. PASCHAL, THE CONSTITUTION OF THE UNITED STATES DEFINED AND CAREFULLY ANNOTATED 256 (1868) ("[The Second Amendment] is based on the idea, that the people cannot be oppressed or enslaved, who are not first disarmed."); WILLIAM C. ROBINSON, NOTES ON ELEMENTARY LAW 103 (1875) ("The constitution of the United States secures the right to keep and bear arms, such as are used for purposes of war, in defence of the citizens or the state."); ANDREW W. YOUNG & SALTER S. CLARK, THE GOVERNMENT CLASS BOOK: A YOUTH'S MANUAL OF INSTRUCTION IN THE PRINCIPLES OF CONSTITUTIONAL GOVERNMENT AND LAW 185 (1880) ("Right to Keep Arms—This means the right of every one to own and use, in a peaceful manner, warlike weapons . . . .It was thought that without it, ambitious men might, by the aid of the regular army, overthrow the liberties of the people and usurp the powers of government.")

Judge Kozinski and this Court are in good company. *See Heller, 554 U.S. at 599* ("It was understood across the political spectrum that the right helped to secure the ideal of a citizen militia, which might be necessary to oppose an oppressive military force if the constitutional order broke down."). At bottom, the purpose of the Second Amendment is incompatible with registration.

V.   **THE RELIEF PLAINTIFFS SEEK.**

The State incorrectly argues that the relief that Plaintiffs seek would harm, rather than help Plaintiffs. Opp. at 43. The State misunderstands the relief that Plaintiffs seek here. Plaintiffs seek to enjoin enforcement of the registration requirement *as a condition* of continued possession of Regulated Items that were acquired before January 10, 2023, i.e., items *eligible* for registration that were not registered. In other words, the Act's "possession" restriction could not be enforced against people with such items, even after December 31, 2023. People would still be free to submit an endorsement affidavit before December 31, 2023, or later if the State leaves registration open. They just cannot be compelled to in order to maintain possession of their Regulated Items that were lawfully acquired before January 10, 2023. Of course, if the Seventh Circuit's ruling is vacated by the en banc panel or the Supreme Court, this Court should enjoin registration in its entirety.

/ / /

/ / /

/ / /

/ / /

## CONCLUSION

For these reasons as well as those in the opening brief, this Court should preliminarily enjoin Illinois's registration requirement.

Dated: December 6, 2023                                    Respectfully submitted,

*s/ C.D. Michel*

| | |
|---|---|
| Mark L. Shaw, Esq. | C.D. Michel, Esq. (pro hac vice) |
| Jennifer Craigmile Neubauer, Esq. | Sean A. Brady, Esq. (pro hac vice) |
| Michael A. Danforth, Esq. | Konstadinos T. Moros, Esq. (pro hac vice) |
| SHAW LAW LTD. | MICHEL & ASSOCIATES, P.C. |
| 33 North County Street, Suite 300 | 180 East Ocean Blvd., Suite 200 |
| Waukegan, Illinois 60085 | Long Beach, CA 90802 |
| (T): (847) 244-4696 | (T): (562) 216-4444 |
| (F): (847) 244-4673 | (F): (562) 216-4445 |
| (E-1): mlshaw@shawlawltd.com | (E-1): cmichel@michellawyers.com |
| (E-2): jcneubauer@shawlawltd.com | (E-2): sbrady@michellawyers.com |
| (E-3): michael@danforthlawgroup.com | (E-3): kmoros@michellawyers.com |

*Attorneys for Plaintiffs Federal Firearms Licensees of Illinois, Guns Save Life, Gun Owners of America, Gun Owners Foundation, Piasa Armory, Debra Clark, Jasmine Young, and Chris Moore*

## CERTIFICATE OF SERVICE

I hereby certify that on December 6, 2023, an electronic PDF of FEDERAL FIREARMS LICENSEES OF ILLINOIS PLAINTIFFS' REPLY TO STATE DEFENDANTS' OPPOSITION TO THE SECOND MOTION FOR PRELIMINARY INJUNCTION AND OPPOSITION TO PARTIAL RULE 12(B)(6) MOTION TO DISMISS was uploaded to the Court's CM/ECF system, which will automatically generate and send by electronic mail a Notice of Docket Activity to all registered attorneys participating in the case. Such notice constitutes service on those registered attorneys.

Dated: December 6, 2023                                    Respectfully submitted,

                                                           *s/ C.D. Michel*
                                                           C.D. Michel