## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **FEDERAL FIREARMS LICENSEES OF ILLINOIS,** an Illinois not-for-profit corporation, **GUNS SAVE LIFE,** an Illinois not-for-profit corporation, **GUN OWNERS OF AMERICA,** a California non-stock corporation and a not-for-profit membership organization, **GUN OWNERS FOUNDATION,** a Virginia non-stock corporation and a not-for-profit legal defense and educational foundation, **PIASA ARMORY,** a Missouri corporation, **JASMINE YOUNG,** a resident of Madison County, Illinois, **CHRIS MOORE,** a resident of Hardin County, Illinois, | ) ) ) ) ) ) ) ) ) ) ) |
| **Plaintiffs,** | ) ) |
| **vs.** | ) **Case No. 3:23-CV-215-SPM** |
| **JAY ROBERT "J.B." PRITZKER,** in his official capacity as Governor of the State of Illinois, **KWAME RAOUL,** in his official capacity as Attorney General of the State of Illinois, and **BRENDAN F. KELLY,** in his official capacity as Director of the Illinois State Police, | ) ) ) ) ) ) |
| **Defendants.** | ) ) |

## <u>SECOND AMENDED COMPLAINT FOR DECLARATORY, INJUNCTIVE AND OTHER RELIEF</u>

Plaintiffs **FEDERAL FIREARMS LICENSEES OF ILLINOIS, an Illinois not-for-profit corporation, GUNS SAVE LIFE, an Illinois not-for-profit corporation, GUN OWNERS OF AMERICA, a California non-stock corporation and a not-for-profit membership organization, GUN OWNERS FOUNDATION, a Virginia non-stock corporation and a not-for-profit legal defense and educational foundation, PIASA ARMORY, a Missouri corporation, JASMINE YOUNG, a resident of Madison County, Illinois, and CHRIS MOORE, a resident of Hardin County**(collectively referred to

1

hereinafter as "Plaintiffs"**),** who are, or represent members and supporters who are, law-abiding Illinois residents who seek to protect themselves, their families, and/or their homes with firearms owned and in common use by millions of Americans for self-defense and/or sport, or are lawfully, federally licensed retailers that seek to acquire, maintain, possess, use and/or transfer firearms to such persons for such use, by the undersigned counsel of record, request that this Court enter an Order in their favor and against Defendants **JAY ROBERT "J.B." PRITZKER, in his official capacity as Governor of the State of Illinois, KWAME RAOUL, in his official capacity as Attorney General of the State of Illinois, and BRENDAN F. KELLY, in his official capacity as Director of the Illinois State Police** (collectively referred to hereinafter as "Defendants"),who are charged with the responsibility of enforcing the laws of the State of Illinois and, more specifically, charged with enforcing *Public Act 102-1116, a/k/a Protect Illinois Communities Act, generally, and, more specifically, 720 ILCS 5/24-1.9, et seq.* (referred to hereinafter as the "Firearms Ban Act"), which Order declares the Firearms Ban Act to be an unconstitutional infringement of the civil rights of law abiding residents of the State of Illinois and/or of the United States to: **a)** "keep and bear arms", which arms are commonly possessed firearms and various firearms attachments and/or parts, for the defense of themselves and/or their families; **b)** travel freely with these arms; **c)** supply these arms to such persons; **d)** continue to possess these arms without being forced to register them with the state, at least not under the current regulations; and/or **e)** acquire, maintain, possess, use and/or transfer these arms for all other lawful purposes, and, thereafter, enjoins the enforcement of the Firearms Ban Act: **a)** temporarily; **b)** preliminarily; and/or **c)** permanently; and awards any provable damages to Plaintiffs by Defendants' unconstitutional actions. In support of this Complaint for Declaratory,

Injunctive Relief and Other Relief (referred to hereinafter as the "Complaint"), Plaintiffs state the following:

## INTRODUCTION

1.      If the right to "keep and bear arms" means anything, it must mean that the government cannot ban the most popular firearms in the country[1], like the class of firearms known as magazine-fed semi-automatics.

2.      For example, certainly, a rifle like the ubiquitous AR-15, which has been on the market for **over sixty years**, and which is owned by **many millions of law-abiding Americans**, easily meets that description.

3.      Yet, in a clearly unconstitutional attack on law-abiding Americans' rights, Illinois enacted the Firearms Ban Act, a statute that completely bars Plaintiffs from acquiring, transferring, possessing and/or repairing hundreds of types of commonly owned firearms and various firearms attachments and/or parts that Illinois now pejoratively and inaccurately labels "assault weapons."

4.      Those firearms include a lengthy list that bans commonly owned, popular firearms by name, firearms that resemble those listed by name, various parts for repairing these firearms, and various attachments with ergonomic features, such as those designed to aid the physically disabled and/or smaller stature individuals in protecting themselves, their families and/or their homes -- none of which ergonomic features affects the lethality or rate of fire of these arms.

---

[1]      *The Second Amendment to the U. S. Constitution squarely protects Plaintiffs' right to "keep and bear arms" which are "typically possessed by law-abiding citizens for lawful purposes" (District of Columbia v. Heller, 554 U.S. 570, 624-25 (2008)), [because] "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms[.]" Id., 554 U.S. at 582.*

5.     The only individuals and/or entities not covered by the Firearms Ban Act are certain current and/or former government employees, private security guards, locksmiths and a handful of presumably, politically connected individuals and/or "professionals" whose personal safety and/or chosen "professions" are more worthy of protection than are those of average, every day, law-abiding residents of the State of Illinois.

6.     Fortunately for Plaintiffs, and the average, everyday, law-abiding residents of the State of Illinois, the U. S. Supreme Court has repeatedly taught us that gun laws in this country can only withstand constitutional review if they are consistent with a broad and enduring historical tradition of firearm laws regulating certain types of persons, arms, or activities.

7.     Because commonly owned firearms were never outright banned at the founding of this country, or during the 18th and 19th centuries, neither the United States nor Illinois has any historical tradition to support the Firearms Ban Act, and, therefore, the Firearms Ban Act must be stricken from the Illinois Compiled Statutes books!

## JURISDICTION AND VENUE

8.     The Court has original jurisdiction of this civil action pursuant to *28 U.S.C. § 1331* because this action arises under the Constitution and laws of the United States, thus raising federal questions.

9.     The Court also has jurisdiction pursuant to *28 U.S.C. § 1343(a)(3)* and *42 U.S.C. § 1983* since this action seeks to redress the deprivation, under color of the laws, statutes, ordinances, regulations, customs, and usages of the State of Illinois and political subdivisions thereof, of rights, privileges or immunities secured by the United States Constitution and by Acts of Congress.

10.     Plaintiffs' claims for declaratory relief are authorized by *F.R.C.P. 57* and/or *28
U.S.C. §§ 2201* and *2202,* respectively, their claims for injunctive relief are authorized by
*F.R.C.P. 65*, and their claims for attorneys' fees and costs are authorized by *42 U.S.C. § 1988.*

11.     Venue in this judicial district is proper pursuant to *28 U.S.C. § 1391(b)(2)*
because a substantial part of the events or omissions giving rise to the claims occurred in this
judicial district, and by *28 U.S.C. § 1391(c)(1)* and *(2)* because of the parties' residences and/or
their being subject to the personal jurisdiction of the Court in this judicial district.

<u>**THE PARTIES**</u>

<u>**Plaintiffs**</u>

12.     **FEDERAL FIREARMS LICENSEES OF ILLINOIS** (referred to hereinafter
as "FFL-IL") is an Illinois not-for-profit corporation,  and represents federally licensed gun
dealers across the State of Illinois that are harmed by the ban on sales,  with members whose
retail establishments sell the commonly used, banned firearms that make up a significant portion
of their sales, and who will be driven out of business if the Firearms Ban Act is implemented and
enforced.

13.     **GUNS SAVE LIFE** (referred to hereinafter as "GSL") is an Illinois not-for-profit
corporation with many members residing in this judicial district and/or throughout the State of
Illinois, teaches and trains individuals in the use of firearms, including firearms banned by the
Firearms Ban Act, whose members will be irreparably harmed by the ban on sales preventing
them from further acquiring new, banned firearms and various firearms attachments and/or parts.

14.     **GUN OWNERS OF AMERICA** (referred to hereinafter as "GOA") is a
California non-stock corporation and a not-for-profit membership organization with its principal
place of business in Springfield, Virginia, and is organized and operated as a non-profit

5

membership organization that is exempt from federal income taxes under ***Section 501(c)(4) of the U.S. Internal Revenue Code.***

15.    GOA was formed in 1976 to preserve and defend the Second Amendment rights of gun owners.

16.    GOA has more than 2 million members and supporters across the country, including residents within this judicial district and/or throughout the State of Illinois.

17.    **GUN OWNERS FOUNDATION** (referred to hereinafter as "GOF") is a Virginia non-stock corporation and a not-for profit legal defense and educational foundation with its principal place of business in Springfield, Virginia, and is organized and operated as a non-profit legal defense and educational foundation that is exempt from federal income taxes under ***Section 501(c)(3) of the U.S. Internal Revenue Code.***

18.    GOF was formed in 1983, and is supported by gun owners across the country and within this judicial district and/or throughout the State of Illinois, who, like the individual plaintiffs, will be irreparably harmed by the implementation and enforcement  of the Firearms Ban Act.

19.    **PIASA ARMORY, a Missouri corporation** (referred to hereinafter as "Piasa") is a small, family-owned,  federally licensed gun dealer in within this judicial district that has been harmed by the loss of sales and the inability to reasonably understand what firearms may, or may not,  be sold and whether they can return banned firearms they take in for repair.

20.    **JASMINE YOUNG** (referred to hereinafter as "Young") is a 30-year-old resident of East Alton, Madison County, Illinois who practices gun safety daily and participates in local International Defensive Pistol Association shooting events, who would like to purchase

an AR-15 for hunting, sports and self-defense and who would use the AR-15 to participate in

International Defensive Pistol Association matches, but will now be banned from doing so.

21.    **CHRIS MOORE** (referred to hereinafter as "Moore") is a 35-year-old physician

and resident outside of Cave-in-Rock, Hardin County, Illinois who lives with his wife and son

and wants his wife to be able to use the AR-15 for the self-defense of her family and herself,

because she is of shorter stature with a weaker grip and the AR-15 is easier, and, thus, safer for

her to use.

23.    Many of the members and supporters of FFL-IL, GSL, GOA and GOF, like the

individual plaintiffs,  will be irreparably harmed by Illinois' sweeping and unconstitutional

Firearms Ban Act.

24.    Many of the irreparable harms to the members and supporters of FFL-IL, GSL,

GOA and GOF, which will be caused by implementation and enforcement of the Firearms Ban

Act, are alleged herein by FFL-IL, GSL, GOA and GOF serving in a representational capacity on

behalf of the interests of their members and supporters.

25.    Each of the members and supporters of FFL-IL, GSL, GOA and GOF have

standing to challenge the Firearms Ban Act in their own right.

26.    Protection of the rights and interests of the members and supporters of FFL-IL,

GSL, GOA and GOF is germane to the missions of the members and supporters of FFL-IL, GSL,

GOA and GOF, which are to preserve and protect the Second Amendment and the rights of

Americans to "keep and bear arms", and to "place a check on" overreaches by anti-gun

governments.

27.    Litigation of the challenges raised herein does not require participation of each of

the individual members and supporters of FFL-IL, GSL, GOA and GOF, and FFL-IL, GSL,

GOA and GOF are fully and faithfully capable of representing the interests of their members and supporters without participation by each of these individuals and/or entities.

28.    Indeed, FFL-IL, GSL, GOA and GOF routinely litigate cases throughout the State of Illinois and/or the country on behalf of their members and supporters.

**Defendants**

29.    **JAY ROBERT "J.B." PRITZKER, in his official capacity as the duly elected Governor of the State of Illinois** (referred to hereinafter as the "Governor"), is the chief executive officer of the State of Illinois, who is charged with the responsibility of enforcing the laws of the State of Illinois and, more specifically, charged with enforcing the Firearms Ban Act.

30.    **KWAME RAOUL, in his official capacity as the duly elected Attorney General of the State of Illinois** (referred to hereinafter as the "Attorney General"), is the chief law enforcement officer of the State of Illinois, who is charged with the responsibility of enforcing the laws of the State of Illinois and, more specifically, charged with enforcing the Firearms Ban Act.

31.    **BRENDAN F. KELLY, in his official capacity as Director of the Illinois State Police** (referred to hereinafter as the ISP Director"), is the chief operating officer of the Illinois State Police, who is charged with the responsibility of managing and controlling the enforcement of the State's criminal laws by the Illinois State Police and, more specifically, charged with implementing and enforcing the Firearms Ban Act.

32.    Defendants, by implementing and enforcing the Firearms Ban Act against Plaintiffs and other Illinois, and United States residents, will be acting "under color of state law" within the meaning of *42 U.S.C. § 1983.*

## FACTUAL AVERMENTS

### Historical Background on U.S. Firearms Ownership:  At the Founding of the Nation

33.    The American experiment might never have begun were it not for citizens taking

up arms against the British Empire's overreach in seeking to disarm them.

34.    While tensions had been building for some time, the fighting started in earnest

when hundreds of British troops marched from Boston to nearby Concord in order to seize an

arms cache on the night of April 18, 1775.

35.    Despite being overwhelmingly outnumbered and out-gunned, colonial farmers

and everyday citizens mobilized as quickly as they could, "bringing their private arms to bear" in

defense of their individual freedoms.

36.    By the end of the day, these common, everyday citizens succeeded in driving the

British all the way back to Boston and inflicting more casualties on the "Redcoats" than they

themselves had suffered.

37.    In other words, free persons exercising their preexisting natural right to "keep and

bear arms" had successfully driven back the preeminent superpower of their time.

38.    In doing so, they inspired others to carry on years of struggle that would

eventually lead to full independence for a new country.

39.    When it later came time to establish the Constitution and its accompanying Bill of

Rights, the founders were very clear on the importance of an armed citizenry bearing their own

private arms as a bulwark against both foreign invasion and domestic tyranny.

40.    As future U.S. President James Madison explained, unlike other countries, our

new federal government would face guaranteed obstacles to subjugating the people:

> **To [a federal army] would be opposed a militia amounting to near half a million of
> citizens with arms in their hands,** officered by men chosen from among themselves,

> **fighting for their common liberties, and united and conducted by governments possessing their affections and confidence …. <u>Besides the advantage of being armed, which the Americans possess over the people of almost every other nation,</u> the existence of subordinate governments, to which the people are attached, and by which the militia officers are appointed, forms a barrier against the enterprises of ambition, more insurmountable than any which a simple government of any form can admit of …."**

(underlining added)[2]/.

41.     Tench Coxe, a friend of future President Madison, and himself a delegate to the Constitutional Convention who authored a draft of what would become the Second Amendment, later wrote about *what* kind of arms the Second Amendment contemplates:

> **Who are the militia? Are they not ourselves? … [The government] has no power to disarm the militia. Their swords and every terrible implement of the soldier are the birthright of Americans.**[3]/

42.     In its final form, the Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."[4]/

43.     It was intended to protect the natural right of armed self-defense from government infringement, and the modern U.S. Supreme Court has repeatedly confirmed that individual self-defense is its "central component". [5]/

44.     The Second Amendment to the U.S. Constitution declares that "the right of the people to keep and bear arms shall not be infringed."[6]/

---

[2]/     *Federalist No. 46.*

[3]/     *The Pennsylvania Gazette, Feb. 20, 1788.*

[4]/     *U.S. Const. amend. II.*

[5]/     *McDonald v. City of Chicago, 561 U.S. 742, 767 (2010) (quoting Heller, 554 U.S. at 599, 628); see also Caetano v. Massachusetts, 577 U.S. 411, 136 S. Ct. 1027 (2016).*

[6]/     *U.S. CONST. amend. II.*

45.    "Self-defense is a basic right, recognized by many legal systems from ancient times to the present day, and . . . individual self-defense is 'the central component' of the Second Amendment right."[7]/

46.    The "arms" protected by the Second Amendment are those "typically possessed by law-abiding citizens for lawful purposes" contemporarily, and restrictions on such arms are especially suspect when they extend "to the home, where the need for defense of self, family, and property is most acute."[8]/

47.    Because "it is clear that the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty," the Second Amendment right to "keep and bear arms" is incorporated into the Due Process Clause of the Fourteenth Amendment and may not be infringed by state or local governments.[9]/

48.    "The standard for applying the Second Amendment is that [w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct, and the government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation – resulting in the individual's conduct [then falling] outside the Second Amendment's 'unqualified command.'"[10]/

49.    Courts may not apply a "means-ends" "interest-balancing" test akin to "intermediate scrutiny" in Second Amendment cases.[11]/

---

[7]/    *McDonald v. City of Chicago, 561 U.S. 742, 767 (2010) (quoting Heller, 554 U.S. at 628).*

[8]/    *Heller, 554 U.S. at 624-25, 628; see also Caetano v. Massachusetts, 577 U.S. 411, 136 S. Ct. 1027 (2016).*

[9]/    *McDonald, 561 U.S. at 778.*

[10]/    *New York State Rifle & Pistol Association v. Bruen, 597 U.S. ___, 142 S. Ct. 2111, 2126 (2022).*

[11]/    *Bruen, 142 S. Ct. at 2129.*

50.     As such, lower courts may not take public policy considerations into account when ruling on Second Amendment cases.

51.     The Second Amendment "is the very product of an interest balancing by the people" and it "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms" for self-defense.[12]/

52.     Not surprisingly, just last year, the U.S. Supreme Court reaffirmed that "[i]t is this balance – struck by the traditions of the American people -- that demands our unqualified deference."[13]/

53.     The "arms" protected by the Second Amendment are those "typically possessed by law-abiding citizens for lawful purposes" today.[14]/

54.     Semiautomatic rifles, including ones now banned in Illinois, "traditionally have been widely accepted as lawful possessions"[15]/, as well as semi-automatic shotguns and handguns.

55.     Our historical tradition also makes clear that the Second Amendment exists to guarantee an armed citizenry who can act as a bulwark against tyranny, whether from a foreign invader or a domestic government that disrupts our constitutional republic or violates the individual rights it is sworn to uphold.

---

[12]/     *Heller, 554 U. S. 635.*

[13]/     *Bruen, 142 S. Ct. at 2131.*

[14]/     *Heller, 554 U.S. at 624-25; see also, e.g., Caetano, 577 U.S. 411, 136 S. Ct. at 1027-28.*

[15]/     *Staples v. United States, 511 U.S. 600, 612 (1994).*

56.     This was not only the understanding of the founding generation; it was also the prevailing view throughout the 19th century.[16]/

### Historical Background on U.S. Firearms Ownership:  The 18th and 19th Centuries

57.     Several prominent writers have explained that weapons of warfare were what was *most* protected by the Second Amendment.

58.     For example, Henry Campbell Black, most famous for being the original author of ***Black's Law Dictionary***, wrote of the Second Amendment that "[t]he 'arms' here meant are those of a soldier … . The citizen has at all times the right to keep and bear arms of modern warfare."[17]/

59.      Black was far from alone; the idea that the Second Amendment protected "arms of modern warfare" as a guard against tyranny was the prevailing one among legal scholars of the time:

> •     **"Some tyrannical governments resort to disarming the people, and making it an offence to keep arms, or participate in military parades. In all countries where despots rule with standing armies, the people are not allowed to keep <u>guns and other warlike weapons</u>." Joseph Bartlett Burleigh,** *The American Manual: Containing an Outline of the Origin and Progress of Political Power, and the Laws of Nations***, at 212 (1848) (underlining added);**

> •     **"It is scarcely necessary to say, that the right of the people thus to bear arms is the foundation of their liberties; for, without it, they would be without any power of resistance against the existing government." Edward D. Mansfield,** *The Political Manual; Being a Complete View of the Theory and Practice of the General and State Governments of the United States***, at 205 (1861);**

> •     **"But a militia would be useless unless the citizens were enabled to exercise themselves in the <u>use of warlike weapons</u>. To preserve this privilege, and to secure to the people the ability to oppose themselves in military force against the usurpations**

---

[16]/     *The court in District of Columbia v. Heller, 554 U.S. 570, 612-13 (2008) (quoting Nunn v. State, 1 Ga. 243, 251 (1846)), explained that the Second Amendment protected "'[t]he right of the whole people, old and young, men, women and boys, and not militia only, to keep and bear arms of every description, and not such merely as are used by the militia, shall not be infringed, curtailed, or broken in upon, in the smallest degree … .'"*

[17]/     *Henry Campbell Black, M.A., Handbook of American Constitutional Law, at 543 (3d ed. 1910).*

of government, as well as against enemies from without, that government is forbidden by any law or proceeding to invade or destroy the right to keep and bear arms." John Norton Pomeroy, LL.D., *An Introduction to the Constitutional Law of the United States – Especially Designed for Students, General and Professional*, at 152 (1868) (underlining added);

• "Right to Keep Arms – This means the right of everyone to own and use, in a peaceful manner, warlike weapons. [The government] is forbidden to pass any law infringing the right. It was thought that without it, ambitious men might, by the aid of the regular army, overthrow the liberties of the people and usurp the powers of government." Andrew White Young, *The Government Class Book; A Youth's Manual of Instruction in the Principles of Constitutional Government and Law*, at 185 (Effingham Maynard & Co. 1889) (1880); and

• "The right declared was meant to be a strong moral check against the usurpation and arbitrary powers of rulers, and as necessary and efficient means of regaining rights when temporarily overturned by usurpation." Thomas M. Cooley, LL.C., *The General Principles of Constitutional Law in the United States of America*, at 298 (1898).

60.    That these scholars would mostly come from the "Second Founding" era, and later, is revealing.

61.    By that time, revolvers capable of firing 5-6 shots before reloading had replaced single-shot flintlock pistols, while similarly slow-to-load muzzleloaders had been supplanted by quick-firing lever action rifles like the Henry and Winchester Repeating Rifles, which could fire anywhere between 7 and 17 rounds before reloading (depending on the model and caliber).

62.    Despite these rapid advancements in firearm technology, there was no significant discussion about changing or limiting the scope of the Second Amendment.

63.    Nor did anyone of note suggest that the right did not apply to the transformative firearm technology of the time.[18]/

---

[18]/    *On the contrary, the Heller Court explained that the right applies to "even those [arms] that were not in existence at the time of the founding," and called any argument to the contrary "bordering on the frivolous." Id., 554 U.S. at 582.*

### Historical Background on U.S. Firearms Ownership:  Defense of Marginalized Americans

64.     Winchester rifles were particularly popular among marginalized groups who naturally wanted the best small arms technology available for their self-defense.

65.     African Americans were encouraged by no less than John R. Mitchell, Jr., Vice President of the National Colored Press Association, to buy Winchesters to protect their families from the 'two-legged animals … growling around your home in the dead of the night."[19]

66.     Similarly, Ida B. Wells, a prominent African American civil rights advocate, feminist and journalist wrote in 1892 that a "Winchester rifle should have a place of honor in every black home, and it should be used for the protection which the law refuses to give."[20]

67.     Harriet Tubman famously carried a revolver, which, at the time, was at the peak of firearms technology, sometimes even threatening escaping slaves in her party with shooting them if they grew faint of heart, thus endangering the other escapees.[21]

68.     Indeed, the armed Tubman began escorting escaped slaves all the way to Canada due to the Fugitive Slave law: "I wouldn't", she said, "trust my people wid  Uncle Sam no longer."[22]

69.     Annie Oakley overcame poverty, prejudice, and physical setbacks to not only become a hunter and sharpshooter simply to put food on the table, but to gain a career by her

---

[19]     *Johnson, et al. Firearms Law and Second Amendment Regulation, Rights, and Policy (3rd ed. 2021), p. 521, referencing Giddings, Paula J. Ida: A Sword Among Lions (2008), p. 153-154.*

[20]     *Johnson, et al., p. 521 referencing Wells, Ida B. Southern Horrors. N.Y. Age June 25, 1892. Reprinted in Wells, Ida B. The Light of Truth: Writings of an Anti-Lynching Crusader, p. 84.*

[21]     *Siebert, William Henry, The Underground Railroad From Slavery to Freedom (Dalcassian Publishing Co., 1898), p. 187.*

[22]     *Id.*

genius with the gun which led to her stardom in Buffalo Bill's Wild West Show during the latter half of the nineteenth century.[23]/

70.    As such, Oakley was widely hailed for forty years as the archetypal western woman, urging women to take up shooting to procure food, protect themselves, and enjoy healthy exercise.[24]/

71.    Oakley's feats with the Winchester rifle were numerous and extraordinary, and she preferred plain guns with good wood in the stocks and open sites, maintaining that the shooter's physique determined the best gun: "The best gun is the gun that best fits the shooter" she advised, with quality, strength, safety, balance, fit and ease of manipulation."[25]/

72.    Women have increasingly taken Oakley's advice, opting for the AR-15, because its modular design that's easily fitted with accessories make the firearm ideal for users of all sizes and shapes.[26]/

73.    Even Maya Angelou, contemporary poet, author and civil rights activist likes "having guns around", recently explaining a shooting at her home: "If somebody is going to come into my house and I have not put out the welcome mat, I want to stop them."[27]/

**Historical Background on U.S. Firearms Ownership:  Mid-Twentieth Century and Beyond**

74.    The prevailing small arms of the day of course change with time.

---

[23]/    *Riley, Glenda, The Life and Legacy of Annie Oakley (University of Oklahoma Press 2012).*

[24]/    *Id.*

[25]/    *Id., p. 6.*

[26]/    *This is one reason it is so popular: "That's critical when used for home and self-defense. . . "The way it's designed, it is easily adaptable. It can fit my frame. It can also fit my wife, and she can shoot that rifle just as easily." https://www.nssf.org/articles/media-shakes-msr-myths-in-rare-reports/?hilite=women+self+defense.*

[27]/    *Ten Questions for Maya Angelou (TIME), https://time.com/123087/10-questions-with-maya-angelou/, at 3:11.*

**75.**     Today, and for nearly a century, the modern successor of the musket and the Winchester rifle is the magazine-fed, semiautomatic rifle.

**76.**     Even the U.S. government played a part in the distribution of such firearms.

**77.**     Through the Civilian Marksmanship Program, the federal government sold around 207,000 M1 Carbine rifles to American citizens between 1958 and 1967[28]/, which came standard with 15-round and later 30-round magazines.

**78.**     An NRA publication puts the sale at 240,000 in 1963.[29]/

**79.**     One such semiautomatic rifle, the ArmaLite AR-15, has become especially popular for sport and self-defense since first being sold to civilians in the 1960's, around the same time the military adopted a distinct version capable of automatic fire as its standard issue rifle (*i.e.,* the M16).

**80.**     Today, semiautomatic rifles, especially those based on the AR-style, are the most popular firearms in the country.[30]/

**81.**     AR-15 rifles, or similar, modern semi-automatic rifles, are owned by 24.6 million Americans, with the median owner identified as owning a single rifle.[31]/

**82.**     They are used for sporting purposes, competition shooting, hunting, and self-defense.

---

[28]/     *Stephen P. Halbrook, America's Rifle: The Case for the AR-15 at 198 (Bombardier Books 2022).*

[29]/     *https://www.amerianrifleman.org/content/the-m1-carbine-10-little-known-facts/*

[30]/     *"Today, the most popular rifle-type in the U.S. is semi-automatic AR-15 style rifles, a civilian version of the kinds commonly used by the military. Marketed as "modern sporting rifles," these versatile weapons are generally light weight, reliable, and easy to maintain." See 24/7 Wall St., The Companies Making the Most Popular Rifles in America, (January 11, 2023), < https://www.msn.com/en-us/money/savingandinvesting/the-companies-making-the-most-popular-rifles-in-america/ss-AA16dgRN#image=5> (as of January 13, 2023).*

[31]/     *William English, PhD,2021, National Firearms Survey:  Updated Analysis Including Types of Firearms Owned at 2, 33 (May 13, 2022), https://bit.ly/3QBXiyv.*

83.     Recent examples of acts of self-defense and/or defense of others are as follows:

•   **In 2017, in Broken Arrow, Oklahoma, a nineteen-year-old male thwarted a home invasion by shooting and killing three robbers with an AR-15;**

•   **In 2017, in Sutherland Springs, Texas, a neighbor used his AR-15 to end a mass shooting at a church by shooting the perpetrator, who fled and died shortly thereafter;**

•   **In 2018, in Oswego Township, Illinois, after an assailant inflicted multiple stab wounds on the victim, a witness retrieved an AR-15 rifle from his apartment and stopped the knife attack with only the threat of force;**

•   **In 2018, in Maiden, North Carolina, three masked gunmen broke into a house and fired at a teen resident, who shot back with an AR-15, killing one of the robbers;**

•   **In 2019, in Summerfield, Florida, four masked intruders shot a sixty-one-year-old homeowner, who shot and killed two of the robbers with his AR-15;**

•   **In 2010, in Harris County, Texas, a boy, fifteen, and his sister, twelve, were alone when two intruders broke into the house; the boy retrieved the AR-15 belonging to his father, a deputy, and shot one of the burglars; and**

•   **In 2019, in Lithia, Florida, masked gunmen burst into a home, brutally pistol-whipped a father, grabbed his eleven-year-old daughter, and shot at her eight-months pregnant mother, who then shot one of the intruders dead with the family's AR-15.[32]/**

84.     Contrary to the ignorant statements of those uninformed and/or "headline seeking" politicians who are opposed to civilian firearm ownership, the AR-15 and similar semi-automatic firearms are not "weapons of war."

85.     The AR-15 is not used in war – no military has adopted it, opting instead for its automatic or burst-fire capable counterparts like the M16 and M4.

86.     The same can be said for many semi-automatic rifles that are commonly owned by Americans today.

---

[32]/     *Stephen P. Halbrook, America's Rifle: The Case for the AR-15 at 336-337 (Bombardier Books 2022).*

87.     That these civilian-owned firearms may also have some military utility, like the muskets of the minutemen, does not remove them from Second Amendment protection.

88.     Indeed, today, like at the Founding, the "'weapons used by militiamen and weapons used in defense of person and home were one and the same.'"[33]/

89.     Militia activity is expressly included in the scope of the right (and, in fact, is explicitly enumerated), and the major 18th and 19th-century sources were in agreement that the "arms of modern warfare" are protected by the Second Amendment.

90.     When any firearm is very popular in general, it will also, unfortunately, be used in crime; but, according to the FBI,  over 90% of criminals opt to use handguns, not AR-15s or other semi-automatic rifles, when they commit crimes using a firearm[34]/.

91.     The AR-15 and other semiautomatic rifles are no statistical exception.

92.     Their criminal misuse, however, is exceptionally rare.

93.     According to the FBI, in 2019, there were 13,927 murder victims.

94.     Of those, just 364 were killed with rifles of any kind, semi-automatic or otherwise:  in Illinois in 2019, 771 were murdered, 7 with rifles, 10 with knives and 10 with "hands, fist or feet" and the remainder with handguns (564), shotguns (4) or other unspecified firearms (72).

95.     More people in the United States were killed with knives (1,476) or blunt objects (397), or by unarmed assailants using their bare hands or feet (600).[35]/

96.     Untold millions of Americans own AR-style semiautomatic rifles.

---

[33]/     *Heller,  554 U.S. at 625.*

[34]/     *https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/topic-pages/tables/table-20.*
[35]/     *FBI 2019 CRIME in the UNITED STATES Report: Expanded Homicide Data Table 8. < https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/tables/expanded-homicide-data-table-8.xls> (Last accessed January 13, 2023).*

97.    The overwhelming majority of citizens who own and use such rifles do so for lawful purposes, including self-defense and target shooting.

98.    The U.S. Supreme Court has told us "that is all that is needed for citizens to have a right under the Second Amendment to keep such weapons."[36]/

99.    Magazine-fed, semiautomatic rifles are the prevailing small arm of the modern age.

100.    There are few, if any, points that our historical tradition of firearm regulation is clearer on than the command that the most popular rifles in the country cannot constitutionally be banned.

101.    To be sure, this constitutional protection extends to other firearms as well, particularly handguns, in no small part because "the American people have considered the handgun to be the quintessential self-defense weapon."[37]/

102.    Shotguns are also extremely popular choices for common uses such as home defense, hunting, recreational shooting, and more.

103.    Like handguns, they have been available for centuries, and have been sold in semi-automatic form for over a century.

---

[36]/    *In discussing a local ban on so-called "assault weapons," Justices Clarence Thomas and Antonin Scalia explained that "[t]he City's ban is thus highly suspect because it broadly prohibits common semiautomatic firearms used for lawful purposes. Roughly 5 million Americans own AR-style semiautomatic rifles. The overwhelming majority of citizens who own and use such rifles do so for lawful purposes, including self-defense and target shooting. Under our precedents, that is all that is needed for citizens to have a right under the Second Amendment to keep such weapons." Friedman v. City of Highland Park, 577 U.S. 1039, 1042 (2015) (Thomas, J. and Scalia, J., dissenting from the denial of certiorari).*
[37]/    *Heller, 554 U.S. at 629.*

## THE ILLINOIS BAN ON COMMONLY OWNED AND USED FIREARMS

### General Objections

**104.**    The Second Amendment to the United States Constitution protects an individual right to "keep and bear arms", and, importantly, "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct."[38]/

**105.**    "The government must then justify its regulation."[39]/

**106.**    "Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'"[40]/

**107.**    The text of the Second Amendment covers the right to keep, own or possess, and the ability to bear arms, even outside the home for self-defense.[41]/

**108.**    The Second Amendment is also broad enough to protect the right to train and maintain proficiency with a person's firearms.[42]/

**109.**    The newly enacted Firearms Ban Act pejoratively and grossly inaccurately classifies countless commonly owned models of firearms and various firearms attachments and/or parts as "assault weapons" and immediately bans their acquisition, manufacture, delivery, sale, importation, and purchase, and severely limits the ownership, repair and/or use of same.

**110.**    In other words, such firearms and their attachments and/or  parts can no longer be lawfully acquired in Illinois.

---

[38]/    *New York State Rifle & Pistol Association v. Bruen, 597 U.S.___, 142 S.Ct. 2111, 2122 (2022).*

[39]/    *Id.*

[40]/    *Id.*

[41]/    *The Court in Illinois Association of Firearms Retailers v. City of Chicago, 961 F. Supp. 2d 928, 942-946 (N.D. Ill. 2014) acknowledged as much, as well as the right to acquire and, thereafter, sell a firearm.*
[42]/    *See, e.g., Ezell v. City of Chicago, 651 F. 3d 684, 704-706, 709 (7th Cir. 2011).  See also, e.g., Ezell v. City of Chicago, 846 F. 3d 888 (7th Cir. 2017).*

111.    Existing owners of firearms and firearms attachments and/or parts meeting the newly invented definition of "assault weapon" in Illinois must register all firearms meeting that definition with the government or surrender them.

112.    Additionally, such firearms cannot be repaired because the firearms attachments and/or parts cannot be acquired after the effective date of the Firearms Ban Act.

113.    Also, the addition of banned attachments to firearms that are not defined as "assault weapons" under the Firearms Ban Act, automatically and immediately turns these firearms into illegal firearms.

114.    The Firearms Ban Act bans the most popular firearm models and firearms attachments and/or parts in the country, which are lawfully owned and safely operated by millions of Americans without any special restrictions, in all but a few states.

115.    To achieve such a broad ban, Illinois classifies as "assault weapons" dozens of specific, popular firearms and firearms attachments and/or parts by their make and model, along with any other rifle, shotgun, or pistol having certain common features that are the hallmarks of the most popular firearm models and firearms attachments and/or parts.

116.    Almost ***none of the prohibited features*** (***i.e.,*** firearms attachments and/or parts) that qualify a gun for Illinois' prohibition ***have anything to do with affecting a firearm's mechanical rate of fire, cartridge's power, or any other factor linked to the firearm's potential to be exploited for crime.***

117.    To the contrary, the purpose of such popular features is to promote ergonomic comfort for a wide range of shooters (of various shapes, sizes, and levels of ability), accuracy, and safe handling – ***that is, to make the firearms safer and more effective for the core, lawful purpose of self-defense.***

22

118.    In sum, Illinois' prohibition of firearms in common use for lawful purposes like self-defense is based on distinctions that have no historical analogue at all, nor are there any discernable, historical traditions in the United States of banning commonly owned rifles simply because they are accurate, lightweight, or comfortable to shoot.

119.    Nor is there any rational basis for doing so.

120.    While existing owners of newly prohibited firearms have a window of time to register their firearms, which will be "grandfathered in" (with the owners allowed to keep their firearms), the registration of firearms is unconstitutional as it is completely without any backing in our nation's historical tradition of firearm regulation.

121.    As history has taught all too often, registration – always and everywhere – eventually leads to effective, if not actual, confiscation, as occurred in the City of Chicago decades ago.

122.    No other constitutional right works in this way.[43]/

123.     Plaintiffs desire to be able to continue to possess their lawfully acquired, yet now-restricted firearms without registering them with the Illinois State Police.

124.    As such, whenever this Complaint refers to prohibitions on possession under the Firearms Ban Act, it refers to both the forbidden: **(a)** possession of newly acquired firearms; **(b)** possession of previously owned firearms that the owners did not register; **(c)** firearms attachments and/or parts necessary to affix to, and/or repair firearms which are not deemed "assault weapons" by the Firearms Ban Act, but now automatically and immediately become banned firearms upon the affixing of the attachments and/or parts.

---

[43]/    *See Watchtower Bible & Tract Society of New York, Inc. v. Village of Stratton, 536 U.S. 150 (2002) (rejecting a requirement that a door-to-door canvasser register with the government before engaging in door-to-door advocacy protected by the First Amendment).*

## THE ILLINOIS BAN ON COMMONLY OWNED AND USED FIREARMS

### Detailed Objections

125.    The Firearms Ban Act, declares that "it is unlawful for any person within this State to knowingly manufacture, deliver, sell, import, or purchase or cause to be manufactured, delivered, sold, imported, or purchased by another, an assault weapon, assault weapon attachment, .50 caliber rifle, or .50 caliber cartridge."[44]/

### The Firearms Ban Act's Prohibition on Alleged
### "Assault Weapons" and their "Variants" is Unconstitutional

126.    The definition of "assault weapon" in the Firearms Ban Act includes a long, laundry list of specifically named firearms, including the AR-15, AK-47, and dozens of other popular rifles, pistols, and shotguns, ***including any "copies, duplicates, variants, or altered facsimiles with the capability of any such weapon"*** including these specifically named firearms:

**a.    A semiautomatic rifle that has the capacity to accept a detachable magazine or that may be readily modified to accept a detachable magazine, if the firearm has one or more of the following:**

**(i)    a pistol grip or thumbhole stock;**

**(ii)    any feature capable of functioning as a protruding grip that can be held by the non-trigger hand;**

**(iii)    a folding, telescoping, thumbhole, or detachable stock, or a stock that is otherwise foldable or adjustable in a manner that operates to reduce the length, size, or any other dimension, or otherwise enhances the concealability of, the weapon;**

**(iv)    a flash suppressor;**

**(v)    a grenade launcher; [and];**

**(vi)    a shroud attached to the barrel or that partially or completely encircles the barrel, allowing the bearer to hold the firearm with the non-trigger hand without being burned, but excluding a slide that encloses the barrel.**

---

[44]/    ***720 ILCS 5/24-1.9, et seq.***

**b.      A semiautomatic rifle that has a fixed magazine with the capacity to accept more than 10 rounds, except for an attached tubular device designed to accept, and capable of operating only with .22 caliber rimfire ammunition.**

**c.      A semiautomatic pistol that has the capacity to accept a detachable magazine or that may be readily modified to accept a detachable magazine, if the firearm has one or more of the following:**

**(i)      a threaded barrel;**

**(ii)      a second pistol grip or another feature capable of functioning as a protruding grip that can be held by the non-trigger hand;**

**(iii)      a shroud attached to the barrel or that partially or completely encircles the barrel, allowing the bearer to hold the firearm with the non-trigger hand without being burned, but excluding a slide that encloses the barrel;**

**(iv)      a flash suppressor;**

**(v)      the capacity to accept a detachable magazine at some location outside of the pistol grip; or**

**(vi)      a buffer tube, arm brace, or other part that protrudes horizontally behind the pistol grip and is designed or redesigned to allow or facilitate a firearm to be fired from the shoulder.**

**d.      A semiautomatic pistol that has a fixed magazine with the capacity to accept more than 15 rounds.**

**e.      Any shotgun with a revolving cylinder.**

**f.      A semiautomatic shotgun that has one or more of the following:**

**(i)      a pistol grip or thumbhole stock;**

**(ii)      any feature capable of functioning as a protruding grip that can be held by the non-trigger hand;**

**(iii)      a folding or thumbhole stock;**

**(iv)      a grenade launcher;**

**(v)      a fixed magazine with the capacity of more than 5 rounds; or**

**(vi)      the capacity to accept a detachable magazine.**

**g.      Any semiautomatic firearm that has the capacity to accept a belt ammunition feeding device.**

**h.      Any firearm that has been modified to be operable as an assault weapon as defined in this Section.**

**i.      Any part or combination of parts designed or intended to convert a firearm into an assault weapon, including any combination of parts from which an assault**

weapon may be readily assembled if those parts are in the possession or under the control of the same person.[45]/

127.    The definition of banned "assault weapon attachment" means any device capable of being attached to a firearm that is specifically designed for making or converting a firearm into an "assault weapon" (or, by definition, converting it into any *copies, duplicates, variants, or altered facsimiles with the capability of any such weapon").*[46]/

128.    This means that possessing a plastic pistol grip or another harmless part, even without an accompanying firearm, is now a serious crime in Illinois.

129.    Particular to pistols, Plaintiffs challenge the restriction on threaded barrels, the mere presence of which turns an otherwise legal pistol into an "assault weapon".

130.    All the prohibition on threaded barrels truly accomplishes is harassment of competition shooters, who rely on threaded barrels for competitive attachments, like muzzle brakes, to their pistols.

131.    For home and personal defense, attachments like compensators are designed to reduce "muzzle-climb" while shooting and thus aid in accuracy and safety.[47]/

132.    The only exemptions from the so-called "assault weapon" ban are for certain current and/or former government employees, private security guards, locksmiths and a handful of presumably, politically-connected individuals and/or "professionals" whose personal safety

---

[45]/    *720 ILCS  5/24-19(a)(1)(J).*

[46]/    *Id.*
[47]/    *The prohibition on "threaded barrels" in 720 ILCS 5/24-1(b)(1)(C)(i) accomplishes only the harassment of competition shooters, who rely upon "threaded barrels" for competitive attachments, like muzzle breaks to pistols, or individuals during personal and/or home defense, who rely upon them for using attachments like compensators which reduce "muzzle-climb" while shooting and, thus, aid in accuracy and safety. This ban was likely added due to the legislative ignorance fueled by the Hollywood-inspired fear of suppressors (wrongly called "silencers."). But suppressors are already heavily regulated under the National Firearms Act, and are banned by Illinois law, making the ban on" threaded barrels" completely superfluous, in addition to unconstitutional.*

and/or chosen "professions" are more worthy of protection than are those of average, every day, law-abiding residents of the State of Illinois.

133.    Existing owners can be "grandfathered into" compliance with the law if they submit an affidavit to the Illinois State Police that includes their FOID number, a sworn statement confirming that they owned the firearm before the ban, and the make, model, serial number, and caliber of the firearm.

134.    Carrying or possessing a so-called "assault weapon" (or any ***copies, duplicates, variants, or altered facsimiles with the capability of any such weapon"***) is labeled a Class A misdemeanor for a first offense, which is punishable by up to 364 days in jail and a $2,500 fine.[48]/

135.    A second or subsequent offense is labeled a Class 3 felony, which is punishable by 2 to 5 years in prison[49]/, together with the loss of all Second Amendment rights.[50]/

136.    Manufacturing, selling, delivering, importing, or purchasing any "assault weapon" or .50 caliber rifle is a Class 3 felony for a first offense, which is punishable by 2 to 5 years in prison[51]/, together with a loss of Second Amendment rights.[52]/

137.    A second or subsequent offense is labeled a Class 2 felony, which is punishable by 3 to 7 years in prison.[53]/

---

[48]/    ***720 ILCS 5/24-9/1(b).***

[49]/    ***720 ILCS 5/24-9/1(b).***

[50]/    ***18 U.S.C. § 922(g).***
[51]/    ***720 ILCS 5/24-9/1(b).***

[52]/    ***18 U.S.C. § 922(g).***

[53]/    ***720 ILCS 5/24-9/1(b).***

138.     Selling, manufacturing, delivering, importing, possessing, or purchasing any

"assault weapon attachment" or .50 caliber cartridge is labeled a Class A misdemeanor for a first

offense, which is punishable by up to 364 days in jail and a $2,500 fine.[54]/

139.     A second or subsequent offense is labeled a Class 4 felony, which is punishable

by 1 to 3 years in prison[56]/, together with a loss of Second Amendment rights.[55]/

### The Firearms Ban Act on Firearms Attachments
### (Which Increase Comfort, Accuracy and Safety) is Also Unconstitutional

140.     Aside from the list of specific firearms and any of their variants with the same

capabilities, the Firearms Ban Act restricts so-called "assault weapon attachments"[56]/ that are as

completely irrational as they are unconstitutional.

141.     For example, a "*pistol grip*" on a rifle or shotgun allows for a more comfortable

and stable grip, which in turn reduces strain on muscles and joints, and *promotes accuracy and

safety* when shooting.

142.     "By holding the pistol grip, the shooter keeps the barrel from rising after the first

shot, and thereby stays on target for a follow-up shot. The defensive application is obvious, as is

the public safety advantage in preventing stray shots."[57]/

143.     A "*pistol grip*" also lessens felt recoil and, by allowing a user to grip the rifle

from below rather than from above, minimizes the chance that a rifle will slip out of the user's

hand while firing, further *increasing safety*, improving accuracy, and preventing stray shots.

---

[54]/     *720 ILCS 5/24-9/1(b).*

[56]/     *720 ILCS 5/24-9/1(b).*

[55]/     *720 ILCS 5/24-9/1(b).*

[56]/     *720 ILCS 5/24-9.1(a)(3) and (b).*
[57]/     *Kolbe v. Hogan, 849 F.3d 114, 159 (4th Cir. 2017) (en banc) (Traxler, J., dissenting) (citing David B.
Kopel, Rational Basis Analysis of "Assault Weapon" Prohibition, 20 J. Contemp. L. 381, 396 (1994)).*

144.    Like a pistol grip, a ***"thumbhole stock"*** makes it easier for a user to have a more comfortable and stable grip, which provides for ***greater accuracy*** and decreases the unsafe risks of dropping the weapon or firing stray shots.

145.    An **"adjustable ("telescoping") stock"** merely permits the rifle's or shotgun's user to adjust the stock forward or backward, making it shorter or longer, according to his or her specific physical size and shape, so that the rifle or shotgun can be held comfortably and more controllably.

146.    In other words, the purpose of an ***"adjustable ("telescoping") stock"*** is to fit the particular user's arm length, making it ***easier, thus safer***, to shoot; particularly if there are multiple users of different sizes using the same rifle or shotgun.[58]/

147.    A ***"flash suppressor" prevents a rifle user from being blinded*** by the "flash" of the firearm's muzzle in low lighting conditions, such as at dusk or dawn or during the nighttime.

148.    Another function of a ***"flash suppressor"*** can be to ***reduce recoil*** and muzzle (tip of the barrel) movement, making the rifle less uncomfortable for the user to operate and ***increasing controllability and accuracy, and thus safety***.

149.    In sum, a ***pistol grip, thumbhole stock, adjustable stock,*** and ***flash suppressor*** are each designed to make a rifle or shotgun more comfortable, easier to use and, therefore, more accurate, thereby facilitating the firearm's ***safe and effective operation when used for a lawful purpose such as self-defense.***

---

[58]/    ***"[T]here is essentially no difference between a short standard stock and a shortened retractable stock." Murphy v. Guerrero, No. 14-00026, 2016 WL 5508998, at *19 (D. N. Mar. I. Sept. 28, 2016).***

**150.** None of these features increases a gun's rate of fire, the lethality of its cartridge, or its capacity for firepower. To the contrary, such features "actually tend to make rifles or shotguns easier to control and more accurate – making them safer to use."[59]/

**151.** Firearms with these features are extremely popular with the American public, with more than 11 millions rifles having at least some of these features being manufactured in, or imported into, the United States from 1990 through 2014.[60]/

**152.** In 2012, such rifles accounted for approximately 20 percent of all retail firearm sales.

**153.** In 2014 alone, approximately 1,228,000 such rifles were manufactured or sold in the United States.[61]/

**154.** Finally, purchasers consistently report that one of the most important reasons for their purchase of this class of firearm is *self-defense;* however, other lawful (and constitutionally protected) purposes for these banned firearms include hunting, competitive shooting, and target shooting.

**155.** The so-called "assault weapon" is a non-technical, political term of ever-changing definition and scope, with no connection to the public safety interests that the law purports to serve.

**156.** "'Prior to 1989, the term 'assault weapon' did not exist in the lexicon of firearms, but now is used in political parlance by anti-gun publicists to expand the category of 'assault

---

[59]/    *Murphy v. Guerrero, No. 14-00026, 2016 WL 5508998, at \*18 (D. N. Mar. I. Sept. 28, 2016).*

[60]/    *See Kolbe v. Hogan, 813 F.3d 160, 174 (4th Cir. 2016), vacated 849 F.3d 114 (2017).*

[61]/    *To put that in perspective, less than 570,000 Ford F-150 trucks – the best-selling vehicle in the United States – were sold in 2014. Warren Clarke, Top 10 Best-Selling Vehicles for 2014, Edmunds (Jan. 15, 2015), https://www.edmunds.com/car-reviews/top-10/top-10-best-selling-vehicles-for-2014.html.*

rifles' so as to allow an attack on as many additional firearms as possible on the basis of undefined 'evil' appearance."[62]/

157.    Various firearms condemned as "assault weapons" and banned by the Firearms Ban Act, including those the Act expressly prohibits by make and model, are arms "typically possessed by law-abiding citizens for lawful purposes" throughout the United States.[63]/

158.    Illinois has banned no less than *the most popular rifle in the country*.

159.    Illinois has also banned popular semi-automatic shotguns based on similar irrational feature-based restrictions, and pistols if they have a "threaded barrel" – another popular feature commonly used for lawful purposes.

160.    Any public interest analysis based on Illinois' desire to infringe constitutional rights in order to purportedly further public safety has no relevance to the Second Amendment analysis.

161.    Nevertheless, no public interest is furthered by prohibiting these ubiquitous features of modern firearms, or by prohibiting any of the commonly possessed and popular firearms that Illinois expressly lists as "assault weapons" by make and model.

162.    None of these features makes the firearms more dangerous, raises their likelihood of their use in crimes, or increases their power, rate of fire, or ammunition capacity.

163.    To the contrary, these features enhance public safety by making firearms safer, more accurate, and more effective for use in self-defense.

## ILLINOIS'S "ASSAULT WEAPON" REGISTRATION SCHEME VIOLATES THE SECOND AMENDMENT

*a. The Registration Process*

---

[62]/    *Stenberg v. Carhart, 530 U.S. 914, 1001 n.16 (2000) (Thomas, J., dissenting) (quoting Bruce H. Kobayashi & Joseph E. Olson, In Re 101 California Street: A Legal and Economic Analysis of Strict Liability for the Manufacture and Sale of "Assault Weapons", 8 Stan. L. & Pol'y Rev. 41, 43 (1997)).*

[63]/    *Heller, 554 U.S. at 624-25.*

164.    The only way that an owner of items that are banned under the Firearms Ban Act

can maintain possession of those items is to have them properly registered because the ban does

not "apply to a person's possession of an assault weapon, assault weapon attachment, .50 caliber

rifle, or .50 caliber cartridge device if the person lawfully possessed that assault weapon . . . "

and "if the person has provided in an endorsement affidavit, prior to January 1, 2024, under oath

or affirmation and in the form and manner prescribed by the Illinois State Police, beginning

October 1, 2023." 720 Ill. Comp. Stat. Ann. 5/24-1.9(d).

165.    In sum, owners of banned firearms must register their banned firearms before

January 1, 2024, according to the process set forth by the Illinois State Police, which had until

October 1, 2023, to promulgate rules on how this registration process would work.

166.    Under Illinois law, there are four types of rulemaking processes available to State

agencies, depending on whether the agency is making proposed rules, emergency rules,

peremptory rules, or required/internal rules. 5 ILCS 100/5-5, et seq.

167.    The "proposed rule" process is what State agencies usually undertake. That

process takes between ninety days to one year to complete. Rules adopted under that process are

only effective after a public comment period and Joint Committee on Administrative Rules

("JCAR") review. 5 ILCS 100/5-40.

168.    In contrast, "emergency rules" take effect immediately, and remain in effect for

no more than 150 days. 5 ILCS 100/5-45(c). They are typically only allowed when there is a

"threat to the public interest, safety or welfare" which requires rules to be adopted in less time

than would be needed to complete proposed rulemaking. If an agency wants emergency rules to

become permanent, then it must also file a companion proposed rule that goes through the

normal comment period.

**169.**    On September 15, 2023, the Illinois State Police filed with the Illinois Secretary of
State emergency rules to implement the so-called Protect Illinois Communities Act ("PICA
Rules"). A true and correct copy of those rules is attached as Exhibit A. Why the Illinois State
Police waited over nine months from when the Firearms Ban Act was adopted to file emergency
rules, rather than making "proposed rules" under the normal process earlier is not explained.

**170.**    The registration requirement potentially affects thousands of Illinoisans in life-
altering ways. Those who fail to register become criminals overnight. Not allowing the
community of firearm owners affected by the law to review proposed regulations and weigh in
on them before they became effective is unjustifiable. That is especially so given that emergency
rules expire after 150 days, which here takes us beyond the January 1st deadline because the
PICA Rules were first published in September. The State's "emergency rules" are thus
effectively permanent rules without ever having complied with the permanent rule process.

**171.**    And the delay is more egregious in light of the fact that the PICA Rules largely
just re-state the statutory provisions without providing any clarity. Why it took so long to simply
restate the law is a mystery.

*b.    Illinois's registration requirement violates the Second Amendment.*

**172.**    A requirement to register firearms or common firearm parts as a precondition to
being able to continue to possess ("keep") them undeniably falls within the Second
Amendment's text and is thus subject to *Bruen*'s historical analysis. To prevail under that
analysis, Illinois must demonstrate that this nation has a historical tradition of requiring people to
register with the government all firearms and firearm parts that the government declares to be
undesirable for public possession or forfeit their right to lawfully possess those items. Illinois
cannot meet its burden because no such tradition exists.

173.     Additionally, because the PICA Rules make no allowance for firearms meeting the "assault weapon" definition that were lawfully purchased while this Court's injunction was in effect, the January 1, 2023, cutoff date for registration acts as a complete ban and confiscation of firearms in that category. As this Court has already preliminarily held, banning such arms violates the Second Amendment.

174.     Thus, to the extent it does not enjoin the entire registration scheme, this Court should at least enjoin enforcement of the January 1, 2023, cutoff date as applied to those firearms for effectively unlawfully banning protected arms.  Otherwise, countless people who lawfully purchased firearms will be turned into criminals overnight at the end of the year or forced to forfeit their firearms. The State cannot meet its burden to defend such an outcome under *Bruen*.

## COUNT I

## DECLARATORY RELIEF

175.     Plaintiffs repeat and reallege their averments contained in all preceding paragraphs of the Complaint.

176.     Plaintiffs believe that the Firearms Ban Act infringes on their constitutionally protected civil rights to "keep and bear arms", as recognized by the Second and Fourteenth Amendments to the U.S. Constitution, by generally prohibiting commonly owned firearms defined as "assault weapons" in the Firearms Ban Act and by requiring registration of firearms owned before the ban.

177.     In passing and/or threatening to enforce the Firearms Ban Act, Defendants presumably believe the Firearms Ban Act does not infringe on Plaintiffs' constitutionally protected civil rights to "keep and bear arms", as recognized by the Second and Fourteenth

Amendments to the U.S. Constitution, by generally prohibiting the ownership of firearms defined as "assault weapons" in the Firearms Ban Act.

178.    As a result, an actual and present controversy exists between the parties, which can be resolved by this Court declaring whether the Firearms Ban Act violates the Second and Fourteenth Amendments to the U.S. Constitution, by generally prohibiting the ownership of firearms defined as "assault weapons" in the Firearms Ban Act.

179.    Plaintiffs should not be forced to choose between risking criminal prosecution, or exercising their constitutional rights to "keep and bear" common arms for self-defense and other lawful purposes.

180.    Accordingly, pursuant to *F.R.C.P. 57*, *28 U.S.C. § 2201 and/or § 2202*, Plaintiffs are entitled to a declaration that the prohibition on "assault weapons", as defined and mandated, by the Firearms Ban Act, violates Plaintiffs' constitutionally protected civil rights to "keep and bear arms", as recognized by the Second and Fourteenth Amendments to the U.S. Constitution, by generally prohibiting commonly owned firearms, and their attachments and/or parts, defined as "assault weapons" in the Firearms Ban Act because:

A.    The Firearms Ban Act's definition of "assault weapon" – whether by express listing of make and model or by the presence of prohibited feature combinations – includes the most popular class, makes, and models of firearms and their attachments and/or parts in the nation;

B.    The Firearms Ban Act generally prohibits Illinois residents or those visiting the State of Illinois from the acquisition, importation, use, possession, and transfer of such firearms, their attachments and/or parts, subject to severe criminal penalties, including up to many years in prison;

**C.**      The Firearms Ban Act's prohibitions and restrictions on firearms, their attachments and/or parts that are commonly possessed throughout the United States by law-abiding, responsible citizens for all manner of lawful purposes infringe on the right of the residents of the State of Illinois, including Plaintiffs and their members and supporters, to "keep and bear protected arms" as guaranteed by the Second Amendment of the U.S. Constitution, and as made applicable to the State of Illinois by the Fourteenth Amendment of the U.S. Constitution;

**D.**      In violation of the Second and Fourteenth Amendments to the U.S. Constitution, the Firearms Ban Act prohibits law-abiding, responsible adults, including individual plaintiffs, as well as members and supporters of institutional plaintiffs, who would otherwise do so, from acquiring a rifle, pistol, or shotgun listed in the Firearms Ban Act or that has features, attachments and/or parts that are standard on firearms that are in common use by law-abiding citizens for lawful purposes throughout the United States;

**E.**      In violation of the Second and Fourteenth Amendments to the U.S. Constitution, the Firearms Ban Act prohibits law-abiding, responsible adults, including individual plaintiffs, as well as members and supporters of institutional plaintiffs, who would otherwise do so, from possessing a rifle, pistol, or shotgun listed in the Firearms Ban Act or that has features, attachments and/or parts that are standard on firearms that are in common use by law-abiding citizens for lawful purposes throughout the United States;

**F.**      In violation of the Second and Fourteenth Amendments to the U.S. Constitution, the Firearms Ban Act prohibits law-abiding, responsible adults, including individual plaintiffs, as well as members and supporters of institutional plaintiffs, who would otherwise do so, from adding features, attachments and/or parts which are listed in the Firearms Ban Act to a rifle,

pistol, or shotgun, that are standard on firearms that are in common use by law-abiding citizens for lawful purposes throughout the United States;

G.      In violation of the Second and Fourteenth Amendments to the U.S. Constitution, the Firearms Ban Act prohibits law-abiding, responsible adults, including individual plaintiffs, as well as members and supporters of institutional plaintiffs, who would otherwise do so, from maintaining in good working order any rifle, pistol or shotgun affected under the ban, and impedes a right to obtain "attachments" and/or parts which are listed in the Firearms Ban Act to a rifle, pistol, or shotgun, that are standard on firearms that are in common use by law-abiding citizens for lawful purposes throughout the United States to keep them in good working order;

H.      In violation of the Second and Fourteenth Amendments to the U.S. Constitution, the Firearms Ban Act prohibits law-abiding, responsible adults, including individual plaintiffs, as well as members and supporters of institutional plaintiffs, who would otherwise do so, from transferring a rifle, pistol, or shotgun listed in the Firearms Ban Act or that has features, attachments and/or parts that are standard on firearms that are in common use by law-abiding citizens for lawful purposes throughout the United States;

I.      In violation of the Second and Fourteenth Amendments to the U.S. Constitution, the Firearms Ban Act's prohibitions extend into Plaintiffs' homes, where the Second and Fourteenth Amendments' Amendment protections are at their zenith, but also infringes upon lawful and constitutionally protected conduct such as self-defense, hunting, recreational shooting, and competitive marksmanship participation;

J.      In violation of the Second Amendment to the U.S. Constitution, the Firearms Ban Act requires Plaintiffs to register their banned firearms if they desire to keep them.

**K.**     Based upon the foregoing, Defendants cannot satisfy their burden of providing

sufficient historical sources to prove a broad and enduring American tradition of justifying the

Firearms Ban Act's restrictions on the Second and Fourteenth Amendments' right of residents of

the State of Illinois and/or Plaintiffs, to acquire, possess, transfer, transport, and use firearms,

their attachments and/or parts that are in common use by law-abiding adults throughout the

United States for the core right of defense of oneself, their families and their homes and other

lawful purposes; and

**L.**     Based upon the foregoing, Defendants justify their ban simply by calling these

commonly owned firearms, their attachments and/or parts "assault weapons" or "weapons of

war," because the clear historical tradition in this country has always been for the prevailing

small arms technology of the day to be available to "ordinary, everyday, law-abiding,

citizens."[64]/

**181.**     Plaintiffs have incurred great expenses in attorneys' fees and court costs in being

forced to bring the above-captioned action as a result of Defendants' unconstitutional violation

of their civil rights – expenses which should be reimbursed as authorized by *42 U.S.C. § 1988.*

**WHEREFORE,** Plaintiffs **FEDERAL FIREARMS LICENSEES OF ILLINOIS, an**

**Illinois not-for-profit corporation, GUNS SAVE LIFE, an Illinois not-for-profit**

**corporation, GUN OWNERS OF AMERICA, a California non-stock corporation and a**

**not-for-profit membership organization, GUN OWNERS FOUNDATION a Virginia non-**

**stock corporation and a not-for-profit legal defense and educational foundation,  PIASA**

**ARMORY, a  Missouri corporation, JASMINE YOUNG, a resident of Madison County,**

**Illinois,** and **CHRIS MOORE, a resident of Hardin County, Illinois** (collectively referred to

---

[64]/     *Bruen,* 124 S. Ct. at 2134.

hereinafter as "Plaintiffs"), pray this Court for the entry of an Order in their favor and against Defendants **JAY ROBERT "J.B." PRITZKER, in his official capacity as Governor of the State of Illinois, KWAME RAOUL, in his official capacity as Attorney General of the State of Illinois, and BRENDAN F. KELLY, in his official capacity as Director of the Illinois State Police,** (collectively referred to hereinafter as "Defendants"), as follows:

A.      Pursuant to ***F.R.C.P. 57*** and ***28 U.S.C. § 2201, and/or § 2202***, declaring that the prohibition on "assault weapons", as defined and mandated, by the Firearms Ban Act, violates Plaintiffs' constitutionally protected civil rights to "keep and bear arms", as recognized by the Second and Fourteenth Amendments to the U.S. Constitution, by generally prohibiting commonly owned firearms their attachments and/or parts defined as "assault weapons" in the Firearms Ban Act, and further declaring the allegations contained in paragraph number 331, subparagraph letters A through K,  of Count I;

B.      awarding Plaintiffs from Defendants a reimbursement of their attorneys' fees and costs associated with the above-captioned action as authorized by ***42 U.S.C. § 1988;*** and

C.      awarding Plaintiffs from Defendants such other and further relief this Court deems just and equitable in the premises.

## COUNT II

## TEMPORARY, PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

**206.**    Plaintiffs repeat and reallege their averments contained in all preceding paragraphs of the Complaint.

**182.**    Plaintiffs have a clearly and articulable right in need of protection – their Second and Fourteenth Amendment rights under the U.S. Constitution to "keep and bear arms".

**183.**    Plaintiffs' clearly and articulable right is presently and continuously injured by Defendants' threatened, due to a "chilling effect", and/or actual, enforcement of the Firearms Ban Act, insofar as its prohibition on "assault weapons" violates Plaintiffs' rights recognized by the Second and Fourteenth Amendments to the U.S. Constitution by precluding the acquisition, sale, purchase, possession (or possession without registration, in the case of existing firearms, attachments and/or parts) manufacture, use, importation, and transfer of firearms, their attachments and/or parts that are "typically possessed by law-abiding citizens for lawful purposes" nationwide.

**184.**    If not enjoined by this Court, Defendants will continue threatened, "chilling effect", and/or actual enforcement of the Firearms Ban Act in derogation of Plaintiffs' constitutionally protected civil rights.

**185.**    Nominal damages as a direct and proximate result of Defendants' threatened, causing a "chilling effect", and/or actual, violation of Plaintiffs' constitutionally protected civil rights are indeterminate, unascertainable and extremely difficult, if not impossible, to prove.

**186.**    As a result, Plaintiffs have no plain, speedy, and adequate remedy at law and, in any event, even if minimal monetary relief were available, it would not fully redress any harm suffered by Plaintiffs due to their inability to engage in constitutionally protected activity because of Illinois' ongoing enforcement of the unconstitutional Firearms Ban Act.

**187.**    The balancing of hardships and/or equities between Plaintiffs and Defendants weighs heavily in favor of Plaintiffs and against Defendants because Plaintiffs merely want to exercise their constitutionally protected civil rights in peace and Defendants want to violate Plaintiffs' constitutionally protected civil rights by threatened, causing "chilling effect", and/or actual, enforcement of the Firearms Ban Act in derogation of Plaintiffs' constitutionally

protected civil rights as recognized by the Second and Fourteenth Amendments to the U.S. Constitution.

188.    The public interest is served by this Court prohibiting the threatened,  causing a "chilling effect", and/or actual, enforcement of unconstitutional laws such as the Firearms Ban Act.

189.    Plaintiffs' likelihood of success on the merits of their claims is great in that they are very likely to prevail on the merits of the above-captioned action at trial, given the law as consistently articulated and rearticulated by the U.S. Supreme Court, even as recently as 2022.

190.    Accordingly, pursuant to *F.R.C.P. 65,* Plaintiffs are entitled to an injunction against the prohibition on "assault weapons", as defined and mandated by the Firearms Ban Act, because the Firearms Ban Act violates Plaintiffs' constitutionally protected civil rights to "keep and bear arms", as recognized by the Second and Fourteenth Amendments to the U.S. Constitution, by generally prohibiting commonly owned firearms and their attachments and/or parts defined as "assault weapons" in the Firearms Ban Act because:

A.    The Firearms Ban Act's definition of "assault weapon" – whether by express listing of make and model or by the presence of prohibited feature combinations – includes the most popular class, makes, and models of firearms and their attachments and/or parts in the nation;

B.    The Firearms Ban Act generally prohibits Illinois residents or those visiting Illinois from the acquisition, importation, use, possession, and transfer of such firearms, their attachments and/or parts, subject to severe criminal penalties, including up to many years in prison;

**C.**     The Firearms Ban Act's prohibitions and restrictions on firearms, their attachments and/or parts that are commonly possessed throughout the United States by law-abiding, responsible citizens for all manner of lawful purposes infringe on the right of the residents of the State of Illinois, including Plaintiffs and their members and supporters, to "keep and bear protected arms" as guaranteed by the Second Amendment of the U.S. Constitution, and as made applicable to the State of Illinois by the Fourteenth Amendment of the U.S. Constitution;

**D.**     In violation of the Second and Fourteenth Amendments to the U.S. Constitution, the Firearms Ban Act prohibits law-abiding, responsible adults, including individual plaintiffs, as well as members and supporters of institutional plaintiffs, who would otherwise do so, from acquiring a rifle, pistol, or shotgun listed in the Firearms Ban Act or that has features, attachments and/or parts that are standard on firearms that are in common use by law-abiding citizens for lawful purposes throughout the United States;

**E.**     In violation of the Second and Fourteenth Amendments to the U.S. Constitution, the Firearms Ban Act prohibits law-abiding, responsible adults, including individual plaintiffs, as well as members and supporters of institutional plaintiffs, who would otherwise do so, from possessing a rifle, pistol, or shotgun listed in the Firearms Ban Act or that has features, attachments and/or parts that are standard on firearms that are in common use by law-abiding citizens for lawful purposes throughout the United States;

**F.**     In violation of the Second and Fourteenth Amendments to the U.S. Constitution, the Firearms Ban Act prohibits law-abiding, responsible adults, including individual plaintiffs, as well as members and supporters of institutional plaintiffs, who would otherwise do so, from adding features, attachments and/or parts which are listed in the Firearms Ban Act to a rifle,

pistol, or shotgun, that are standard on firearms that are in common use by law-abiding citizens for lawful purposes throughout the United States;

G.      In violation of the Second and Fourteenth Amendments to the U.S. Constitution, the Firearms Ban Act prohibits law-abiding, responsible adults, including individual plaintiffs, as well as members and supporters of institutional plaintiffs, who would otherwise do so, from maintaining in good working order any rifle, pistol or shotgun affected under the ban, and impedes a right to obtain "attachments" and/or parts which are listed in the Firearms Ban Act to a rifle, pistol, or shotgun, that are standard on firearms that are in common use by law-abiding citizens for lawful purposes throughout the United States to keep them in good working order;

H.      In violation of the Second and Fourteenth Amendments to the U.S. Constitution, the Firearms Ban Act prohibits law-abiding, responsible adults, including individual plaintiffs, as well as members and supporters of institutional plaintiffs, who would otherwise do so, from transferring a rifle, pistol, or shotgun listed in the Firearms Ban Act or that has features, attachments and/or parts that are standard on firearms that are in common use by law-abiding citizens for lawful purposes throughout the United States;

I.      In violation of the Second and Fourteenth Amendments to the U.S. Constitution, the Firearms Ban Act's prohibitions extend into Plaintiffs' homes, where the Second and Fourteenth Amendments' Amendment protections are at their zenith, but also infringes upon lawful and constitutionally protected conduct such as self-defense, hunting, recreational shooting, and competitive marksmanship participation;

J.      In violation of the Second Amendment to the U.S. Constitution, the Firearms Ban Act requires Plaintiffs to register their banned firearms if they desire to keep them;

**K.**     Based upon the foregoing, Defendants cannot satisfy their burden of providing

sufficient historical sources to prove a broad and enduring American tradition of justifying the

Firearms Ban Act's restrictions on the Second and Fourteenth Amendments' right of residents of

the State of Illinois and/or Plaintiffs, to acquire, possess, transfer, transport, and use firearms,

their attachments and/or parts that are in common use by law-abiding adults throughout the

United States for the core right of defense of oneself, their families and their homes and other

lawful purposes; and

**L.**     Based upon the foregoing, Defendants justify their ban simply by calling these

commonly owned firearms, their attachments and/or parts "assault weapons" or "weapons of

war," because the clear historical tradition in this country has always been for the prevailing

small arms technology of the day to be available to "ordinary, everyday, law-abiding,

citizens."[65]/

**191.**     Plaintiffs have incurred great expenses in attorneys' fees and court costs in being

forced to bring the above-captioned action as a result of Defendants' unconstitutional violation

of their civil rights – expenses which should be reimbursed as authorized by *42 U.S.C. § 1988.*

**WHEREFORE,** Plaintiffs **FEDERAL FIREARMS LICENSEES OF ILLINOIS, an**

**Illinois not-for-profit corporation, GUNS SAVE LIFE, an Illinois not-for-profit**

**corporation, GUN OWNERS OF AMERICA, a California non-stock corporation and a**

**not-for-profit membership organization, GUN OWNERS FOUNDATION a Virginia non-**

**stock corporation and a not-for-profit legal defense and educational foundation,  PIASA**

**ARMORY, a  Missouri corporation, JASMINE YOUNG, a resident of Madison County,**

**Illinois,** and **CHRIS MOORE, a resident of Hardin County, Illinois** (collectively referred to

---

[65]/     *Bruen, 124 S. Ct. at 2134.*

hereinafter as "Plaintiffs"), pray this Court for the entry of an Order in their favor and against Defendants **JAY ROBERT "J.B." PRITZKER, in his official capacity as Governor of the State of Illinois, KWAME RAOUL, in his official capacity as Attorney General of the State of Illinois, and BRENDAN F. KELLY, in his official capacity as Director of the Illinois State Police** (collectively referred to hereinafter as "Defendants"), as follows:

A.     Pursuant to *F.R.C.P. 65,* enjoining the prohibition on "assault weapons", as defined and mandated, by the Firearms Ban Act, violates Plaintiffs' constitutionally protected civil rights to "keep and bear arms", as recognized by the Second and Fourteenth Amendments to the U.S. Constitution, by generally prohibiting commonly owned firearms and their attachments and/or parts defined as "assault weapons" in the Firearms Ban Act, and further declaring the allegations contained in paragraph number 504, subparagraph letters A through K, of Count II;

B.     preliminarily and permanently enjoining the Illinois's registration requirement found in 720 Ill. Comp. Stat. Ann. 5/24-1.9(d);

C.     awarding Plaintiffs any and/or all remedies authorized by *42 U.S.C. § 1983* including, but not limited to, nominal damages

D.     awarding Plaintiffs from Defendants a reimbursement of their attorneys' fees and costs associated with the above-captioned action as authorized by *42 U.S.C. § 1988;* and

E.     awarding Plaintiffs from Defendants such other and further relief this Court deems just and equitable in the premises.

**Dated: September 13, 2024.**

                              **Respectfully submitted,**

                              **FEDERAL FIREARMS LICENSEES OF ILLINOIS, an Illinois not-for-profit corporation**

**GUNS SAVE LIFE, an Illinois not-for-profit corporation, GUN OWNERS OF AMERICA, a California non-stock corporation and a not-for-profit membership organization, GUN OWNERS FOUNDATION, a Virginia non-stock corporation and not-for-profit legal defense and educational foundation, PIASA ARMORY, a Missouri corporation, JASMINE YOUNG, a resident of Madison County, Illinois, and CHRIS MOORE, a resident of Hardin County, Illinois.**

By:     _/s/ C.D. Michel_____
                **One of Their Attorneys**

**ATTORNEYS FOR PLAINTIFFS:**
**Mark L. Shaw, Esq.**
**Jennifer Craigmile Neubauer, Esq.**
**Michael A. Danforth, Esq.**
**SHAW LAW LTD.**
**33 North County Street, Suite 300**
**Waukegan, Illinois 60085**
**(T): (847) 244-4696**
**(F): (847) 244-4673**
**(E-1): _mlshaw@shawlawltd.com_**
**(E-2): _jcneubauer@shawlawltd.com_**
**(E-3): _michael@danforthlawgroup.com_**
_____

**C.D. Michel, Esq. (_Pro Hac Vice_)**
**Sean A. Brady, Esq. (_Pro Hac Vice_)**
**Konstadinos T Moros, Esq. (_Pro Hac Vice_)**
**MICHEL & ASSOCIATES, P.C.**
**180 Ocean Boulevard, Suite 200**
**Long Beach, California 90802**
**(T): (562) 216-4444**
**(F): (562) 216-4445**
**(E-1): _cmichel@michellawyers.com_**
**(E-2): _sbrady@michellawyers.com_**
**(E-3): _kmoros@michellawyers.com_**